**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.*, | * | |
| VICTOR E. BIBBY and BRIAN J. | * | CIVIL ACTION FILE NO. |
| DONNELLY, | * | |
| | * | 1:12-CV-04020-AT |
| RELATORS/PLAINTIFFS, | * | |
| | * | |
| vs. | * | |
| | * | |
| MORTGAGE INVESTORS | * | |
| CORPORATION and | * | |
| WILLIAM L. "Bill" EDWARDS, | * | |
| | * | |
| DEFENDANTS. | * | |

## RELATORS' THIRD AMENDED COMPLAINT

COME NOW RELATORS VICTOR E. BIBBY and BRIAN J.

DONNELLY, by and through counsel of record, Butler, Wooten Cheeley & Peak

LLP, Wilbanks & Bridges LLP, and Phillips and Cohen LLP and file this their

Third Amended Complaint.  Relators add to this action as a party defendant one

William L. Edwards ("Bill Edwards").[1]  Relators also add herein paragraphs 10, 12

---

[1] On information and belief "William L. Edwards" is the legal name of MIC's
CEO.  Apparently he changed his name in the early 1970s "to distance himself
from his time in the Marines."  Apparently his name formerly was "Edward

and 14 and add Counts II – IX.  Consistent with those additions, Relators also add

prayers for relief (f)-(m).[2]

## **INTRODUCTION**

### 1.

This is an action to recover damages and civil penalties on behalf of the

United States of America arising from false and/or fraudulent records, statements

and claims made and caused to be made by Defendants Mortgage Investors

Corporation ("MIC") and Edwards, and/or its or his agents, employees, and co-

conspirators in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

### 2.

Defendant MIC has engaged in a brazen scheme to defraud both our nation's

veterans and the United States treasury of millions of dollars in connection with

home loans guaranteed by the United States Department of Veterans Affairs

("VA").

---

Francis Sylvia III."  Source:  April 18, 2011 article, Tampa Bay Times.
[2]Relators have also amended certain paragraphs to substitute "Defendant MIC" for
the term "Defendant lenders" or "lenders" in certain paragraphs incorporated from
the Second Amended Complaint.  Relators have also amended certain paragraphs
herein to comport with this Court's Order regarding the companion case of *United
States ex rel Bibby et al. v. Wells Fargo* WF Doc. 467.  Those amendments appear
in the following paragraphs of this Third Amended Complaint: 24, 46, 51, 55, and
58.  In addition, Relators have removed paragraphs discussing lenders who have
settled or who have been severed from this action.

3.

To allow veterans to take advantage of low interest rates, while also
protecting those veterans from the predations of unscrupulous lenders, Congress
authorized and the VA established the Interest Rate Reduction Refinancing Loans
("IRRRL") program.  Through this program, veterans are allowed to refinance
their existing VA home loans.  The program is designed to protect veterans from
paying excessive fees and charges in the refinancing transaction.

4.

Defendant MIC has repeatedly violated the rules of the IRRRL program.
Rather than comply with those rules, Defendant MIC over-charged veterans,
charged unallowable fees, and then deliberately concealed those facts from the VA
to obtain taxpayer-backed guarantees for the loans, which would not have been
available but for that concealment.  At the same time, Defendant MIC falsely
certified to the VA, in writing, that it was *not* charging unallowable fees.

5.

Defendant MIC has submitted false and fraudulent documents, records and
claims to the United States to fraudulently induce the VA to guarantee IRRRLs.
Many of those IRRRLs have gone into default or resulted in foreclosure, which has
resulted in massive damages.  Under the False Claims Act, Defendant MIC is

3

liable to the United States for all damages resulting from those fraudulently induced guarantees of IRRRLs, as well as Civil Monetary Penalties ("CMPs") of up to $11,000 for each violation of the False Claims Act.

## **THE PARTIES**

6.

VICTOR E. BIBBY ("Relator Bibby") was President and CEO of U.S. Financial Services, Inc. d/b/a Veteran's Mortgage Company.  U.S. Financial Services is a Georgia corporation which operated offices and provided mortgage services as a licensed mortgage broker in seven (7) U.S. states (Georgia, Florida, Alabama, South Carolina, North Carolina, Tennessee and Texas).

7.

BRIAN J. DONNELLY ("Relator Donnelly") was Vice-President of Operations of U.S. Financial Services, Inc. d/b/a Veteran's Mortgage Company ("U.S. Financial").  He is a licensed mortgage loan officer in Georgia, North Carolina and Tennessee.

8.

Relator BIBBY resides in Fulton County, Georgia.  Relator DONNELLY resides in Cherokee County, Georgia.  They bring this *qui tam* action based upon

4

direct and unique information they possess with regard to the specific fraudulent

acts of Defendant MIC set forth and described with particularity hereafter.

9.

Defendant MIC is an Ohio corporation is a financial services entity, whose

business is in part the making of VA home loans, guaranteed by the United States

Government.  Defendant MIC has a principal office address of 6090 Central

Avenue, St. Petersburg, FL 33707-1622.  Defendant MIC during all relevant times

hereafter described did transact, and does now presently transact, its lending

business in the State of Georgia and within the Northern District of Georgia.

Defendant MIC has been properly served through its registered agent and is subject

to the jurisdiction of this Court.

10.

Defendant WILLIAM L. "BILL" EDWARDS is the CEO, majority

shareholder and Chairman of the Board of Directors of MIC.  Edwards is an

individual resident of the state of Florida who can be served at his home address in

Saint Petersburg, FL.  Edwards has committed tortious injury in this state caused

by acts or omissions both within this state and outside this state and has engaged in

a conspiracy with Defendant MIC and its other officers, employees, and agents to

commit tortious acts or omissions and cause tortious injury in Georgia against

Georgia residents.  Mr. Edwards derives substantial revenue from business activities within this state, as a result of his having control of MIC as Chairman, CEO, and owner of 77.5% of its stock, and as a result of his being employed by Defendant MIC.  A substantial part of the xxx dollars Edwards received during 2012-2014 when he looted the assets of MIC was derived from business activities by MIC and Edwards within the state of Georgia.

## JURISDICTION AND VENUE

### 11.

This Court has jurisdiction over this *qui tam* action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b).  Relators are the original source of the facts and details contained in the Second Amended Complaint, restated in this Third Amended Complaint.  Relators instituted this action in the name of the United States of America as contemplated by the Civil False Claims Act, 31 U.S.C. §§ 3729-33 ("False Claims Act").

### 12.

This court has jurisdiction over Relators' claims against MIC and Edwards for fraudulent transfer, fraud, fraud on the court, and civil conspiracy pursuant to 28 U.S.C.A. § 1367.

13.

Venue is appropriate as to Defendant MIC because said Defendant can be found in, resides in, and/or transacts business in this judicial district. Additionally, acts proscribed by the False Claims Act have been committed by the Defendant MIC in this judicial district. Therefore, within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a), venue is proper.

14.

Venue is appropriate as to the claims against MIC and Edwards for fraudulent transfer, fraud, fraud on the court and civil conspiracy because a substantial part of the events or omissions giving rise to the claim occurred in this state and district and because MIC and Edwards are subject to personal jurisdiction in this district within the meaning of 28 U.S.C. § 1391(b)(2) and (b)(3). This Court also has pendent venue over the claims because the claims arise out MIC's and Edwards' continuation of MIC's long term scheme to defraud the government, first through FCA violations, then by transferring and hiding assets in an attempt to render MIC effectively judgment-proof and thereby evade the already-established jurisdiction of this Court over MIC.

15.

Relators have long ago presented the Government with timely disclosures regarding the False Claims Act violations described herein as required by 31 U.S.C. § 3730 (b)(2).

## APPLICABLE LAW

16.

31 U.S.C. § 3729(a)(1)(A) provides that *any person* who knowingly presents or causes to be presented to the United States any false or fraudulent claim for payment or approval is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person. The current civil penalty is not less than $5,500 and not more than $11,000 per false claim made.  20 C.F.R. § 356.3.

17.

31 U.S.C. § 3729(a)(1)(B) provides that *any person* who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person.  The current civil penalty is not less than $5,500 and not more than $11,000 per false claim made.  20 C.F.R. § 356.3.

18.

The False Claims Act defines a "claim" to include any request or demand made upon an agency of the United States for payment of money.  31 U.S.C. § 3729(b)(2).  As a result of foreclosures of IRRRLs, Defendant MIC has made such claims upon the Government.  As a result of their notification to the VA of defaults of IRRRLs which did not result in foreclosures, Defendant MIC has caused the Government to expend substantial sums which also amount to a "claim."  A false claim exists whenever the United States incurs any cost or is asked to pay any amount in connection with a fraudulently induced guaranty.

19.

No proof of specific "intent" to defraud is required to prove a False Claims Act violation.  The terms "knowing" and "knowingly" are defined to mean that *a person* (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1).

## **BACKGROUND**

20.

IRRRLs are provided to retired or active duty veterans to refinance homes they already own.  IRRRLs are available to all veterans who currently have a VA

9

home loan. The program is designed to give veterans the opportunity to lower their current interest rates or shorten the terms of existing home mortgages. *See* 38 C.F.R. § 36.4223.

21.

Because the loans are for veterans, and because the loans are for lower refinancing payments, and because the loans are guaranteed by the taxpayers, both the type and amount of fees that can be imposed by lenders are strictly limited.

22.

The IRRRL guarantees obligate the United States Government to incur monetary expenses and pay monetary claims to lenders after default, if and when a default occurs.

23.

Ensuring that veterans are not burdened with excessive fees is one of the primary aims of the IRRRLs. The official policy is explicit, unambiguous, and published to lenders:

> The VA home loan program involves a veteran's benefit. VA policy has evolved around the objective of helping the veteran to use his or her home loan benefit. Therefore, VA regulations limit the fees that the veteran can pay to obtain a loan.

10

*See* VA Pamphlet 26-7, Ch. 8, 8-2.  Because of this policy, the VA has stated that "[l]enders must *strictly adhere* to the limitation on borrower-paid fees and charges when making VA loans."  *Id.* (emphasis added).  This policy is violated when the lender charges unallowable fees to the veteran, circumventing the underlying objectives of the VA IRRRL Guaranty Program.

24.

Because the amount of fees that can be charged are limited by law, lenders originating IRRRLs may only receive a "flat charge not exceeding 1 percent of the amount of the loan" as fees.  38 C.F.R. § 36.4313(d)(2).  (Lenders typically refer to this as the "origination fee.")  In addition to that 1% "flat charge," lenders may also charge "reasonable and customary amounts" for certain specified other costs actually incurred by the lender.  *Id.* at § 36.4313(d)(1).  Those allowable fees which the lender may charge include things such as "recording fees and recording taxes," fees for a "credit report," and fees for "title examination and title insurance."  *Id.*  *Such allowable fees must be reasonable and necessary, they can neither have other unallowable fees bundled into them nor may they be excessive.*  Lenders may also charge for those fees which must be paid to the VA.  *Id.* at § 36.4313(e).  The specified allowable fees that may be charged to a veteran in an

11

IRRRL do not include "attorneys fees," other unallowable charges, or excessive charges for otherwise unallowable fees.

25.

VA rules specify that "the lender *may not charge* the borrower [veteran] for attorneys fees."  VA Pamphlet 26-7, Ch. 8, 8-8.

26.

Lenders and/or their brokers almost always charge the 1% "flat charge." When they do, lenders may not charge separately for attorneys fees, because doing so would cause the "flat charge" to exceed the maximum 1%.  *See* VA Pamphlet 26-7, Ch. 8, 8-8.

27.

Lenders are required to affirmatively represent to the VA, by written certifications, that they have fully complied with the law and with VA rules and regulations in processing an IRRRL.  The lender's written certifications are a condition precedent to the VA's issuance of a loan guaranty.

28.

If a lender charges unallowable fees, *or* charges more than the maximum 1% "flat charge" on an IRRRL, the lender is not entitled to a taxpayer-backed guaranty.  The federal law is explicit:

12

> *No charge shall be made* against, or paid by, the borrower incident to
>
> the making of a guaranteed or insured loan other than those expressly
>
> permitted under paragraph (d) [e.g. recording fees, credit report, title
>
> examination fees and title insurance] or (e) [fees payable to the VA]
>
> of this section, and *no loan shall be guaranteed* or insured unless the
>
> lender certifies to the Secretary that it has not imposed and will not
>
> impose any charges or fees against the borrower in excess of those
>
> permissible under paragraph (d) or (e) of this section.

38 C.F.R. § 36.4313(a) (emphasis added).

29.

Lenders regularly and routinely lie to the Government.  Lenders regularly
and routinely charge the veterans for attorneys fees and impose charges in excess
of the maximum 1% "flat charge," exclusive of those allowable fees specified by
subsections (d) and (e).  Lenders regularly and routinely hide those excessive
charges on the standard forms which lenders are required to provide to the VA.
For example, lenders regularly and routinely inflate the charge for "title
examination fees" above the "reasonable and customary amounts" of such
examinations by adding the attorneys fees to the amount which the lender has
represented to the veteran and to the VA was attributable to "title examination

13

fees" or to some other allowable fee.  Lenders such as MIC conceal that conduct from the VA and from the veteran who is taking out the loan.  Defendant MIC is guilty of such misconduct.

30.

By paying unallowable attorneys fees to the lender's closing attorney from the IRRRL proceeds, the lenders charged those fees to the veteran.

31.

By paying attorneys fees from the loan proceeds, the lenders almost always took more than the maximum allowable 1% "flat charge."

32.

No loan with respect to which such misconduct has occurred qualifies for a taxpayer-backed guaranty.

33.

As a matter of law, any loan with respect to which the lender has imposed charges or fees against the borrower "in excess of those permissible" by law "shall" not be entitled to a taxpayer-backed guaranty, and any guaranty issued with respect to such loan is void.  38 C.F.R. § 36.4313(a).

14

34.

Federal regulations prohibit the VA from guaranteeing an IRRRL where the lender has imposed fees against the borrower "in excess of those permissible" by law and where the lender has falsely certified its compliance with the law.

35.

Lenders have deceived the Government and the veterans for the express purpose of obtaining a taxpayer-backed guaranty which the lenders knew they were not legally entitled to obtain.

36.

After IRRRLs have gone into default, lenders have presented claims to the Government based upon guarantees which the lenders knew were obtained by the lenders' fraud.

37.

Ignorant of the lenders' misconduct and of the fact loans tainted by lender misconduct did not qualify for a guaranty, the Government has, through the VA, paid lenders based on guarantees which should not have been issued.  When the VA loans are refinanced under the IRRRL program, thousands of dollars of expenses associated with each IRRRL are added to the loan balance guaranteed by the Government.

38.

According to data submitted by the VA to Congress, the VA has paid more than $2.5 billion dollars in guaranty claims on direct and IRRRLs to lenders since 2001.

39.

In addition to paying lenders directly based on guarantees that should never have been issued, the Government has, through the VA, incurred enormous expenses and administrative costs on loans that did not qualify for Government guarantees, after receiving notice of default from the lenders.

40.

Those losses to the taxpayers resulted directly from guarantees that the Defendant MIC obtained illegally from the Government.  The guarantees were based upon Defendant MIC's false representations to the Government that Defendant MIC had complied with the law and had not imposed charges or fees in excess of those permissible.

41.

The imposition of unallowable charges combined with the false certifications of compliance for the purpose of illegally obtaining a taxpayer-backed guaranty is a violation of the False Claims Act.

## OPERATIVE FACTS

### 42.

The following is a brief description of the typical process which results in an IRRRL backed by a VA-issued guaranty issued to the lender.

(a)     A veteran borrower contacts a lender or licensed mortgage broker (such as U.S. Financial Services) to originate the loan.

(b)     If a broker is involved, the broker works with the veteran to complete a loan application and assists in gathering the documentation required by the lender.

(c)     Before a broker can originate a loan, the broker must be sponsored by an approved VA lender.  If a lender originates the loan, no broker is needed.

(d)     The lenders – not the brokers – actually make and service IRRRLs.

(e)     The lender must approve the loan application and approve the IRRRL prior to closing.

(f)     *It is the lender's responsibility* to make sure the loan conforms to all federal regulations and VA guidelines governing the IRRRL program. The lenders are not supervised by the VA.  The lenders are required to properly educate and supervise their employees regarding the legal

requirements established by Congress and the VA in order for a lender

to participate in the IRRRL program.

(g) After *the lender* has approved the loan and the loan documentation,

*the lender* gives closing instructions to the attorney or title company

handling the closing *for the lender*.

(h) The lender or its agent prepares a HUD-1 statement ("HUD form").

The HUD form lists all of the closing costs and fees. *The lender* must

review for accuracy and confirm the information reflected on the

HUD form before the closing occurs. After that approval, the lender's

closing agent closes the loan in accordance with specific instructions

*provided by the lender*.

(i) When the loan is closed, the lender sends a copy of the HUD form to

the VA. *The lender* certifies the accuracy of the loan documentation

to the VA through the use of VA Form 26-1820, "Loan Report and

Certification of Loan." This form requires that *the lender* specifically

certify to the VA that there are no unallowable charges and the law

has been followed.

(j) The veteran has three days to rescind or cancel the loan after the

closing. If the loan is not cancelled, the attorney/title company

18

completes the funding of the loan with the wired funds provided by the lender.

(k)     The VA then issues a Government guaranty to the lender, explicitly predicated upon the lender's written certifications of compliance with the law.  No guaranty can be issued unless the lender expressly certifies to the Government that its representations are accurate and truthful.

43.

The HUD form is the key document.  *The lenders* are required to complete that document and to certify to the VA that it is accurate and truthful.  The HUD form has "lines" on which the lender is required to reveal what actual costs it has incurred and is charging for specific items delineated on every HUD form.  For example, attorneys fees are to be disclosed on Line 1107; title search fees are to be disclosed on Line 1102; and title examination fees are to be disclosed on Line 1103.

44.

U.S. Financial Services specializes in the brokering and origination of VA loans, including IRRRLs.  The company has originated thousands of VA IRRRLs

in seven states since 2001.  Relators Bibby and Donnelly have originated IRRRLs

for U. S. Financial Services since 2001.

45.

As a broker, Relators work directly with veteran borrowers and coordinate

the loan refinancing process on the veteran borrower's behalf.  Brokers help the

veteran borrower choose an approved lender and complete the application the

lender requires from the veteran.

46.

*The lenders* instruct brokers such as the Relators how to prepare the loan

package for an IRRRL.  One form lenders require that brokers prepare is the

"Good Faith Estimate" of fees and charges.  The "Good Faith Estimate" is part of

the veteran's loan package but is not sent to the VA.  It was Relators' practice to

show on the "Good Faith Estimate" form the anticipated charges for attorneys fees.

The lender would then be responsible for including the actual amount for attorneys

fees on the HUD form.  The lenders, however, would alter the HUD form to

remove the reference to charges for attorneys fees.  The lenders would inflate the

fee charged for "title examination" or "title search" or "title insurance" by the

amount in whole or in part charged for attorneys fees – thereby hiding the

attorneys fees charge by bundling such unallowable fees into an allowable fee.  In

20

some instances, lenders would charge unallowable or excessive fees to the veteran and would disclose such unlawful charges on the face of the HUD form, yet certify that such unlawful fees were not being charged.

47.

Subsequently, lenders instructed Relators not to show an amount charged for attorneys fees on the "Good Faith Estimate" at all, but directed Relators to add attorneys fees to the charge shown for "title examination fee."

48.

Suspicious of such actions and instructions from the lenders, Relators contacted the VA for guidance.  The VA told Relators to refer to the VA Lender Handbook for program guidelines.

49.

The VA Lender Handbook is a compilation of the federal regulations and VA guidelines that govern what charges and fees are allowed and not allowed for VA IRRRLs.

50.

After reviewing the VA Lender Handbook, Relators learned for the first time that the lenders were not truthfully reporting costs and charges on HUD forms. The VA Lender Handbook specifies that all charges and fees imposed on the

veteran/borrower by a lender are capped at 1% of the loan amount (referred to as the "flat charge" or "loan origination fee"), except for certain allowable charges and fees listed in 38 C.F.R. § 36.4313(d) and (e).  "Attorneys fees" are not listed as an allowable fee.  Thus any such attorneys fees charged to the veteran/borrower must come out of the 1% "flat charge" allowed by the regulations.  Fees for "title examination" are, however, a specifically allowed additional charge.  The *actual* amount paid for the title examination is supposed to be reported separately on Line 1103 of the HUD form.  The *actual* amount paid for the title search is supposed to be reported separately on Line 1102 of the HUD form.

51.

VA regulations prohibit a lender from charging more than a reasonable and customary amount to have title work done.  38 U.S.C. § 36.4313(d)(1)(vii) (referring to "title examination").  The actual cost of title work (title examination or title search) ranges from approximately $125.00 to $200.00 (according to regional and national data that track title examination and title search fees across the United States).  Relators have closed thousands of IRRRLs.  They also have reviewed numerous fee sheets and written quotes from closing attorneys and title companies specifying actual fees for title work for VA loans.  Through that experience and based upon that review, Relators have determined that Defendant

22

MIC has been charging veterans for title work in excess of their actual costs.

Defendant MIC has inflated the amounts attributed to either "title examination" or

"title search" for the purpose of hiding the fact that they were charging veterans for

unallowable attorneys fees and other fees.  Other allowable fees, such as title

insurance premiums, must also be reasonable and customary.  Defendant MIC has

inflated the amounts attributed to "title examination," "title search," or "title

insurance" for the purpose of hiding the fact that it was charging veterans for

unallowable attorneys fees and other unallowable fees.

52.

For years, the lenders misled Relators, reporting that attorneys fees and other

unallowable fees were "allowable" charges, even when the 1% origination fee was

exceeded.  That was false.

53.

Rather than using the lines on the HUD form for "title examination" and

"title search" to accurately report the actual cost of title work, Defendant MIC has

been and is including undisclosed attorneys fees and other unallowable fees in the

amounts it represents for "title examination" or for "title search."  In other words,

Defendant MIC is fraudulently reporting costs and fees in excess of what should be

listed on Lines 1102 and 1103.  The result is that Defendant MIC reports, on Lines

23

1102 and 1103 of the HUD forms, charges supposedly incurred for title

examination and title search fees in amounts ranging from $525 to $1200, when in

fact the total cost of title examination and title search fees should amount to only

$125 to $200.  By that deceit, Defendant MIC has improperly lumped unallowable

costs with allowable costs.  The intended result is that the veteran/borrower is

charged excessive and illegal fees at closing.

54.

Although brokers, such as Relators, do not attend the closings or prepare

HUD forms, the lender sends the brokers a copy of the HUD form after the loan

closes.  By examining the HUD form after the closing, Relators could see how the

lenders were concealing illegal charges to the veteran.

55.

Relators also discovered that Defendant MIC's illegal dumping of

unallowable fees was not limited to Lines 1102 and 1103 of the HUD form.

Defendant MIC also concealed unallowable charges on lines of the HUD form

intended for other allowable fees and have also bundled or inflated allowable

charges in excess of what is reasonable and customary in contravention of VA

regulations.

56.

The most typical unallowable charge that was bundled in with charges on Line 1102 or 1103 was attorneys fees.  Any attorneys fees paid should have been listed on Line 1107 of the HUD forms.  The vast majority of the IRRRLs which contained unallowable charges simply left Line 1107 blank – thereby representing to the VA and to the veteran that no attorneys fees were incurred or charged.  That was false.  The attorneys fees were illegally added by the lender to Lines 1102 or 1103 – which were lines on the HUD form specifically designed for the reporting of other fees or charges, not for attorneys fees.  That deceptive practice is a False Claims Act violation.

57.

In their investigation, Relators reviewed hundreds of specific HUD forms, including such forms prepared by Defendant MIC' closing agents, and found HUD forms where the lender's attorneys fees were hidden and not disclosed on Line 1107 or anywhere else on the HUD form.  The lenders hid those attorneys fees by adding the amount for attorneys fees to other lines on the HUD form, which were intended to disclose other fees or charges which were legal and allowable. Relators have identified such fraudulent transactions committed by Defendant MIC.

25

58.

Lenders are required to certify to the VA that no such attorneys fees or other unallowable fees or excessive fees were charged to the veteran.  Lenders did so, but those written certifications were false.

59.

Lenders are required to disclose any attorneys fees incurred by them, even though lenders cannot legally charge the veteran for those fees as part of the loan amount.  Lenders did not disclose the fees paid to the closing attorneys to the veteran or to the VA.

60.

The result of lenders hiding attorneys fees and falsely inflating other costs and charges on the HUD form is that on average $400 or more is stolen from the veteran at the time of closing and paid out of the loan proceeds.  This means that the amount of the IRRRL being guaranteed by the U. S. taxpayers is illegally inflated by $400 or more per loan closing.

61.

The Government incurs costs for these IRRRLs when they go into default.

62.

If an IRRRL goes into default, after the 61st day of non-payment, the VA

regulations require the lender to notify the veteran borrower and the VA that the

loan is in default.  The lender and the VA then commence intervention activities

that cause the VA to expend resources and money.

63.

The VA uses several different intervention approaches when an IRRRL goes

into default.  The VA may opt to:  (1) work with the borrower to cure the

delinquency/default; (2) pursue forbearance, reamortization, modification and/or

repayment; (3) provide VA financial assistance; (4) authorize the private sale of

the property, with the VA paying part of the loan balance based upon the guaranty;

(5) obtain a deed in lieu of foreclosure from the veteran borrower, with the VA

paying off the guaranteed loan in part; (6) authorize the lender to foreclose so the

VA can then purchase the foreclosed property from the lender for the loan amount;

or (7) allow foreclosure and pay the lender under the terms of the guaranty.

64.

The VA also reimburses the servicing lender for costs incurred by the lender

to protect the collateral during the default process.  An intervention in the post-

default scenario by the lender can also entitle the lender to receive a bonus from

the VA for success in dealing with the default.  That means the Government incurs

damage post-default on IRRRLs, even if the default is ultimately cured.  It is a fact

that the Government has incurred enormous expenses on guaranteed loans after

default even in those instances when the default was cured prior to foreclosure.

65.

When the lender has charged the veteran borrower for an unallowable cost,

and when the lender has falsely certified compliance with express conditions

precedent to the issuance of the VA guaranty, a False Claims Act violation has

occurred.  The False Claims Act claim is complete when the IRRRL that was

procured through fraud goes into default, requiring the VA to spend funds because

of its guaranty exposure.  At that point, the lender is liable for both False Claims

Act damages and civil monetary penalties.

66.

After it became known to Relators in late 2005 that IRRRL lenders were

defrauding the veterans and the Government, Relators promptly obtained counsel

(Wilbanks & Bridges) who notified the Government of the fraudulent schemes.

Relators provided explanations and proof to the Government of the illegal

overcharging and inclusion of unallowable costs.  Relators provided to the

Government copies of hundreds of HUD forms containing unallowable costs that

proved the lenders were routinely and systematically hiding and shifting fees on IRRRLs made in multiple states.

## IMPACT OF VA LOAN FRAUD ON AMERICAN TAXPAYERS

67.

Over 1,100,000 IRRRLs have been guaranteed by the VA from 2001 through 2011.  According to the Office of Inspector General for the Department of Veterans Affairs ("VA-OIG"), the nationwide default rate for IRRRLs is 18% or higher.  The total number of IRRRLs going into default routinely exceeds 100,000 per year.  According to the Government Accounting Office, the average number of IRRRL defaults occurring from 1996 to 2000 was 122,000 per year.

68.

According to reports made annually to Congress, approximately 50% of the VA loans that go into default end up in a foreclosure proceeding.  The average cost to the VA from a foreclosed guaranteed loan is approximately $22,000 per loan. The Government losses do not cease when foreclosure occurs.  For example, in fiscal year 2009, the VA reported that the cost of managing the foreclosed properties obtained by the Government after default and foreclosure exceeded $16,000 per loan.

69.

The VA goes to great effort to avoid foreclosure on loans issued to veterans. On average, a VA loan in default does not reach foreclosure for over 100 months. During that time period the Government incurs expenses because of its IRRRL guaranty exposure.

70.

Taxpayers have lost massive amounts over the last decade because of expenses incurred on foreclosed IRRRLs and defaulted IRRRLs.  According to the VA Director of Loan Guaranty Services, the average cost to the VA of a default on an IRRRL exceeds $15,000 per loan, even when the VA is successful in avoiding foreclosure.  Such "successful" interventions occur in approximately 30-35% of the cases where a default occurs.  While these "successful interventions" are better results for the taxpayers than foreclosures, the $15,000 damage per "successful" intervention is still a tremendous loss to the taxpayers.

71.

The losses to the Government are not limited to intervention expenditures or foreclosure costs.  One of the most expensive alternatives to foreclosure which the VA frequently elects to pursue is the "refunding" of an IRRRL.  "Refunding" means the taxpayers actually purchase the entire loan, thereby assuming the entire

30

indebtedness and paying off the lender.  According to published government data,

approximately one-half of IRRRL refundings eventually end up in foreclosure,

which means the taxpayers absorb the entire loss on that loan, in addition to all the

other expenses incident to trying to avoid the foreclosure.

72.

The loss to the United States taxpayers from IRRRL defaults, foreclosures

and refundings is staggering.  Each year the VA presents Congress with

consolidated financial statements known as Performance and Accountability

Reports ("PAR").  These PAR reports provide specific calculations regarding

default costs, foreclosure property costs and claim payments to lenders.  The PAR

reports submitted to Congress reflect that the taxpayers made payments to lenders

on VA guaranteed direct and IRRRLs in excess of $2.5 billion dollars

($2,500,000,000) from 2001 – 2008.  That figure is going up every day and will

continue to do so into the future because IRRRLs are going into default every day

and the Government is spending money every day because of loan guarantees,

many of which were procured by lender fraud and misrepresentations.

73.

The PAR reports also reveal enormous administrative expenses associated

with the VA loan program annually.  The administrative expenses routinely exceed

$100,000,000 per year for VA direct and IRRRLs.  As a subset of those administrative costs, the VA annually calculates administrative costs that are specifically related to defaults processed.  Typically, 25% of the total administrative costs expended are related to defaulted VA loans.

74.

On or about April 25, 2009, the VA-OIG published an audit of the VA's Loan Guaranty Program.  Within that audit report, the VA-OIG reported losses ranging from $10,600,000 in the first quarter of fiscal year 2007 to $32,500,000 for the third quarter of fiscal year 2008.  In the first three quarters of fiscal year 2008 alone, the taxpayers lost over $67,000,000.

75.

Taxpayers' funds are being squandered because of the fraudulent scheme committed by Defendant MIC and other lenders, which contaminate thousands of IRRRL closings with intentional fraud.  Defendant MIC is adding illegal fees to the IRRRLs and fraudulently inducing the Government to guarantee the loans based upon false certifications and misrepresentations.  But for the VA's reliance upon the false written certifications and misrepresentations of the lenders, the VA could not have obligated the taxpayers to act as guarantor for the IRRRLs at issue.

**DEFENDANT MIC PROVIDED MULTIPLE FALSE CERTIFICATIONS AND CLAIMS TO THE VA IN ORDER TO OBTAIN GOVERNMENT**

## GUARANTEES

### A.   LENDER CERTIFICATIONS BEFORE THE LOANS ARE MADE

76.

Each lender is required to certify compliance with the VA regulations and
directives for closing IRRRLs by submitting VA Form 26-8736 to the VA prior to
closing any IRRRL.  Form 26-8736 is an application for authority to close IRRRLs
on an automatic non-supervised basis.  This form is required by 38 U.S.C. §§ 3702
and 3710.  As part of the express certifications made in this form, each lender
agreed and certified that it would comply with Title 38 U.S.C., VA regulations and
other directives issued by the VA.  Form 26-8736 must be signed by the president
or principal officer for the lender.

77.

Every lender was also required to submit Form 26-8736a as a condition of
participation as an approved lender in the VA's IRRRL Guaranty Program.  Each
lender must provide an express certification that its underwriter identified on Form
26-8736a is properly trained and qualified.  Because the VA does not supervise the
lenders' employees who handle the loans, it is crucial that the lenders properly
train and oversee its employees and the lenders must so certify in order to

participate in the IRRRL program.  The Government relies on the lenders to

truthfully prepare and submit these forms.

### B.   LENDER CERTIFICATIONS MADE DURING THE IRRRL PROCESS

78.

For each specific IRRRL made, the lender also has to certify on multiple VA

Forms that it complied with the applicable VA regulations pertaining to that loan.

Lenders must expressly certify that no unallowable charges were imposed upon the

veteran borrower.  Defendant MIC submitted fraudulent certifications to the VA

falsely claiming it was not charging veterans unallowable fees.

79.

Defendant MIC fraudulently submitted VA Form 26-8923, the "Interest Rate

Reduction Refinancing Loan Worksheet," to the VA.  This form must be submitted

by the lender when a guaranty is requested on an IRRRL.  On Line 8 of this form,

the lender specifically is required to list the "allowable closing costs."  Defendant

MIC committed fraud on this form by improperly hiding unallowable attorneys

fees or other costs within "allowable" charges on the IRRRL worksheet and then

expressly certifying that the information contained was "true, accurate and

complete."

80.

Defendant MIC committed other false certifications to the VA on the HUD forms which Defendant MIC prepared and subsequently provided to the borrowers and the VA.  On each HUD form, the lender is required to certify that the HUD form is a "true and accurate account of the transaction."  For those IRRRLS where unallowable fees are improperly bundled into allowable charges, the certifications to the VA were false.

81.

Defendant MIC also made false statements on VA Form 26-1820, which must be submitted by the lenders to the VA.  This form is titled "Report and Certification Upon Disbursement."  On Form 26-1820, the lender is required to expressly certify that it "has not imposed and will not impose any charges or fees against the veteran borrower in excess of those permissible under the schedule set forth in paragraph (d) of 38 C.F.R. 36.4312."  The lender is further required to expressly certify that the information provided to the VA regarding the loan is accurate and complete.  The lender is also required to certify that "[t]he loan conforms with the applicable provisions of Title 38, U.S. Code and the Regulations concerning guaranty or insurance of loans to veterans."

82.

For those IRRRLs with respect to which unallowable fees were charged to veterans, the written certifications by Defendant MIC on each of the above-mentioned VA forms were false.

83.

The stakes are high for lenders who use false information to obtain Government guarantees.  Numerous federal laws are violated when any lender intentionally provides false certifications and/or adds illegal fees to a Government guaranteed loan.  Form 26-1820 itself explicitly warns lenders that:

Federal Statutes provide severe penalties for any fraud, intentional misrepresentation, or Criminal Connivance or conspiracy purposed to influence the issuance of any guaranty or insurance by the Department of Veterans Affairs.

VA Form 26-1820.

## C.    POST-CLOSING CERTIFICATIONS

84.

When an IRRRL is at least 61 days into default, the lenders complete VA Form 26-6850 and forward it to the VA.  This is the "Notice of Default" ("NOD").  The information in Form 26-6850 is required so the VA can "determine

compliance with the applicable reporting requirements of VA regulations."  Form

26-6850.  When a lender sends a NOD to the VA on a loan for which the guaranty

was fraudulently obtained, the submission of a false claim occurs.

85.

Additional forms which lenders must submit to the VA after closing require

the lender to provide the VA with accurate information regarding the outstanding

loan and default balances:

> VA Form 26-6850(a), "Notice of Default and Intention to Foreclose";
>
> VA Form 26-1874, "Claim Under Loan Guaranty"; and
>
> VA Form 26-567, "Status of Loan Account – Foreclosure or Other
>
> Liquidation."

At the bottom of Form 26-1874, each lender is warned:

> PENALTY:  Federal statutes provide severe penalties for any fraud,
>
> intentional misrepresentation, or criminal connivance or conspiracy in
>
> making any claim upon or against the Government of the United
>
> States, or any department or officer thereof, in obtaining or aiding to
>
> obtain the payment or approval of such claim.

VA Form 26-1874.

For those loans where veterans are charged unallowable fees, the amounts reported

37

to the VA are inaccurate and fraudulent, because the amounts include illegal fees –

a fact known to the lenders, but concealed from the veterans and the Government.

## PROOF OF DEFENDANT MIC'S FALSE CLAIM

86.

Relators have attached to this Third Amended Complaint a chart as Exhibit

A, which includes a specific example whereby Defendant MIC has presented a

false claim to the Government.

87.

In the IRRRL referenced in Exhibit A, Defendant MIC did not properly

report the actual amount of the closing costs it incurred on the HUD form.  Instead,

Defendant MIC improperly bundled unallowable closing costs into the "title

examination" fee.  Defendant MIC reported $450 as its cost for "title

examination," but a reasonable and customary fee for a title examination fee is in

the range of $125-$200.

88.

For the loan referenced on Exhibit A and for all other IRRRLs where

Defendant MIC charged illegal attorneys or other unallowable fees, Defendant

MIC failed to meet its obligation to provide accurate and truthful reporting prior to

closing of the loan as required by VA Forms 26-8736 and 26-8736a.

89.

For the IRRRL referenced on Exhibit A and for all other IRRRLs where Defendant MIC charged illegal attorneys or other unallowable fees, Defendant MIC provided false and misleading information and fraudulent certifications on VA Form 26-8923, the HUD form and VA Form 26-1820.

90.

For the IRRRL referenced on Exhibit A and for all other IRRRLs where Defendant MIC charged illegal attorneys or other unallowable fees, Defendant MIC provided false and misleading information on VA Form 26-6850 and VA Form 26-1874.  In many of those instances, false information was also provided on VA Form 26-6850a when foreclosures were involved.

91.

The IRRRL referenced on Exhibit A went into foreclosure and Defendant MIC (or the entity who purchased MIC's rights under the loan) submitted a false claim to the VA for payment.  For other IRRRLs like those on Exhibit A which went into foreclosure, Defendant MIC (or the entity who purchased MIC's rights under the loan) also submitted false claims to the VA for payment.  Other loans made by Defendant MIC went into default and Defendant MIC made false statements or claims regarding those loans as well.  The Government was forced to

spend funds on all such loans because of the Government's obligations created by the fraudulently obtained guarantees.

92.

Defendant MIC made the referenced false certifications to the VA knowingly and repeatedly over a course of years.  Defendant MIC intentionally concealed unallowable charges on IRRRLs from veterans and from the VA.

93.

Defendant MIC never notified the Government that its certifications – made *before, during and after* the IRRRL closing – were false and inaccurate.

94.

The Government relied upon each of the false certifications and representations made by Defendant MIC, to the detriment of both veterans and taxpayers.  Because these loans are "non-supervised" by the VA, the certifications are the VA's "policing" tool to make sure the lenders follow and adhere to all applicable federal regulations and VA guidelines.  The betrayal of the VA's trust in the lenders resulted in massive damage to the United States taxpayers over the last decade, as well as the theft of tens of millions of dollars directly from our country's veterans.

## MOTIVE FOR THE FRAUDULENT ACTIONS OF DEFENDANT MIC

95.

Defendant MIC's motive is crystal clear.  Defendant MIC engaged in the fraudulent schemes outlined herein in order to illegally raise its profits by benefitting from the financial assistance and guarantees provided by the Government.  Defendant MIC's fraud enabled it to obtain VA guarantees, which greatly reduced its risk in making IRRRLs.  But Defendant MIC also profited *directly* from its fraudulent conduct because it illegally passed on to the veteran and the Government fees that were not supposed to be paid from loan proceeds – such as attorneys fees.  Those unallowable fees were added to the loan amount that is guaranteed by the VA.  That allowed Defendant MIC to make an additional $400 to $1,000 on every IRRRL closing that involved inflated and unallowable fees. The direct profits generated by Defendant MIC's fraud have been enormous.[3] Both the veteran borrowers and the taxpayers have been victimized by Defendant MIC's fraud.

---

[3] In a letter posted on MIC's website, Defendant Edwards claimed that MIC had originated more than 300,000 loans in just the past 15 years. Letter from the CEO, available at http://mortgageinvestors.com/ceo-letter.php.  It is unknown to Relators how many of those loans were IRRRLs, or how many of those IRRRLs violated VA regulations.  The 'dirty' rate found by Relators for the first 8000 HUDs for MIC-originated loans evaluated by Relators is 15%.

96.

There is also one additional important fact to consider.  Many of the loans made by Defendant MIC were sold to other entities.  By fraudulently obtaining Government guarantees on the IRRRLs, Defendant MIC was able to obtain a premium price for the sale of the IRRRL to an acquiring entity.  Without the Government guaranty in place, the amounts received upon the sale of the IRRRL would be much lower.  With an IRRRL guaranty, the Government is obligated to pay at least 25% of all losses on loans up to $417,000.  The Government pays 100% of all losses incurred up to 25% of the loan balance.  The loss protection provided to the loan holder from the Government guaranty is a valuable asset.

## COUNT I.

## VIOLATION OF CIVIL FALSE CLAIMS ACT, 31 USC §§ 3729-33 *ET SEQ*.

97.

Paragraphs 1 through 96 are incorporated as if fully set forth herein.

98.

Defendant MIC knowingly or recklessly disregarded applicable laws, regulations, and rules by either presenting false and fraudulent claims to the Veterans Administration or by causing false and fraudulent claims to be presented

42

to the Veterans Administration, in direct violation of, *inter alia* 31 U.S.C. §

3729(a)(1)(A).

99.

Defendant MIC made false statements to obtain Government guarantees,

which caused false or fraudulent claims to be paid or approved, in violation of *inter*

*alia* 31 U.S.C. § 3729(a)(1)(B).

100.

More specifically, Defendant MIC caused false certifications to be made and

submitted to the VA.  Truthful and accurate certifications are a condition precedent

to both issuance of and payment under a guaranty of an IRRRL.

101.

Had the Government or the Veterans Administration known that the federal

regulations and VA guidelines were violated or that Defendant MIC's express

certifications were false, the VA could not have guaranteed the VA loans.  Federal

regulations prohibit Defendant MIC or other lenders from including unallowable

and illegal fees in any IRRRL.  The Government could not have issued a guaranty

had it known the lender certifications were false.

102.

As a result of the Government's reliance upon the false and misleading statements and certifications by Defendant MIC, the Government has been damaged and will continue to be damaged as tens of thousands of VA loans which contain unallowable fees go into default. Once these loans go into default, the Government's exposure as guarantor is triggered and the Government begins to spend taxpayer dollars in an attempt to delay or avoid foreclosures on the refinanced homes of veteran borrowers.

103.

The Government and the VA were not aware of the falsity of the claims and certifications made by Defendant MIC. The Government and the VA, in reliance on the accuracy of the statements and certifications by Defendant MIC, guaranteed thousands of VA IRRRLs for the purposes of assuring payment if and when default occurred. The VA has stated that some 15,000 MIC-originated IRRRLs resulted payments being made by the Government, as a result of defaults, foreclosures, refundings, and/or acquisitions. In addition, the Government suffered other losses as a result of the failure of such MIC-originated IRRRLs.

104.

In situations where the VA has information that a lender has acted intentionally or repeatedly in failing to adhere to the program guidelines, the VA can expel the lender from participation in the VA lending program.  2 C.F.R. §§ 180 and 801; *see also* VA Pamphlet 26-7, Ch. 17, 17-6 to 17-17.  If the VA had known that Defendant MIC was repeatedly committing the fraud referenced herein, Defendant MIC would surely have been removed from the VA Loan Guaranty Program.  The taxpayers could have saved hundreds of millions of dollars from losses related to VA IRRRLs had Defendant MIC been removed from the VA Loan Guaranty Program.

105.

The fraudulent acts of Defendant MIC totally undermined one of the core purposes of the IRRRLs which was to provide VA guarantees in exchange for the limiting of fees and charges paid by the veteran at the closing of an IRRRL.

106.

As a result of Defendant MIC's actions set forth above, the United States has been severely damaged and will continue to incur damages in the future.

107.

Any guaranty which was issued for an IRRRL with respect to which
Defendant MIC failed to comply with federal regulations and VA guidelines,
and/or any guaranty that was issued where the certification to the VA was false, is
void.  Defendant MIC should be required to reimburse the Government for all
costs the Government has incurred following default of any such loan.  These
damages are trebled under the False Claims Act.

108.

The False Claims Act requires that each lender pay the Government a civil
penalty of between $5,500 and $11,000 for each false claim.  This means that a
penalty should be imposed for each false claim submitted to the VA in which the
lender falsely claimed it had complied with federal regulations and VA guidelines.
A penalty should also be imposed for each HUD form where the lender has
charged the veteran for unallowable fees.

## COUNTS II - IX

### THE FRAUDULENT SCHEME TO TRANSFER ASSETS PERPETRATED BY DEFENDANTS MIC AND EDWARDS

109.

Defendant MIC is a privately held corporation.

46

110.

Defendant Edwards is founder of Defendant MIC and is its largest shareholder, owning at least 77.5% of the outstanding stock. At various times, Edwards has served as Chief Executive Officer and Chairman of the Mortgage Investors' Board of Directors.

111.

*On October 3, 2011*, this case was unsealed. Doc. 61.

112.

*On November 15, 2011*, Defendant MIC filed its "motion for summary judgment." Doc 11. MIC claimed it was entitled to judgment as a matter of law on Relators' claims against it. Doc. 30 at 1 (Order dated 11-19-12).

113.

MIC's filing of a "motion for summary judgment" at such an early stage of the proceedings seemed inexplicable at the time; each of the other seven defendants then in this case filed, instead, motions to dismiss under Rule 9(b).

114.

*On November 19, 2012* this Court denied MIC's motion for judgment as a matter of law. Doc. 30.

115.

*On December 5, 2012*, Relators served upon MIC various discovery,

including Relators' First Requests for Production of Documents ("First RPDs"),

seeking, *inter alia*,  financial information "relating to MIC's profitability and/or its

corporate structure" (RPD # 13), "stock records" including "dividend transfers paid

to shareholders" (RPD # 20), "for 2010 to the present, all quarterly and annual

financial statements" (RPD #25), and "audited financial statements" (RPD # 26).

116.

*On February 6, 2013*, MIC objected to Relators' First RPDs 13, 20, 25, and

26, but in response to RPD #26 MIC agreed to "produce audited financial

statements *for 2010 and 2011*" (emphasis added).

117.

Thirty-three days later, *on March 11, 2013*, MIC did produce its financial

statements for 2010 and 2011.  MIC refused to produce later financial statements,

although it eventually did produce the financial statement for 2012.  The 2010-

2012 financial statements showed that MIC was still an operating entity with

substantial servicing rights for IRRRLs.

118.

MIC had been a very successful originator of IRRRLs and a very profitable business.[4]  Because of the 2012 financial statement, questions were raised, first by Relators, and then by the Department of Justice, about whether MIC remained an ongoing entity, and was solvent and able to satisfy any judgment imposed by this Court.  *See* transcript 4/12/2013 at 29/8-20, 43/2-17; 5/11/2015 Tr. at 89/17-19; 6/22/2015 Tr. at 29/8-31/17.[5]  On all three of those occasions, MIC's representations to this Court were intended to communicate that there was no issue about MIC's solvency or its ability to pay a judgment entered by this Court.

119.

Despite letters and 'meet & confer' sessions, MIC refused to produce financial statements for 2013 and 2014.[6]

---

[4] MIC's CEO Bill Edwards described MIC's success in a letter to MIC customers posted on the MIC website where he stated that MIC had originated more than 300,000 VA loans worth more than $25 billion dollars in the *last fifteen years alone*.  Letter from the CEO, available at http://mortgageinvestors.com/ceo-letter.php.

[5] The DOJ raised its concerns about MIC's solvency in its filing of June 8, 2015. Doc. No. 131.

[6] Relators counsel requested updated financial information by email and letter on June 4, 2015 and June 8, 2015.  On June 11, 2015, the parties had a meet and confer telephone call where MIC stated that it would consider, but not commit to, producing its financial statements.  After Relators sent another letter on June 12, 2015 and on the eve of required Joint Submission to the Court regarding

120.

Pressured by this Court's June 9, 2015 Order requiring a Joint Submission

by the parties and the imminence of a June 22 hearing in this case, finally at a meet

& confer on June 11 MIC relented and said that it would produce additional

financial statements.  However, eleven days later, at the June 22 hearing, it still had

not done so.  Directed by this Court on June 22 to do so, finally on June 25, 2015,

MIC produced its 2013 and 2014 financial statements in response to Relators' First

RPDs.

121.

The 2013 financial statement first produced by MIC on June 25, 2015

revealed that in *the year 2013 alone MIC had distributed $xxx* to its shareholders.

See Exhibit B, MIC "Consolidated Financial Statements, Supplemental

Information and Report of Independent Certified Public Accountants" for 2013.

---

outstanding disputes, MIC agreed to produce its financial statements, but did not
set a date by when it would do so.  Relators raised the issue again by letter on June
18, 2015 and at the status conference on June 22, 2015.  Even after the Court
directed MIC to produce its financial statements at the June 22, 2015 hearing, MIC
still had not done so and Relators sent *another* letter to MIC asking when the
financial statements would be produced.  It was only after Relators sent its ***fifth***
letter on June 24, 2015 demanding that the documents be produced, that MIC
finally agreed to produce the 2013 and 2014 financial statements to Relators by no
later than June 25, 2015.

Of that amount some $xxx went to MIC's CEO Edwards, who owns 77.5% of the stock of MIC.[7]  The 2013 financial statement also revealed that MIC *had paid $xxx in "royalty fees" to an entity owned by Edwards*.  See Exhibit B, Note 11 – Related party transactions, at page 17.  That is a total of *at least* $xxx distributed during 2013 alone to Edwards.[8]

122.

The distribution in year 2013 of $xxx to shareholders – 77.5% of that to Edwards – plus an additional $xxx distributed to an entity owned by Edwards, was more than MIC showed as "total assets" on its 2012 financial statement.  The distribution in year 2013 of $xxx to shareholders was more than MIC showed as "total shareholders' equity" on its 2012 financial statement.  *Edwards had almost totally looted the company – in the months after this Court denied MIC's motion for summary judgment* – and the corporation MIC had allowed that to happen.

---

[7] MIC's second largest stockholder is Edwards' ex-wife Linda Edwards, whom he divorced in 1998. She owns 8.7% of the MIC stock.

[8] The words "at least" are used because the 2013 financial statement also shows large outflows from MIC's assets for "rent," "title insurance," and "loan settlement services" – which may well have also been payments to shareholders.  For example, Bill Edwards owns 40% of the stock of National Title Network Inc. to which MIC paid $xxx in 2013.  Ex. C. Note 11; MIC's Resp. to Relators Amended First Interrogatories at 43.

123.

As a result of the distributions and transfers of assets, MIC's assets have been diminished by 87.6% since the year (2011) MIC filed its motion for summary judgment. At the end of year 2011 MIC had assets of $xxx. At the end of year 2014, MIC had assets of $xxx, but "cash or cash equivalents" of only $xxx. *See* Ex. C. at p 6. Most – 73% - of that dissipation of assets occurred *within months* after this Court denied MIC's motion for summary judgment on November 19, 2012.[9]

124.

The 2014 financial statement first produced by MIC on June 25, 2015 reveals that

- In October 2013 [MIC] suspended the origination of new mortgage loans.

- On June 30, 2014, MIC sold its mortgage loan servicing portfolio.

- MIC has liquidated substantially all assets other than cash and cash equivalents, and does not expect to resume mortgage lending and sale operations in 2015 and thus, does not expect to earn material revenues or conduct other operations in 2015.

- MIC is considering liquidation.

---

[9] In 2013 alone, MIC distributed $xxx to its shareholders. Of that, $xxx went to MIC CEO and principal shareholder Edwards.

125.

The 2014 financial statement also reveals that MIC had changed its reporting *regarding this case*.  The previous MIC financial statements reported, with respect to this case, that "management is not aware of any material expected effects on the future financial condition, operations, or cash flows of the Company."  The 2014 financial statement states "should the Company receive an unfavorable outcome, the impact would likely be material to the financial statements."  Ex. C at 12.  That was an understatement.  That dramatic change resulted directly from, and was caused by, MIC's distribution of most of its assets to shareholders, mainly to Edwards.

126.

The reason MIC refused to produce financial statements for 2013 and 2014 is thus self-evident:  MIC and its shareholders were engaged in fraudulent transfers and a fraud upon this Court, in an attempt to defeat this Court's jurisdiction over MIC by rendering MIC effectively judgment-proof.

127.

The purpose of MIC's and Edward's scheme was to so dissipate MIC's assets so that, given the amounts remaining from which a judgment could be satisfied, continuing this litigation would not be worth the time, trouble, and

expense.  Unless the looting is undone, MIC and Edwards have in fact rendered MIC effectively judgment-proof.

### 128.

It is irrefutably clear from MIC's own long-concealed 2013 and 2014 financial statements that after this Court denied MIC's motion for summary judgment, MIC decided to grant the equivalent of "judgment" to itself by making itself effectively judgment-proof.

### 129.

When MIC represented to this Court on three separate occasions – April 12, 2013, May 11, 2015, and June 22, 2015 – that the solvency of MIC and its ability to pay a judgment was not an issue, MIC did not inform this Court of the foregoing facts.

### 130.

More specifically, *MIC did not tell this Court* that after this Court denied MIC's motion for summary judgment Edwards and MIC were engaged in a scheme to reduce MIC's assets by 87%,[10] or that MIC had distributed $xxx to its shareholders – 77.5% of which went to MIC's CEO Edwards, or that MIC had also

---

[10] 2011 assets of $xxx minus 2014 assets of $xxx equals $xxx – a reduction of 87%.

paid out $xxx to an entity owned by Edwards.  *MIC also did not tell this Court*
that, in the words of the 2014 financial statement, MIC had liquidated substantially
all assets, suspended the origination of new mortgage loans, and was considering
liquidation.  Given inquiries three times by the Court, and inquiries by Relators and
by the Department of Justice, simple honesty compelled MIC to divulge that
information.  Instead MIC deliberately withheld that information from the Court,
from Relators, and from the Department of Justice – for as long as MIC could do
so, until it was finally forced to produce the 2013 and 2014 financial statements.

131.

There is no doubt that MIC deliberately misled this Court.  On April 12,
2013, Relators' counsel raised concerns about the viability of MIC after MIC
officer Jim Shatz had testified the company was being sold.  MIC counsel Souders
told this Court, in response to the Court's own question: "they're trying to get a
bank holding company to purchase it. *But that changes nothing.  It's an ongoing*
*concern. . . . And we're here for the long haul.*  4/12/13 Tr. at 43/5-15 (emphasis
added).  Then, after the long delay caused by MIC's and WF's attempt to take
advantage of the seal violations, on May 11, 2015, the Court asked "Is there an
issue as to MIC's financial 16 viability? Is that something that MIC is pressing?"
MIC counsel Kieval then told this Court "No, Your Honor. My client – it's not a

55

secret that my client stopped making loans some time ago, but ***that's it.***"  5/11/15 Tr. at 89/15-19 (emphasis added).  ***But then after*** MIC had finally agreed, the week before the June 22 hearing, to produce financial statements for 2013 and 2014 – which were long past due to Relators – MIC backtracked.  The Court said to MIC counsel Kieval:  "Now, I understood your position as stated on behalf of MIC was that you're solvent and your company's solvent and it's not an issue. But you're also providing financial information; is that correct?"  MIC counsel Kieval responded: "Your Honor, just to be clear, I don't make any representation about the financial state of the company."  6/22/15 Tr. at 29/20-25.

132.

Even when on June 22, 2015 this Court told MIC counsel that "we do have judicial economy interests here as well" (6/22/15 Tr. at 31/12-13), MIC *said nothing* about the fact, later revealed when on June 25 MIC finally produced financial statements for 2013 and 2014, that MIC's assets had been looted to the point it makes no sense, for Relators or the Court, to continue the litigation against MIC ***unless the looting can be undone***.  (Whether MIC counsel then knew, on June 22, that MIC had been so looted is presently unknown, although the 2013 and 2014 financial statements finally produced three days later make that clear.  *See Malautea v. Suzuki Motor Co*., 987 F.2d 1536, 1543, n. 8 (11th Cir. 1993) ("If our

56

suspicions regarding the General Motors information are true, then counsel's oral argument statement regarding Suzuki's inability to comply was a bold falsity.  Of course, the defendants' appellate counsel may have fully believed his representation to this court; he may just have been the innocent lamb which the defendants led to slaughter."  But certainly MIC and its principal shareholder and CEO Edwards knew what had been done.)

133.

That granting itself judgment by rendering itself effectively judgment-proof was MIC's purpose and intention is revealed by what Relators have discovered – but which MIC of course already knew – about those MIC-originated loans that violated VA regulations ('dirty' loans).  MIC has produced HUDs for 9000 of the 15,000 MIC-originated loans identified by the VA.  See Doc. 138 at pp. 3-4 (under "a. Missing HUDs, Loan Files, and Payment Information on MIC-originated IRRRLs.")  Relators have identified 1207 'dirty' loans from amongst the first 8000 HUDs studied by Relators.  That is a 15% 'dirty' rate.  But of those 1207, 965 of the loans were acquired by the VA.  That is 80% of the 'dirty' loans.  Acquisitions result in much higher losses to the Government.  The actual damages to the Government as a result of just those 965 acquired loans is $99,235,639.  That is an average loss to the Government per loan of $102,834.  If the same percentage of

the 6000 loans for which MIC has failed to produce HUDs are 'dirty,' then there are another 900 loans at issue (15% of 6000 is 900). If the same percentage of those loans are acquisitions, then that means there are another 720 loans on which the Government has lost an average of $102,834 per loan, for an additional amount of actual damages of $74,040,480. The total *actual* damages to the Government thus appear to be at least $173,276,119. *That does not include* treble damages or civil monetary penalties.

134.

The reason those who control MIC have caused it to distribute the vast majority of MIC's assets to its shareholders, principally CEO Edwards, and to an entity controlled by Edwards is thus self-evident: to defeat this Court's jurisdiction by rendering MIC essentially judgment-proof.

135.

MIC and its CEO Edwards cannot defend or justify the distributions revealed by the 2013 and 2014 financial statements. The law requires that a corporation and its directors favor its creditors over its shareholders. MIC is an Ohio corporation. As a matter of Ohio law, MIC was precluded from paying dividends or distributions to its shareholders "when the corporation is insolvent or

58

there is reasonable ground to believe that by such payment it would be rendered insolvent."  Ohio Stat. 1701.33.

136.

MIC has never had a 'defense' to this action, as demonstrated by the fact that six of the eight defendants originally involved in the case settled, and as demonstrated by Relators' identification of so many 'dirty' loans originated by MIC, and as even more poignantly demonstrated by MIC decision to transfer virtually all of its assets, mostly to CEO Edwards, *after this Court denied MIC's motion for summary judgment.*

**<u>COUNT II: AVOIDANCE OF FRAUDULENT TRANSFERS</u>**

137.

Paragraphs 109 - 136 are incorporated by reference as if set forth fully herein.

138.

By virtue of their claims against MIC in this case, the United States *ex rel.* Relators has a right to payment from MIC and therefore is a creditor of MIC.

139.

MIC made the 2012 and 2013 distributions to Defendant Edwards and the remaining MIC shareholders at the direction of CEO Edwards.

59

140.

The 2012 and 2013 distributions were concealed from the United States *ex rel.* Relators and from the Court when made.

141.

At or around the time that MIC made the 2012 and 2013 distributions, MIC owed The United States *ex rel.* Relators well in excess of $173 million.

142.

At or around the time that MIC made the 2012 and 2013 distributions, MIC and its CEO Edwards knew what MIC's exposure was in this case, and knew it exceeded $xxx.

143.

MIC was precluded from making any distributions to shareholders when the company was insolvent or when there was reasonable ground to believe that by such distributions MIC would be rendered insolvent.  Ohio Stat. § 1701.33

144.

The 2012 and 2013 distributions transferred substantially all of MIC's assets to MIC insiders with the vast majority going to Defendant Edwards.

145.

As a result of the 2012 and 2013 distributions, MIC was rendered effectively insolvent because the sum of all of MIC's debts, including its debt to the United States *ex rel.* Relators, was greater than all of MIC's assets.  Specifically, as a result of the 2012 and 2013 distributions, MIC's total assets are less than $xxx and MIC owes the United States *ex rel.* Relators well in excess of $173 million.

146.

Edwards is an insider of MIC.

147.

Edwards well knew that the distributions he and MIC planned for 2012 and 2013 would render MIC effectively insolvent; that was the very purpose of those distributions.

148.

MIC made the 2012 and 2013 distributions with the actual intent to hinder, delay or defraud MIC's creditors, including the United States *ex rel.* Relators.

149.

The United States *ex rel.* Relators is entitled to a judgment under O.C.G.A. §§ 18-2-74 and 18-2-75 avoiding the 2012 and 2013 distributions.

## COUNT III: CIVIL CONSPIRACY

150.

Paragraphs 109 - 136 are incorporated by reference as if set forth fully herein.

151.

MIC and Edwards (along with other presently unknown MIC directors, employees and agents) have acted in concert with each other to harm the United States *ex rel.* Relators by fraudulently transferring assets with the intent to hinder, delay or defraud MIC's creditors, to-wit, the United States of America, *ex rel.* Relators.

152.

MIC and Edwards (along with other presently unknown MIC directors, employees and agents) have acted and are continuing to act in furtherance of a scheme and common design to harm the United States *ex rel.* Relators by fraudulently transferring MIC's assets.

153.

MIC and Edwards (along with other presently unknown MIC directors, employees and agents) have conspired with one another to commit fraudulent acts, including fraudulent transfers of assets.

154.

As a proximate result of the conduct alleged, the United States *ex rel.*

Relators has suffered and will continue to suffer financial injury.

155.

As a matter of law, after a conspiracy is formed, all members of the

conspiracy are jointly and severally liable for acts of co-conspirators done in

furtherance of the conspiracy.  Thus, MIC and Edwards are liable for each and

every act done by any co-conspirator that furthered MIC's aim of rendering itself

effectively judgment proof by dissipating its assets in an effort to frustrate this

Court's jurisdiction and the ability of Relators and the Government's to collect on

any judgment.

**COUNT IV: PUNITIVE DAMAGES**

156.

Paragraphs 109 – 136 are incorporated by reference as if set forth fully
herein.

157.

MIC and Edwards have intentionally undertaken acts to hinder, delay,

defraud, and cause harm to the creditors of MIC, including the United States *ex rel.*

Realtors and have misrepresented material facts to both Relators and the Court in

an attempt to conceal their fraud.

158.

MIC's and Edwards' wrongful actions constitute willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to the consequences, rendering MIC and Edwards liable to Relators for punitive damages.

159.

Because MIC and Edwards acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT V: PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

160.

Paragraphs 109 - 136 are incorporated by reference as if set forth fully herein.

161.

MIC and Edwards caused and perpetrated the fraudulent 2012 and 2013 distributions to be made in the face of at least $173 million in liability to Relators.

162.

As a result of the fraudulent 2012 and 2013 distributions, MIC has been rendered effectively insolvent and will never be able to satisfy a judgment entered against it in this case.

163.

MIC and Edwards have intentionally placed the funds available to satisfy the

debt owed to the United States beyond the reach of the United States and in all

likelihood, given the past conduct by MIC and Edwards, the remaining funds are

surely being dissipated as well.

164.

There is not merely a substantial threat that the United States will suffer

irreparable injury if an injunction freezing the proceeds from the fraudulent 2012

and 2013 distributions is not issued – the threat is *certain*.  MIC and Edwards have

caused MIC's cash available to pay a judgment to be dissipated down to some

$xxx – an amount that makes continuing this litigation untenable, unless the

looting can be undone and further looting is stopped.

165.

The threatened injury to Relators and the Government outweighs the

threatened harm that the injunction may do to the Defendants.

166.

There is a substantial likelihood that Relators will prevail on the merits of

their claims against MIC.  There is overwhelming evidence that MIC overcharged

veterans when closing IRRRLs and then falsely certified to the government that it had not done so.

167.

Granting the requested injunction will not disserve the public interest.

168.

The fraudulent 2012 and 2013 distributions were made in connection with the following badges of fraud, among others:

- The distributions were made after MIC had been sued in this case, the Court had denied MIC's Motion for Summary Judgment and six of the eight original Defendant MIC had settled for more than $170 million.

- The distributions were made to MIC insiders;

- The distributions were concealed when made; and

- The distributions have rendered MIC effectively insolvent.

169.

MIC and Edwards have intentionally attempted to place the funds available to satisfy the amount MIC will owe the United States beyond the reach of Relators.

170.

Pursuant to Federal Rule of Civil Procedure 65, Relators are entitled to injunctive relief enjoining MIC from making any further transfers of its assets and enjoining Bill from transferring or encumbering any of his assets, including the proceeds of all distributions or payments made to him since this case was unsealed October 3, 2011.

## COUNT VI: ATTORNEYS FEES

171.

By fraudulently transferring assets that could be used to satisfy MIC's obligations to the United States, MIC and Edwards have acted in bad faith and with the intent to defraud and have caused Relators unnecessary trouble and expense in this action.

172.

Relators respectfully request an award of attorneys fees pursuant to O.C.G.A. § 13-16-11.

**WHEREFORE**, Relators pray for judgment against Defendants MIC and Edwards as follows:

(a)      That Defendant MIC be ordered to cease and desist from submitting and/or causing the submission of false claims, false certifications and illegal demands for payment in violation of 31 U.S.C. §§ 3729-33;

(b)      That Defendant MIC be ordered to cease and desist from imposing unallowable charges upon veterans and from concealing such charges by falsely inflating allowable charges or otherwise violating 31 U.S.C. §§ 3729-33;

(c)      That judgment be entered in favor of the United States *ex rel.* Relators and against Defendants MIC for all damages available pursuant to 31 U.S.C. §§ 3729-33, plus a civil penalty of not less than Five Thousand Five Hundred and No/100 ($5,500.00) Dollars, and no more than Eleven Thousand and No/100 ($11,000.00) Dollars per false claim, as provided by 31 U.S.C. § 3729(a);

(d)      That the United States *ex rel.* Relators be awarded the maximum amount permissible according to 31 U.S.C. § 3730(d);

(e)      That judgment be granted for the United States *ex rel.* Relators against Defendants MIC for any and all costs including, but not limited to, court costs, expert fees, and all Relators' attorneys fees incurred to prosecute this action;

(f)     That the Court avoid and set aside all distributions to shareholders and to Defendant Edwards and to entities owned by him made at any time since this case was unsealed on October 3, 2011;

(g)     That upon entry of a judgment against MIC and Edwards the Court authorize Relators to levy executions on the assets transferred or on their proceeds;

(h)     That the Court award the United States *ex rel.* Relators their actual damages sustained as a result of MIC's, Edwards' and other unnamed co-conspirators' civil conspiracy;

(i)     That the Court grant preliminary and permanent injunctions against further disposition of MIC's assets and against any transfer or encumbrance of the proceeds of the 2012 and 2013 distributions to Edwards, to other shareholders, and to entities owned by Edwards;

(j)     That the Court award punitive damages and attorneys' fees against MIC and Edwards to the extent available under the applicable law; and

(k)     That the United States and Relators be granted such other and further relief as the Court deems to be equitable and just.

69

Respectfully submitted this 13th day of August, 2015.


BUTLER WOOTEN CHEELEY                WILBANKS & BRIDGES, LLP
& PEAK LLP


BY: s/ James E. Butler, Jr.          BY: s/ Marlan B. Wilbanks
JAMES E. BUTLER, JR.                 MARLAN B. WILBANKS
  jim@butlerwooten.com                 mbw@wilbanks-bridgeslaw.com
  Georgia Bar No. 099625              Georgia Bar No. 758223
BRANDON L. PEAK                      TY M. BRIDGES
  brandon@butlerwooten.com             tmb@wilbanks-bridgeslaw.com
  Georgia Bar No. 141605              Georgia Bar No. 081500
JOSEPH M. COLWELL                    3414 Peachtree Street, N.E., Ste. 1075
  joseph@butlerwooten.com            Atlanta, Georgia 30326
  Georgia Bar No. 531527             (404) 842-1075
ROBERT H. SNYDER, JR.                (404) 842-0559 Fax
  rob@butlerwooten.com
  Georgia Bar No. 404522
2719 Buford Highway                  PHILLIPS & COHEN
Atlanta, Georgia  30324
(404) 321-1700
(404) 32101713 Fax                   BY: s/ Mary Louise Cohen
                                     MARY LOUISE COHEN
                                       mlc@phillipsandcohen.com
                                       DC Bar No. 298299
                                     2000 Massachusetts Avenue, N.W.
                                     Washington, DC 20036
                                     (202) 833-4567
                                     (202) 833-1815 Fax

                                     Attorneys for Relators/Plaintiffs

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the

foregoing filing complies with the applicable font and size requirements and is

formatted in Times New Roman, 14 point font.

<u>s/  James E. Butler, Jr.</u>
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
BRANDON L. PEAK
  Georgia Bar No. 141605
JOSEPH M. COLWELL
  Georgia Bar No. 531327
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
Butler Wooten Cheeley & Peak LLP
2719 Buford Highway
Atlanta, Georgia  30324
(404) 321-1700
(404) 321-1713 Fax

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on August 13, 2015, I electronically filed RELATORS' THIRD AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Matthew R. Rosenkoff
Raanon Gal
Taylor English Duma LLP
1600 Parkwood Circle – Suite 400
Atlanta, GA 30339

Mitchel H. Kider
David M. Souders
Michael Y. Kieval
Weiner Brodsky Kider PC
1300 19th Street, NW, Fifth Floor
Washington, DC 20036

Lesli C. Esposito
John D. Huh
DLA Piper
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103-7300

I certify I have served this document on the following via e-mail:

*United States of America:*

Alan S. Gale
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC  20044
  *Alan.Gale@usdoj.gov*

*-and-*

Paris Wynn
Assistant U.S. Attorney
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA  30303
  *Paris.Wynn@usdoj.gov*

This 13th day of August, 2015.

BY: <u>s/  James E. Butler, Jr.     </u>
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
BRANDON L. PEAK
  Georgia Bar No. 141605
JOSEPH M. COLWELL
  Georgia Bar No. 531327
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
Butler Wooten Cheeley & Peak LLP
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax