# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.*, | * | |
| VICTOR E. BIBBY and BRIAN J. | * | CIVIL ACTION FILE NO. |
| DONNELLY, | * | |
| | * | 1:12-CV-04020-AT |
| RELATORS/PLAINTIFFS, | * | |
| | * | |
| vs. | * | |
| | **\*** | |
| WILLIAM L. "Bill" EDWARDS,[1] | * | |
| Individually and WILLIAM L. "BILL" | * | |
| EDWARDS as Trustee of the William L. | * | |
| Edwards Revocable Trust,[2] and | * | |
| MORTGAGE INVESTORS | * | |
| CORPORATION, | * | |
| | * | |
| DEFENDANTS. | * | |

---

[1] On information and belief "William L. Edwards" is the legal name of MIC's CEO.  Edwards has testified that he changed his name in the early 1970s "to distance himself from his time in the Marines."  Apparently his name formerly was "Edward Francis Sylvia III."  Sources:  9/17/15 Edwards Deposition at 7/1-25; 9/20-12/3; April 18, 2011 article, Tampa Bay Times.

[2] Edwards testified under oath that the name of the trust is the "William Edwards Revocable Trust." Edwards Dep. at 209/1-13.  However, an indenture filed 11/06/01 involving MIC CEO Jeffrey Crilley identifies the name of the trust as the "William L. Edwards Revocable Trust" and indicates that the trust agreement is dated "9-18-97." This Fourth Amended Complaint is filed pursuant to the deadline imposed by the Court by Order dated December 11, 2015.  (Doc. 315.)  Relators have requested trust documents from defendants and from Edwards' accountant Garavaglia.  As of the date by which this Fourth Amended Complaint must be filed defendants MIC, Edwards and Garavaglia have not produced any trust documents.

## <u>RELATORS' FOURTH AMENDED COMPLAINT[3]</u>

COME NOW RELATORS VICTOR E. BIBBY and BRIAN J.

DONNELLY, by and through counsel of record, Butler Wooten Cheeley & Peak

LLP, Wilbanks & Gouinlock LLP, and Phillips and Cohen LLP and file this their

Fourth Amended Complaint.

## <u>INTRODUCTION</u>

1.

This is an action to recover damages and civil penalties on behalf of the

United States of America (hereinafter "the Government") arising from false and/or

fraudulent records, statements and claims made and caused to be made by

Defendants Mortgage Investors Corporation ("MIC") and Edwards,[4] and/or its or

his agents, employees, and co-conspirators in violation of the federal False Claims

Act, 31 U.S.C. §§ 3729 *et seq.*

---

[3] For continuity purposes, Relators have retained certain paragraphs in this
Complaint related to claims asserted under 31 U.S.C. § 3729(a)(1)(A) and for
"Notice of Default" ("NOD") only loans.  Relators are not attempting to contest
the Court's ruling on the Defendants' Motion for Summary Judgment or to pursue
NOD only loans at this time.

[4] Whenever "Edwards" is used herein that refers both to Edwards, individually and
to Edwards as Trustee of the William L. Edwards Revocable Trust.

2.

Defendants have engaged in a brazen scheme to defraud both our nation's veterans and the United States treasury of millions of dollars in connection with refinance home loans guaranteed by the United States Department of Veterans Affairs ("VA").  Those loans are known as "IRRRLs" (Interest Rate Reduction Refinancing Loans).

3.

At all times, Defendant MIC was wholly controlled by, and its actions were directed by, Edwards who bought MIC in 1995,[5] has controlled it ever since, owns 77.5% of MIC's stock,[6] and is Chairman of the Board.[7]  Edwards testified under oath that he considers the money that was in MIC to be money that belongs to him.[8]  After this case was unsealed on October 3, 2011, Edwards caused MIC to pay himself over $xxx million in "executive bonuses;" caused shareholder distributions to be made that transferred another $xxx from MIC to Edwards; and caused $xxx of MIC's assets to be transferred to a corporation wholly owned and

---

[5] Edwards Dep. at 109/20-21.

[6] ██████████████

[7] Edwards Dep. at 145/11-17.

[8] Edwards Dep. at 66/13-17:  ("Q. Do you consider the money that's in MIC to be money that belongs to you?  A. Yes.")

controlled by Edwards (Marketing Solution Publications, Inc. ("MSP")),[9] which money Edwards also considers to be his own to take at will.[10]  Edwards and MIC have consistently ignored and disregarded corporate formalities.  *See* ¶¶ 153 - 156, *infra*.  *The result is that MIC was a corporation in name only.*  Consequently at times herein actions will be attributed to "Defendants," meaning Edwards and MIC.  Edwards has testified under oath that he has moved "all" of his money and "all" of his assets into the William L. Edwards Revocable Trust (the "Edwards Trust").[11]  Edwards has testified that the MIC assets transferred to him during 2012 and 2013 were moved into said Trust.[12]  Consequently references herein to "Edwards" are to both Edwards in his individual capacity and Edwards as Trustee of the Edwards Trust.

4.

To allow veterans to take advantage of low interest rates, while also protecting those veterans from the predations of unscrupulous lenders, Congress authorized and the VA established the IRRRL program.  Through this program,

---

[9] Edwards testified that he was "president" of MSP, and "CEO," and "COO," and that there are no other officers.  Edwards Dep. at 118/20-119/2.

[10] Edwards Dep. at 123/6-8 ("Q.  How are you paid by Marketing Solutions? A. I'm paid whenever I feel like taking money, I take it.").

[11] Edwards Dep. at 209/4-9.

[12] Edwards Dep. at 207/25-210/6.

veterans are allowed to refinance their existing VA home loans.  The program is designed to protect veterans from paying excessive fees and charges in the refinancing transaction.

5.

Defendants repeatedly violated the rules of the IRRRL program.  Rather than comply with those rules, Defendants over-charged veterans, charged unallowable fees, and then deliberately concealed those facts from the VA to obtain taxpayer-backed guarantees for the loans, which would not have been available but for that concealment.  At the same time, Defendant MIC falsely certified to the VA, in writing, that it was *not* charging unallowable fees.

6.

Defendants have submitted false and fraudulent documents, records and claims to the United States to fraudulently induce the VA to guarantee IRRRLs. Many of those IRRRLs have gone into default or resulted in foreclosure, which has resulted in massive damages.  Under the False Claims Act, Defendants are liable to the United States for all damages resulting from those fraudulently induced guarantees of IRRRLs, as well as Civil Monetary Penalties ("CMPs") of up to $11,000 for each violation of the False Claims Act.

## THE PARTIES

7.

VICTOR E. BIBBY ("Relator Bibby") was President and CEO of U.S. Financial Services, Inc. d/b/a Veteran's Mortgage Company.  U.S. Financial Services was a Georgia corporation which operated offices and provided mortgage services as a licensed mortgage broker in seven (7) U.S. states (Georgia, Florida, Alabama, South Carolina, North Carolina, Tennessee and Texas).

8.

BRIAN J. DONNELLY ("Relator Donnelly") was Vice-President of Operations of U.S. Financial Services, Inc. d/b/a Veteran's Mortgage Company ("U.S. Financial").  He is a licensed mortgage loan officer in Georgia, North Carolina and Tennessee.

9.

Relator BIBBY resides in Fulton County, Georgia.  Relator DONNELLY resides in Cherokee County, Georgia.  They bring this *qui tam* action based upon direct and unique information they possess with regard to the specific fraudulent acts of Defendants set forth and described with particularity hereafter.

6

10.

Defendant MIC is an Ohio corporation with its principal place of business in Florida and is a financial services entity, whose business was the making of VA home loans, guaranteed by the United States Government.  Defendant MIC has a principal office address of 6090 Central Avenue, St. Petersburg, FL 33707-1622. Defendant MIC during all relevant times hereafter described did transact its lending business in the State of Georgia and within the Northern District of Georgia.  Defendant MIC has been properly served through its registered agent and is subject to the jurisdiction of this Court.

11.

Defendant WILLIAM L. "BILL" EDWARDS, individually, is the majority shareholder and Chairman of the single-member MIC "Board of Directors". Edwards is a citizen of the state of Florida.  Edwards, both personally and through his alter ego MIC, has at all relevant times transacted business in the state of Georgia.  Defendant WILLIAM L. "BILL" EDWARDS, as Trustee of the Edwards Trust, individually, has moved "all" of his money and "all" of his assets into the

Edwards Trust.[13] ███████████████████████████████████████

███████████████████████████████████████

13.

Edwards directed MIC to take action *to delay* the entry of judgment in this case *so that* he could drain the company of its assets and to make it impossible for Relators, both Georgia residents, to collect any judgment obtained in this action. Edwards then perpetrated that scheme: in 2012 and 2013 some $xxx was taken out of MIC at Edwards' direction.  By doing so, Edwards has committed tortious injury to the Relators and to the Government in this state caused by acts or omissions both within this state and outside this state.  Defendants Edwards and MIC continue to attempt to delay the entry of judgment in this case.

13.

Edwards has engaged in a conspiracy to strip MIC of available assets and render MIC judgment proof.  Edwards' co-conspirators include but are not limited to Defendant MIC; current or former MIC Officers Jeffrey Crilley, David Lattner, Jim Shatz and Michael Garavaglia; and persons and entities distinct from MIC but wholly controlled by Edwards, including MSP, The Bill Edwards Group, LLC (the

---

[13] Edwards Dep. at 209/4-9.

███████████████████████

"Edwards Group"), and the Edwards Trust.  By taking actions to render MIC judgment proof so that Relators and the U.S. Government cannot collect any judgment in this case, Edwards and his co-conspirators have committed tortious acts or omissions and caused tortious injury in Georgia to the Government and to the Relators who are Georgia residents.

14.

Edwards derives substantial revenue from business activities within this state as a result of his having control of MIC as Chairman and owner of 77.5% of its stock.  A substantial part of the millions of dollars Edwards received during 2012-2013 when he looted the assets of MIC was derived from business activities by Edwards and MIC within the state of Georgia.  In addition, Edwards owns several music publishing businesses, including Big 3 Records, Spring Fish Publishing, Paddock Publishing, and Mojo Rizin' Publishing, LLC (the "Music Publishing Businesses") that sell and distribute music for major recording artists.  Edwards' Music Publishing Businesses are run out of both Florida where Edwards lives and Atlanta, Georgia where Edwards' entertainment lawyer, Joel Katz, is located.  The Music Publishing Businesses sell and distribute music throughout the country generally and in Georgia specifically.  Edwards derives substantial revenue from

sales made in the state of Georgia as a result of his ownership of the music publishing businesses.

15.

Edwards has exercised unilateral control over MIC, has treated MIC's assets as if they were his own,[15] has used MIC's assets to pay for his personal expenses and for those of his separate entities, has unilaterally set his own compensation (and that of his wholly owned entities) to the detriment of MIC's creditors, has failed to make or keep any corporate records of $xxx worth of payments to himself and to his wholly owned entities, has taken actions to defraud MIC's creditors, and generally has abused the corporate form in order to perpetrate a fraud on MIC's creditors and to evade MIC's tort responsibility.  As a result, MIC's corporate form must be disregarded and all of MIC's contacts with Georgia must be imputed to Edwards *personally.*

16.

Based on the foregoing, Edwards is subject to personal jurisdiction in Georgia under both O.C.G.A. § 9-10-91 and the United States Constitution.

**JURISDICTION AND VENUE**

---

[15] Edwards Dep. at 66/13-17: ("Q. Do you consider the money that's in MIC to be money that belongs to you?  A. Yes.")

17.

This Court has jurisdiction over this *qui tam* action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b).  Relators are the original source of the facts and details contained in the Second Amended Complaint, restated in this Fourth Amended Complaint.  Relators instituted this action in the name of the United States of America as contemplated by the Civil False Claims Act, 31 U.S.C. §§ 3729-33 ("False Claims Act").

18.

This court has jurisdiction over Relators' claims against Edwards and MIC for fraudulent transfer, fraud, fraud on the court, and civil conspiracy pursuant to 28 U.S.C.A. § 1367.

19.

Venue is appropriate as to Defendant MIC because said Defendant can be found in, resides in, and/or transacts business in this judicial district.  Additionally, acts proscribed by the False Claims Act have been committed by the Defendant MIC in this judicial district.  Therefore, within the meaning of 28 U.S.C. § 13919(e) and 31 U.S.C. § 3732(a), venue is proper.

20.

Venue is appropriate as to the claims against Edwards and MIC for

fraudulent transfer and civil conspiracy because a substantial part of the events or

omissions giving rise to the claim occurred in this state and district and because

Edwards and MIC are subject to personal jurisdiction in this district within the

meaning of 28 U.S.C. § 1391(b)(2) and (b)(3).  This Court also has pendent venue

over the claims because the claims arise out MIC's and Edwards' continuation of

MIC's long term scheme to defraud the Government, first through False Claims

Act violations, then by transferring and hiding assets in an attempt to render MIC

effectively judgment-proof and thereby evade the already-established jurisdiction

of this Court over MIC.

21.

Relators have long ago presented the Government with timely disclosures

regarding the False Claims Act violations described herein as required by 31

U.S.C. § 3730 (b)(2).

## **APPLICABLE LAW**

22.

31 U.S.C. § 3729(a)(1)(A) provides that *any person* who knowingly presents

or causes to be presented to the United States any false or fraudulent claim for

payment or approval is liable to the United States Government both for a civil

penalty and for three times the amount of damages which the Government sustains

because of the act of that person.  The current civil penalty is not less than $5,500

and not more than $11,000 per false claim made.  20 C.F.R. § 356.3.

23.

31 U.S.C. § 3729(a)(1)(B) provides that *any person* who knowingly makes,

uses, or causes to be made or used, a false record or statement material to a false or

fraudulent claim is liable to the United States Government both for a civil penalty

and for three times the amount of damages which the Government sustains because

of the act of that person.  The current civil penalty is not less than $5,500 and not

more than $11,000 per false claim made.  20 C.F.R. § 356.3.

24.

The False Claims Act defines a "claim" to include any request or demand

made upon an agency of the United States for payment of money.  31 U.S.C.

§ 3729(b)(2).  As a result of foreclosures of IRRRLs, Defendant MIC has made

such claims upon the Government.  As a result of their notification to the VA of

defaults of IRRRLs which did not result in foreclosures, Defendant MIC has

caused the Government to expend substantial sums which also amount to a

13

"claim."  A false claim exists whenever the United States incurs any cost or is asked to pay any amount in connection with a fraudulently induced guaranty.

25.

No proof of specific "intent" to defraud is required to prove a False Claims Act violation.  The terms "knowing" and "knowingly" are defined to mean that *a person* (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1).

## BACKGROUND

26.

IRRRLs are provided to retired or active duty veterans to refinance homes they already own.  IRRRLs are available to all veterans who currently have a VA home loan.  The program is designed to give veterans the opportunity to lower their current interest rates or shorten the terms of existing home mortgages.  *See* 38 C.F.R. § 36.4223.

14

27.

Because the loans are for veterans, and because the loans are for lower refinancing payments, and because the loans are guaranteed by the taxpayers, both the type and amount of fees that can be imposed by lenders are strictly limited.

28.

The IRRRL guarantees obligate the United States Government to incur monetary expenses and pay monetary claims to lenders after default, if and when a default occurs.

29.

Ensuring that veterans are not burdened with excessive fees is one of the primary aims of the IRRRLs.  The official policy is explicit, unambiguous, and published to lenders:

> The VA home loan program involves a veteran's benefit.  VA policy
> has evolved around the objective of helping the veteran to use his or
> her home loan benefit.  Therefore, VA regulations limit the fees that
> the veteran can pay to obtain a loan.

*See* VA Pamphlet 26-7, Ch. 8, 8-2.  Because of this policy, the VA has stated that "[l]enders must *strictly adhere* to the limitation on borrower-paid fees and charges when making VA loans."  *Id.* (emphasis added).  This policy is violated when the

15

lender charges unallowable fees to the veteran, circumventing the underlying objectives of the VA IRRRL Guaranty Program.

30.

Because the amount of fees that can be charged are limited by law, lenders originating IRRRLs may only receive a "flat charge not exceeding 1 percent of the amount of the loan" as fees.  38 C.F.R. § 36.4313(d)(2).  (Lenders typically refer to this as the "origination fee.")  In addition to that 1% "flat charge," lenders may also charge "reasonable & customary amounts" for certain specified other costs *actually incurred* by the lender ("actual costs").  *Id.* at § 36.4313(d)(1).  Those allowable fees which the lender may charge include things such as fees for "title examination and title insurance."  *Id.*[16]  In addition to being the actual costs incurred by the lender, *such allowable fees must be "reasonable & customary."*  Allowable fees cannot have unallowable fees bundled into them nor may they be excessive.  Fees charged that are more than the costs actually incurred by the lender are excessive; fees charged that are more than the "reasonable & customary" amount for such costs are excessive.  The specified allowable fees that may be

---

[16] Lenders may also charge for those fees which must be paid to the VA.  *Id.* at § 36.4313(e).

charged to a veteran in an IRRRL do *not* include "closing fees", other unallowable charges, or excessive charges for otherwise unallowable fees.

31.

Lenders, including MIC, almost always charge the 1% "flat charge."  When they do, lenders may not charge separately for attorneys fees or "closing fees", because doing so would cause the "flat charge" to exceed the maximum 1%.  *See* VA Pamphlet 26-7, Ch. 8, 8-8.

32.

Lenders are required to affirmatively represent to the VA, by written certifications, that they have fully complied with the law and with VA rules and regulations in processing an IRRRL.  The lender's written certifications are a condition precedent to the VA's issuance of a loan guaranty.

33.

If a lender charges unallowable fees, *or* charges more than the maximum 1% "flat charge" on an IRRRL, the lender is not entitled to a taxpayer-backed guaranty.  The federal law is explicit:

> *No charge shall be made* against, or paid by, the borrower incident to
> the making of a guaranteed or insured loan other than those expressly
> permitted under paragraph (d) [e.g. recording fees, credit report, title

examination fees and title insurance] or (e) [fees payable to the VA]

of this section, and *no loan shall be guaranteed* or insured unless the

lender certifies to the Secretary that it has not imposed and will not

impose any charges or fees against the borrower in excess of those

permissible under paragraph (d) or (e) of this section.

38 C.F.R. § 36.4313(a) (emphasis added).

34.

Lenders regularly and routinely lie to the Government.  Lenders regularly

and routinely charge both the maximum 1% "origination fee" and charge the

veterans for attorneys fees or closing fees, charge the veteran more than the actual

cost of allowable fees, and charge the veteran more than "reasonable & customary"

amounts for allowable fees.  Lenders regularly and routinely hide those excessive

charges on the standard HUD-1 forms which lenders are required to provide to the

VA.  For example, lenders regularly and routinely inflate the charge for "title

examination fees" above the "reasonable & customary" amounts of such

examinations by adding the attorneys fees or closing fees to the amount which the

lender has represented to the veteran and to the VA was attributable to "title

examination fees" or to some other allowable fee.  Lenders regularly and routinely

inflate the charge for "title insurance" by adding  attorneys fees or closing fees to

18

that cost.  Lenders such as MIC conceal that conduct from the VA and from the veteran who is taking out the loan.  Defendant MIC is guilty of such misconduct.

35.

By paying unallowable attorneys fees or closing fees to the lender's closing attorney or settlement agent from the IRRRL proceeds, the lenders charged those fees to the veteran.

36.

By shifting the cost of attorneys fees or  closing fees to the veteran borrowers, lenders, such as MIC, saved money for otherwise the lenders would have had to pay those amounts.  Lenders' settlement agents do not work for free.

37.

By paying attorneys fees or closing fees from the loan proceeds, the lenders almost always took more than the maximum allowable 1% "flat charge."

38.

No loan with respect to which such misconduct has occurred qualifies for a taxpayer-backed guaranty.

39.

As a matter of law, any loan with respect to which the lender has imposed charges or fees against the borrower "in excess of those permissible" by law

19

"shall" not be entitled to a taxpayer-backed guaranty, and any guaranty issued with respect to such loan is void.  38 C.F.R. § 36.4313(a).

40.

Federal regulations prohibit the VA from guaranteeing an IRRRL where the lender has imposed fees against the borrower "in excess of those permissible" by law and where the lender has falsely certified its compliance with the law.

41.

Lenders have deceived the Government and the veterans for the express purpose of obtaining a taxpayer-backed guaranty which the lenders knew they were not legally entitled to obtain.

42.

After IRRRLs have gone into default, lenders have presented claims to the Government based upon guarantees which the lenders knew were obtained by the lenders' fraud.

43.

The Government, including the VA, was unaware of the lenders' misconduct referenced above.  The VA relied upon lenders, including MIC, to honestly administer the IRRRL program in compliance with federal regulations.  The VA relied upon lenders, including MIC, to honestly certify compliance with federal

20

regulations.  The VA conducted no more than "spot audits" of the lenders' IRRRL

lending practices.  The VA was unaware of the extent to which lenders, including

MIC, were violating the federal regulations and VA rules for the IRRRL program.

The VA was unaware that the lenders, including MIC, deliberately concealed their

misconduct from the VA, by concealing in the final HUD-1 the fact that

unallowable fees had been charged to the veterans and that closing costs had been

illegally shifted to the veterans.  The VA was unaware that the lenders, including

MIC, had violated federal regulations and falsely certified compliance therewith

for thousands upon thousands loans.  The VA was unaware that the lenders'

misconduct, including MIC's, was systemic and purposeful, intentional rather than

inadvertent.[17]  Lenders concealed those facts from the VA.

44.

The VA was unaware that MIC was systematically charging veterans more

than the actual or reasonable & customary fees for title work such as "title exam,"

"title search," and "abstract of title"; was systematically charging veterans more

---

[17] The VA was unaware that the lenders' misconduct in charging veterans
unallowable fees was so extensive that six major banks who were defendants in
this lawsuit made the decision to pay a total of $172 million to settle the same
claims made against them that are made against MIC, without even waiting for a
Court decision of the motions to dismiss this action said defendants had each filed.
(The share of the IRRRL market attributable to those six major banks was only
slightly higher than the share of that market attributable to MIC alone.)

than the actual or reasonable & customary fees for title insurance; that MIC

negotiated with its settlement agents for them to reduce the closing costs that MIC

had to pay by increasing the costs the veteran had to pay; that MIC's settlement

agents had reduced the closing costs that MIC had to pay by inflating the amounts

charged to veterans for "allowable" fees; that MIC's conduct in showing on many

HUDs that a "POC" fee was paid by MIC for closing/attorneys fees was a ruse,

because the actual closing or attorneys fee was much higher than the "POC"

amount revealed by the HUD, but those higher fees were hidden in inflated

"allowable" fees charged to the veterans; that MIC's certifications that it had not

charged the veteran unallowable fees for thousands of loans were not honest and

not accurate; or that MIC never 'self reported' to the VA the fact it had charged

veterans unallowable fees even though MIC knew it had done so.  MIC concealed

those facts from the VA.

45.

Unaware of the misconduct by lenders, including MIC, and therefore

unaware that loans tainted by such lender misconduct did not qualify for a

guaranty, the Government has paid lenders based on guarantees which should not

have been issued and were void as a matter of law.  When an existing VA loan is

refinanced under the IRRRL program, thousands of dollars of expenses are added

22

to the loan balance guaranteed by the Government and must be repaid by the veteran, thus increasing the likelihood of default and loss to the Government.

46.

According to data submitted by the VA to Congress, the VA has paid more than *$2.5 billion dollars* in guaranty claims on direct and IRRRLs to lenders since 2001.

47.

In addition to paying lenders directly based on guarantees that should never have been issued, the Government has, through the VA, incurred enormous expenses and administrative costs on loans that did not qualify for Government guarantees, after receiving notice of default from the lenders.

48.

Those losses to the taxpayers resulted directly from guarantees that the Defendant MIC obtained illegally from the Government.  The guarantees were based upon Defendant MIC's false representations to the Government that Defendant MIC had complied with the law and had not imposed charges or fees in excess of those permissible.

49.

The imposition of unallowable charges combined with the false certifications of compliance for the purpose of illegally obtaining a taxpayer-backed guaranty is a violation of the False Claims Act.

## OPERATIVE FACTS

50.

The following is a brief description of the typical process which results in an IRRRL backed by a VA-issued guaranty issued to the lender.

(a)   A veteran borrower contacts a lender or licensed mortgage broker (such as U.S. Financial Services) to originate the loan.

(b)   If a broker is involved, the broker works with the veteran to complete a loan application and assists in gathering the documentation required by the lender.

(c)   Before a broker can originate a loan, the broker must be sponsored by an approved VA lender.  If a lender originates the loan, no broker is needed.

(d)   The lenders – not the brokers – actually make and service IRRRLs.

(e)   The lender must approve the loan application, the HUD-1, and the IRRRL itself prior to closing.

(f)     *It is the lender's responsibility* to make sure the loan conforms to all

federal regulations and VA guidelines governing the IRRRL program.

The lenders are not supervised by the VA.  The lenders are required to

properly educate and supervise their employees regarding the legal

requirements established by Congress and the VA in order for a lender

to participate in the IRRRL program.

(g)     After *the lender* has approved the loan and the loan documentation,

*the lender* gives closing instructions to the attorney or title company

handling the closing *for the lender*.

(h)     The lender or its agent prepares a HUD-1 statement. The HUD form

lists all of the closing costs and fees.  *The lender* must review for

accuracy and confirm the information reflected on the HUD form

before the closing occurs.  After that approval, the lender's settlement

agent closes the loan in accordance with and pursuant to specific

instructions *provided by the lender*.

(i)     When the loan is closed, the lender sends a copy of the HUD form to

the VA.  *The lender certifies* the accuracy of the loan documentation

to the VA through the use of VA Form 26-1820, "Loan Report and

Certification of Loan."  This form requires that *the lender specifically*

25

*certify to the VA that there are no unallowable charges and the law has been followed.*

(j)     The veteran has three days to rescind or cancel the loan after the closing.  If the loan is not cancelled, the attorney/title company completes the funding of the loan with the wired funds provided by the lender.

(k)     A Government guaranty then automatically issues to the lender, explicitly predicated upon the lender's written certifications of compliance with the law.  No guaranty can be issued unless the lender expressly certifies to the Government that its representations are accurate and truthful.

51.

The HUD form is the key document.  *The lenders* are required to complete that document and to certify to the VA that it is accurate and truthful.  The HUD form has "lines" on which the lender is required to reveal what actual costs it has incurred and is charging for specific items delineated on every HUD form.  For example, attorneys fees or closing fees are to be disclosed on Line 1101 or 1107; title search fees are to be disclosed on Line 1102; title examination fees are to be disclosed on Line 1103; title insurance fees are to be disclosed on Line 1108.

26

52.

U.S. Financial Services specialized in the brokering and origination of VA loans, including IRRRLs.  The company originated thousands of VA IRRRLs. Relators Bibby and Donnelly began originating IRRRLs for U. S. Financial Services in 2001.

53.

As brokers, Relators worked directly with veteran borrowers and coordinated the loan refinancing process on behalf of the veteran borrowers. Brokers help the veteran borrower choose an approved lender and complete the application the lender requires from the veteran.

54.

*The lenders* instruct brokers such as the Relators how to prepare the loan package for an IRRRL.  One form lenders require that brokers prepare is the "Good Faith Estimate" of fees and charges.  The "Good Faith Estimate" is part of the veteran's loan package but is not sent to the VA.  It was Relators' practice to show on the "Good Faith Estimate" form the anticipated charges for attorneys fees. The lender would then be responsible for including the actual amount for attorneys fees or closing fees on the HUD form.  The lenders, however, would alter the HUD form to remove the reference to charges for attorneys fees.  The lenders would

inflate the fee charged for "title examination" or "title search" or "title insurance" by the amount in whole or in part charged for attorneys fees or closing fees– thereby hiding the attorneys fees or closing fees charged by bundling such unallowable fees into an allowable fee.  In some instances, lenders would charge unallowable or excessive fees to the veteran and would disclose such unlawful charges on the face of the HUD form, yet would still certify that such unlawful fees were not being charged.

55.

Subsequently, lenders instructed Relators not to show an amount charged for attorneys fees or closing fees on the "Good Faith Estimate" at all, but directed Relators to add attorneys fees or closing fees to the charge shown for "title examination fee."

56.

Suspicious of such actions and instructions from the lenders, Relators contacted the VA for guidance.  The VA told Relators to refer to the VA Lender Handbook for program guidelines.

28

57.

The VA Lender Handbook is a compilation of the federal regulations and

VA guidelines that govern what charges and fees are allowed and not allowed for

VA IRRRLs.

58.

After reviewing the VA Lender Handbook, Relators learned for the first time

that the lenders were not truthfully reporting costs and charges on HUD forms.

The VA Lender Handbook specifies that all charges and fees imposed on the

veteran/borrower by a lender are capped at 1% of the loan amount (referred to as

the "flat charge" or "loan origination fee"), except for certain allowable charges

and fees listed in 38 C.F.R. § 36.4313(d) and (e).  "Attorneys fees" and "closing

fees" are not listed as allowable fees.  Thus any such attorneys fees or closing fees

charged to the veteran/borrower *must come out of* the 1% "flat charge" allowed by

the regulations.  Fees for "title examination" are, however, a specifically allowed

additional charge.  The *actual* amount paid for the title examination is supposed to

be reported separately on Line 1103 of the HUD form.  The *actual* amount paid for

the title search is supposed to be reported separately on Line 1102 of the HUD

form.  The *actual* amount paid for the title insurance is supposed to be reported

separately on Line 1108 of the HUD form.

29

59.

VA regulations prohibit a lender from charging more than a reasonable & customary amount to have title work done.  38 U.S.C. § 36.4313(d)(1)(vii) (referring to "title examination").  The actual cost of title work (title examination or title search) ranges from approximately $125.00 to $200.00 (according to regional and national data that track title examination and title search fees across the United States).  Relators have closed thousands of IRRRLs.  They also have reviewed numerous fee sheets and written quotes from closing attorneys and title companies specifying actual fees for title work for VA loans.  Through that experience and based upon that review, Relators have determined that Defendant MIC charged veterans for title work in excess of their actual costs.  Defendant MIC inflated the amounts attributed to either "title examination" or "title search" for the purpose of hiding the fact that they were charging veterans for unallowable attorneys fees or closing fees and other fees.  Other allowable fees, such as title insurance premiums, must also be reasonable & customary.  Defendant MIC inflated the amounts attributed to "title examination," "title search," and "title insurance" for the purpose of hiding the fact that it was charging veterans for unallowable attorneys fees or closing fees and other unallowable fees.

60.

For years, the lenders misled Relators, reporting that attorneys fees or closing fees and other unallowable fees were "allowable" charges, even when the 1% origination fee was exceeded.  That was false.

61.

Rather than using the lines on the HUD form for "title examination" and "title search" and "title insurance" to accurately report the actual cost of title work, Defendant MIC was including undisclosed closing fees and other unallowable fees in the amounts it represents was charged for "title examination" or for "title search" or for "title insurance."  In other words, Defendant MIC was fraudulently reporting costs and fees in excess of what should be listed on Lines 1102, 1103, and 1108.  The result is that Defendant MIC reported, on Lines 1102 and 1103 of the HUD forms, charges supposedly incurred for title examination and title search fees in amounts ranging from $525 to $1200, when in fact the total cost of title examination and title search fees should amount to only $125 to $200.  By that deceit, Defendant MIC improperly lumped unallowable costs with allowable costs. The intended result was that the veteran/borrower is charged excessive and illegal fees at closing.

62.

Although brokers, such as Relators, do not attend the closings or prepare HUD forms, the lender sends the brokers a copy of the HUD form after the loan closes.  By examining the HUD form after the closing, Relators could see how the lenders were concealing illegal charges to the veteran.

63.

Relators also discovered that Defendant MIC's illegal dumping of unallowable fees was not limited to Lines 1102, 1103, and 1108 of the HUD form. Defendant MIC also concealed unallowable charges on lines of the HUD form intended for other allowable fees and have also bundled or inflated allowable charges in excess of what is reasonable & customary in contravention of VA regulations.

64.

The most typical unallowable charge that was bundled in with charges on Line 1102, 1103, or 1108 was a closing fee.  Any closing fee paid should have been listed on Line 1101 of the HUD forms.  Many of the IRRRLs which contained unallowable charges simply left Line 1101 blank or showed only a nominal amount – thereby representing to the VA and to the veteran that no, or very little, closing fees were incurred or charged.  That was false.  The closing fees

were illegally added by the lender to Lines 1102, 1103, or 1108 – which were lines on the HUD form specifically designed for the reporting of other fees or charges, not for closing fees.  That deceptive practice is a False Claims Act violation.

65.

Defendant MIC also deceived veteran borrowers and the VA by purporting to show, on Line 1101 for some HUDs, that there was a closing fee "POC," which means "paid outside of closing" by the lender.  Typically MIC would show, on Line 1101 for such HUDs, a "POC" charge of "$50" or "$100."  That was a ruse: no settlement agent closes an IRRRL for just $50 or $100.   The actual closing fees were much higher, and the balance of that fee was shifted by MIC to the veteran borrower by inflating the charge for title work and/or for title insurance.

66.

In their investigation, Relators reviewed hundreds of specific HUD forms, including such forms prepared by Defendant MIC and/or its settlement agents, and found HUD forms where the lender's attorneys fees or closing fees were hidden and not disclosed on Line 1107 or 1101 or anywhere else on the HUD form.  The lenders hid those fees by adding the amount for attorneys fees and closing fees to other lines on the HUD form, which were intended to disclose other fees or charges

which were legal and allowable.  Relators have identified such fraudulent

transactions committed by Defendant MIC.

67.

Lenders are required to certify to the VA that no such attorneys fees or

closing fees or other unallowable fees or excessive fees were charged to the

veteran.  Lenders did so, but those written certifications were false.

68.

Lenders are required to disclose any attorneys fees or closing fees incurred

by them, even though lenders cannot legally charge the veteran for those fees as

part of the loan amount.  Lenders did not disclose the fees paid to the closing

attorneys to the veteran or to the VA.

69.

The result of lenders hiding attorneys fees and closing fees and falsely

inflating other costs and charges on the HUD form is that on average $400 or more

is stolen from the veteran at the time of closing and paid out of the loan proceeds.

This means that the amount of the IRRRL being guaranteed by the U. S. taxpayers

is illegally inflated by $400 or more per loan closing.  That also means the lender

itself saved that amount, adding to its profits from the loan.

70.

The Government incurs costs for these IRRRLs when they go into default.

71.

If an IRRRL goes into default, after the 61st day of non-payment, the VA regulations require the lender to notify the veteran borrower and the VA that the loan is in default.  The lender and the VA then commence intervention activities that cause the VA to expend resources and money.

72.

The VA uses several different intervention approaches when an IRRRL goes into default.  The VA may opt to:  (1) work with the borrower to cure the delinquency/default; (2) pursue forbearance, reamortization, modification and/or repayment; (3) provide VA financial assistance; (4) authorize the private sale of the property, with the VA paying part of the loan balance based upon the guaranty; (5) obtain a deed in lieu of foreclosure from the veteran borrower, with the VA paying off the guaranteed loan in part; (6) authorize the lender to foreclose so the VA can then purchase the foreclosed property from the lender for the loan amount; or (7) allow foreclosure and pay the lender under the terms of the guaranty.

73.

The VA also reimburses the servicing lender for costs incurred by the lender to protect the collateral during the default process.  An intervention in the post-default scenario by the lender can also entitle the lender to receive a bonus from the VA for success in dealing with the default.  That means the Government incurs damage post-default on IRRRLs, even if the default is ultimately cured.  It is a fact that the Government has incurred enormous expenses on guaranteed loans after default even in those instances when the default was cured prior to foreclosure.

74.

When the lender has charged the veteran borrower for an unallowable fee, and when the lender has falsely certified compliance with express conditions precedent to the issuance of the VA guaranty, a False Claims Act violation has occurred.  The False Claims Act claim is complete when the IRRRL that was procured through fraud goes into default, requiring the VA to spend funds because of its guaranty exposure.  At that point, the lender is liable for both False Claims Act damages and civil monetary penalties.

75.

After it became known to Relators in late 2005 that IRRRL lenders were defrauding the veterans and the Government, Relators promptly obtained counsel

(Wilbanks & Bridges) who notified the Government of the fraudulent schemes.

Relators provided explanations and proof to the Government of the illegal

overcharging and inclusion of unallowable costs.  Relators provided to the

Government copies of hundreds of HUD forms containing unallowable costs that

proved the lenders were routinely and systematically hiding and shifting fees on

IRRRLs made in multiple states.

## IMPACT OF VA LOAN FRAUD ON AMERICAN TAXPAYERS

76.

Over 1,100,000 IRRRLs have been guaranteed by the VA from 2001

through 2011.  According to the Office of Inspector General for the Department of

Veterans Affairs ("VA-OIG"), the nationwide default rate for IRRRLs is 18% or

higher.  The total number of IRRRLs going into default routinely exceeds 100,000

per year.  According to the Government Accounting Office, the average number of

IRRRL defaults occurring from 1996 to 2000 was 122,000 per year.

77.

According to reports made annually to Congress, approximately 50% of the

VA loans that go into default end up in a foreclosure proceeding.  The Government

losses do not cease when foreclosure occurs.  For example, in fiscal year 2009, the

VA reported that the cost of managing the foreclosed properties obtained by the

Government after default and foreclosure exceeded $16,000 per loan.

78.

The VA goes to great effort to avoid foreclosure on loans issued to veterans.

On average, a VA loan in default does not reach foreclosure for over 100 months.

During that time period the Government incurs expenses because of its IRRRL

guaranty exposure.

79.

Taxpayers have lost massive amounts over the last decade because of

expenses incurred on foreclosed IRRRLs and defaulted IRRRLs.  According to the

VA Director of Loan Guaranty Services, the average cost to the VA of a default on

an IRRRL exceeds $15,000 per loan, even when the VA is successful in avoiding

foreclosure.  Such "successful" interventions occur in approximately 30-35% of

the cases where a default occurs.  While these "successful interventions" are better

results for the taxpayers than foreclosures, the $15,000 damage per "successful"

intervention is still a tremendous loss to the taxpayers.

80.

The losses to the Government are not limited to intervention expenditures or

foreclosure costs.  One of the most expensive alternatives to foreclosure which the

38

VA frequently elects to pursue is the "refunding" of an IRRRL.  "Refunding"

means the taxpayers actually purchase the entire loan, thereby assuming the entire

indebtedness and paying off the lender.  According to published government data,

approximately one-half of IRRRL refundings eventually end up in foreclosure,

which means the taxpayers absorb the entire loss on that loan, in addition to all the

other expenses incident to trying to avoid the foreclosure.

81.

The loss to the United States taxpayers from IRRRL defaults, foreclosures

and refundings is staggering.  Each year the VA presents Congress with

consolidated financial statements known as Performance and Accountability

Reports ("PAR").  These PAR reports provide specific calculations regarding

default costs, foreclosure property costs and claim payments to lenders.  The PAR

reports submitted to Congress reflect that the taxpayers *made payments to lenders*

on VA guaranteed direct and IRRRLs *in excess of $2.5 billion dollars*

($2,500,000,000) from 2001 – 2008.  That figure is going up every day and will

continue to do so into the future because IRRRLs are going into default every day

and the Government is spending money every day because of loan guarantees,

many of which were procured by lender fraud and misrepresentations.

39

82.

The PAR reports also reveal enormous administrative expenses associated

with the VA loan program annually.  The administrative expenses routinely exceed

$100,000,000 per year for VA direct loans and IRRRLs.  As a subset of those

administrative costs, the VA annually calculates administrative costs that are

specifically related to defaults processed.  Typically, 25% of the total

administrative costs expended are related to defaulted VA loans.

83.

On or about April 25, 2009, the VA-OIG published an audit of the VA's

Loan Guaranty Program.  Within that audit report, the VA-OIG reported losses

ranging from $10,600,000 in the first quarter of fiscal year 2007 to $32,500,000 for

the third quarter of fiscal year 2008.  In the first three quarters of fiscal year 2008

alone, the taxpayers lost over $67,000,000.

84.

Taxpayers' funds are being squandered because of the fraudulent scheme

committed by Defendant MIC and other lenders, which contaminate thousands of

IRRRL closings with intentional fraud.  Defendant MIC was shifting fees it is

supposed to pay to veteran borrowers and charging veteran borrowers unallowable

fees, then fraudulently obtaining the Government guarantees based upon false

40

certifications and misrepresentations.  But for the VA's reliance upon the false

written certifications and misrepresentations of the lenders, the VA could not have

obligated the taxpayers to act as guarantor for the IRRRLs at issue.

## DEFENDANTS PROVIDED MULTIPLE FALSE CERTIFICATIONS AND CLAIMS TO THE VA IN ORDER TO OBTAIN GOVERNMENT GUARANTEES

### A.   LENDER CERTIFICATIONS BEFORE THE LOANS ARE MADE

85.

Each lender is required to certify compliance with the VA regulations and

directives for closing IRRRLs by submitting VA Form 26-8736 to the VA prior to

closing any IRRRL.  Form 26-8736 is an application for authority to close IRRRLs

on an automatic non-supervised basis.  This form is required by 38 U.S.C. §§ 3702

and 3710.  As part of the express certifications made in this form, each lender

agreed and certified that it would comply with Title 38 U.S.C., VA regulations and

other directives issued by the VA.  Form 26-8736 must be signed by the president

or principal officer for the lender.

86.

Every lender was also required to submit Form 26-8736a as a condition of

participation as an approved lender in the VA's IRRRL Guaranty Program.  Each

lender must provide an express certification that its underwriter identified on Form 26-8736a is properly trained and qualified.  Because the VA does not supervise the lenders' employees who handle the loans, it is crucial that the lenders properly train and oversee its employees and the lenders must so certify in order to participate in the IRRRL program.  The Government relies on the lenders to truthfully prepare and submit these forms.

### B.   LENDER CERTIFICATIONS MADE DURING THE IRRRL PROCESS

87.

For each specific IRRRL made, the lender also has to certify on multiple VA Forms that it complied with the applicable VA regulations pertaining to that loan. Lenders must expressly certify that no unallowable charges were imposed upon the veteran borrower.  Defendant MIC submitted fraudulent certifications to the VA falsely claiming it was not charging veterans unallowable fees.

88.

Defendant MIC fraudulently submitted VA Form 26-8923, the "Interest Rate Reduction Refinancing Loan Worksheet," to the VA.  This form must be submitted by the lender when a guaranty is requested on an IRRRL.  On Line 8 of this form, the lender specifically is required to list the "allowable closing costs."  Defendant MIC committed fraud on this form by improperly hiding unallowable attorneys

fees or closing fees or other costs within "allowable" charges on the IRRRL

worksheet and then expressly certifying that the information contained was "true,

accurate and complete."

89.

Defendant MIC committed other false certifications to the VA on the HUD

forms which Defendant MIC prepared and subsequently provided to the borrowers

and the VA.  On each HUD form, the lender is required to certify that the HUD

form is a "true and accurate account of the transaction."  For those IRRRLS where

unallowable fees were improperly bundled into allowable charges or more than

actual fees were charged to the veteran or the fees charged were not reasonable &

customary, the certifications to the VA were false.

90.

Defendant MIC also made false statements on VA Form 26-1820, which

must be submitted by the lenders to the VA.  This form is titled "Report and

Certification Upon Disbursement."  On Form 26-1820, the lender is required to

expressly certify that it "has not imposed and will not impose any charges or fees

against the veteran borrower in excess of those permissible under the schedule set

forth in paragraph (d) of 38 C.F.R. 36.4312."  The lender is further required to

expressly certify that the information provided to the VA regarding the loan is

accurate and complete.  The lender is also required to certify that "[t]he loan

conforms with the applicable provisions of Title 38, U.S. Code and the Regulations

concerning guaranty or insurance of loans to veterans."

91.

For those IRRRLs with respect to which unallowable fees were charged to

veterans, the written certifications by Defendant MIC on each of the above-

mentioned VA forms were false.

92.

The stakes are high for lenders who use false information to obtain

Government guarantees.  Numerous federal laws are violated when any lender

intentionally provides false certifications and/or adds illegal fees for a Government

guaranteed loan.  Form 26-1820 itself explicitly warns lenders that:

> Federal Statutes provide severe penalties for any fraud, intentional
>
> misrepresentation, or Criminal Connivance or conspiracy purposed to
>
> influence the issuance of any guaranty or insurance by the Department
>
> of Veterans Affairs.

VA Form 26-1820.

### C.   **POST-CLOSING CERTIFICATIONS**

44

93.

When an IRRRL is at least 61 days into default, the lenders complete VA
Form 26-6850 and forward it to the VA.  This is the "Notice of Default" ("NOD").
The information in Form 26-6850 is required so the VA can "determine
compliance with the applicable reporting requirements of VA regulations."  Form
26-6850.  When a lender sends a NOD to the VA on a loan for which the guaranty
was fraudulently obtained, the submission of a false claim occurs.

94.

Additional forms which lenders must submit to the VA after closing require
the lender to provide the VA with accurate information regarding the outstanding
loan and default balances:

>  VA Form 26-6850(a), "Notice of Default and Intention to Foreclose";
>
>  VA Form 26-1874, "Claim Under Loan Guaranty"; and
>
>  VA Form 26-567, "Status of Loan Account – Foreclosure or Other
>  Liquidation."

At the bottom of Form 26-1874, each lender is warned:

>  PENALTY:  Federal statutes provide severe penalties for any fraud,
>  intentional misrepresentation, or criminal connivance or conspiracy in
>  making any claim upon or against the Government of the United

States, or any department or officer thereof, in obtaining or aiding to

obtain the payment or approval of such claim.

VA Form 26-1874.

For those loans where veterans are charged unallowable fees, the amounts reported

to the VA are inaccurate and fraudulent, because the amounts included illegal fees

– a fact known to the lenders, but concealed from the veterans and the

Government.

## **PROOF OF DEFENDANTS' FALSE CLAIM**

### 95.

Relators have attached to this Fourth Amended Complaint a chart as Exhibit

A, which includes a specific example whereby Defendant MIC has presented a

false claim to the Government.

### 96.

In the IRRRL referenced in Exhibit A, Defendant MIC did not properly

report the actual amount of the closing costs it incurred on the HUD form.  Instead,

Defendant MIC improperly bundled unallowable closing costs into the "title

examination" fee.  Defendant MIC reported $450 as *its actual cost* for "title

examination," but that was false: a reasonable & customary fee for a title

examination fee is in the range of $125-$200.  MIC shifted unallowable fees into

the line on the HUD for an allowable fee.

97.

For the loan referenced on Exhibit A and for all other IRRRLs where Defendant MIC charged illegal attorneys fees or closing fees or other unallowable fees, Defendant MIC failed to meet its obligation to provide accurate and truthful reporting prior to closing of the loan as required by VA Forms 26-8736 and 26-8736a.

98.

For the IRRRL referenced on Exhibit A and for all other IRRRLs where Defendant MIC charged illegal attorneys fees or closing fees or other unallowable fees, Defendant MIC provided false and misleading information and fraudulent certifications on VA Form 26-8923, the HUD form and VA Form 26-1820.

99.

For the IRRRL referenced on Exhibit A and for all other IRRRLs where Defendant MIC charged illegal attorneys fees or closing fees or other unallowable fees, Defendant MIC provided false and misleading information on VA Form 26-6850 and VA Form 26-1874.  In many of those instances, false information was also provided on VA Form 26-6850a when foreclosures were involved.

100.

The IRRRL referenced on Exhibit A went into foreclosure and Defendant

MIC (or the entity who purchased MIC's rights under the loan) submitted a false

claim to the VA for payment.  For other IRRRLs like those on Exhibit A which

went into foreclosure, Defendant MIC (or the entity who purchased MIC's rights

under the loan) also submitted false claims to the VA for payment.  Other loans

made by Defendant MIC went into default and Defendant MIC made false

statements or claims regarding those loans as well.  The Government was forced to

spend funds on all such loans because of the Government's obligations created by

the fraudulently obtained guarantees.

101.

Defendant MIC made the referenced false certifications to the VA

knowingly and repeatedly over a course of years.  Defendant MIC intentionally

concealed unallowable charges on IRRRLs from veterans and from the VA.

102.

Defendant MIC never notified the Government that its certifications – made

*before, during and after* the IRRRL closing – were false and inaccurate.

103.

The Government relied upon each of the false certifications and

representations made by Defendant MIC, to the detriment of both veterans and

taxpayers.  Because these loans are "non-supervised" by the VA, the certifications

are the VA's "policing" tool to make sure the lenders follow and adhere to all

applicable federal regulations and VA guidelines.  The betrayal of the VA's trust in

the lenders resulted in massive damage to the United States taxpayers over the last

decade, as well as the theft of tens of millions of dollars directly from our

country's veterans.

## MOTIVE FOR THE DEFENDANTS' FRAUDULENT ACTIONS

104.

Defendants' motives were crystal clear.  Defendants engaged in the

fraudulent schemes outlined herein in order to illegally raise MIC's profits by (a)

shifting closing fees MIC should have paid to the veteran borrowers, and (b)

benefitting from the financial assistance provided as a result of the Government

guarantee.  Defendants' fraud enabled them to obtain VA guarantees, which

greatly reduced its risk in making IRRRLs, *and* made the loans originated by MIC

marketable on the secondary market.  Defendant MIC also profited *directly* from

its fraudulent conduct because it illegally passed on to the veteran and the

Government fees that were not supposed to be paid from loan proceeds – such as

attorneys fees and closing fees.  Those unallowable fees were added to the loan

49

amount that is guaranteed by the VA.  That allowed Defendant MIC to make an additional $400 to $1,000 on every IRRRL closing that involved inflated and unallowable fees.  The direct profits generated by Defendant MIC's fraud have been enormous.  Edwards testified that MIC made 450,000 loans.[18]  Virtually all of those loans were IRRRLs.  If MIC cheated on all those IRRRLs, then its profits were inflated by at least $180 million.  Both the veteran borrowers and the taxpayers have been victimized by Defendants' fraud.

105.

There is also one additional important fact to consider.  Many of the loans made by Defendant MIC were sold to other entities.  By fraudulently obtaining Government guarantees on the IRRRLs, Defendant MIC was able to obtain a premium price for the sale of the IRRRL to an acquiring entity.  Without the Government guaranty in place, the amounts received upon the sale of the IRRRL would be much lower.  With an IRRRL guaranty, the Government is obligated to pay at least 25% of all losses on loans up to $417,000.  The Government pays 100% of all losses incurred up to 25% of the loan balance.  The loss protection provided to the loan holder from the Government guaranty is a valuable asset.

**DEFENDANTS' FRAUDULENT SCHEME TO TRANSFER ASSETS**

---

[18] Edwards Dep. at 36/8-9.

106.

Defendant MIC is a privately held Ohio corporation.

107.

Defendant Edwards purchased MIC in 1995[19] and is its largest shareholder,

owning 77.5% of the outstanding stock.[20]  At various times, Edwards has served

as, President, Chief Executive Officer and as the sole member and Chairman of the

MIC "Board of Directors."

108.

Faced with MIC's liability to Relators in this case and MIC's liability in

multiple other state and federal lawsuits and investigations in 2011, 2012 and

2013, Edwards engineered a scheme to distribute nearly all of MIC's assets to

himself and to MIC's other shareholders in an effort to render MIC insolvent and

judgment proof.  As a result of Edwards' actions, more than $xxx was paid out to

Edwards, his wholly owned entities, and to MIC's other shareholders between

October 2011 and the present, with the majority of those payments going to

Edwards and occurring *after this Court denied MIC's motion for summary*

\.

---

[19] Edwards Dep. at 109/20-21.

[20] ████████████████████

*judgment*.  The result of those massive payments to Edwards is that MIC is

insolvent and unable to pay any judgment entered against it in this case.

109.

On October 3, 2011, this case was unsealed.  Doc. 61.


110.

On November 15, 2011, Defendant MIC filed its "motion for summary

judgment."  Doc 11.  MIC claimed it was entitled to judgment as a matter of law

on Relators' claims against it.  Doc. 30 at 1 (Order dated 11-19-12).  Defendant

Edwards directed MIC to file the motion for summary judgment.[21]  MIC's filing of

a "motion for summary judgment" at such an early stage of the proceedings

seemed inexplicable at the time; each of the other seven defendants then in this

case filed, instead, motions to dismiss under Rule 9(b).

111.

MIC filed its motion for summary judgment for the express purpose of

slowing this case down and delaying the entry of a judgment against MIC so that

Edwards could drain the company of all collectible assets.

112.

---

[21] Edwards Dep. at 86/1-5.

In support of its motion for summary judgment, MIC submitted a false declaration arguing that a $450 charge for title search and examination was reasonable & customary.  Doc. 11-2.  To support that position, MIC stated that "fee sheets" contained within MIC's files supported title examination charges of as high as $635.  MIC did not attach those fee sheets to its declaration and withheld from the Court the fact that those fee sheets were altered by MIC (or at its direction) to reduce the amount of closing costs paid by MIC and to increase the fees for title work to be paid by the veteran, *exactly* as Relators had alleged in their initial complaints.[22]

113.

While the Court was considering MIC's motion for summary judgment, six of MIC's eight original co-defendants – each a major national bank – settled with Relators before the Court could rule on those defendants' motions to dismiss.  The six settling co-defendants paid a total of $172 million to settle the claims asserted against them by Relators.  MIC closed far more IRRRLs than each of those six settling co-defendants – its market share of the IRRRL market was slightly less

---

[22]  Dep. of MIC's Chief Compliance Officer, Thomas Carpenter at 94/20 – 95/1 ("Q: [I]sn't it true this [MIC fee sheet] shows that closing costs have been shifted to the veteran? … A: Based on that document, yes.")

than the combined market share of the six settling defendants.  Edwards and MIC

knew that nearly all of their co-defendants had paid $172 million to settle claims

against them that were nearly identical to the claims against MIC.  Knowledge of

those settlements put Edwards and MIC on notice that MIC confronted a potential

liability of at least $172 million - and likely much higher.[23]

114.

On November 19, 2012, this Court denied MIC's motion for summary

judgment.  Doc. 30.

115.

*Less than one week after* the Court denied MIC's motion for summary

judgment, on November 23, 2012, Edwards paid himself from MIC funds an

"executive bonus" of  $xxx .The "executive bonus" paid to Edwards was a sham –

Edwards was not an "executive" of MIC and *did not work at MIC in 2012.*[24]  That

"bonus" was a disguised shareholder distribution – but to only one shareholder, the

---

[23] The settlements with those six major banks came very early in this litigation,
while the motions to dismiss filed by those defendants were still pending, and
before any discovery had been done.
[24] Edwards Dep. at 93/5-20.

controlling shareholder Edwards.  *Thirty-eight days after* the Court denied MIC's

motion for summary judgment, Edwards paid $xxx to MIC's shareholders with

$xxx of that amount going to himself.  The $xxx distribution paid to MIC's

shareholders thirty-eight days *after* this Court denied MIC's motion for summary

judgment was ***nearly double*** the total combined amount paid to MIC's

shareholders in the ***seven*** prior years of 2005, 2006, 2007 2008, 2009, 2010, ***and***

2011.  Thus in the first 38 days after this Court denied MIC's motion for summary

judgment Edwards looted MIC of some $xxx - $xxx of which went directly to

Edwards.

116.

In addition to those payments made directly to Edwards in 2012, Edwards

also directed MIC to pay $xxx to his wholly owned entity MSP during calendar

year 2012 supposedly for "royalty" payments and for "marketing services."  In

truth, Edwards created all of MIC's marketing scripts himself and the payments to

MSP were simply a way to funnel MIC's assets to Edwards personally and away

from MIC's second largest shareholder Linda Edwards – Edwards' ex-wife who he

had divorced in 2000.  Those payments to MSP were purportedly based on a

"royalty" agreement that Edwards directed MIC to enter into with MSP in 2001,

one year after his divorce with Linda Edwards was finalized.  MSP is wholly

55

owned by Edwards and Edwards is MSP's only officer.[25]  Edwards treated MSP's

money like it was his personally and took money out of the company whenever he

felt like it.[26]

117.

This case proceeded through discovery in 2013 and into early 2014.  During

that time, MIC did everything in its power to slow discovery down in order to

delay the entry of a judgment.  MIC first contended that it had no way of knowing

which loans had resulted in payment to MIC and therefore could not produce any

of its loan files.  MIC stated on numerous occasions, though, that the loan files

would be produced once the loans resulting in a payment were identified.

118.

In July 2013, the VA provided a list of more than 14,000 MIC loans that

resulted in a payment and MIC suddenly shifted gears by claiming that it could not

locate nearly half of the loan files.  That position was totally inconsistent with

Edwards claim, in his September 17, 2015 deposition, that when he heard about

this case after it was unsealed he 'ordered' his staff to check every MIC loan file –

---

[25] Edwards Dep. at 107/17-23; 108/7-12; 118/20-119/2.
[26] Edwards Dep. at 123/6-8.

some 450,000 of them, and that those loan files were  "checked, double checked and triple checked" at Edwards' direction.[27]

119.

Unbeknownst to Relators, during 2013 while MIC was delaying discovery and refusing to produce documents, Edwards was continuing to loot MIC's assets. During 2013, Edwards directed that MIC distribute to its shareholders a total of $xxx.  Of that amount some $xxx went to Edwards.  In addition, Edwards also directed MIC to *pay* $xxx in *"royalty fees" to MSP*.[28]  Finally, Edwards also paid himself $xxx in "executive bonuses."  That is a total of *at least* $xxx paid to Edwards in 2013 alone.

120.

The distribution in year 2013 of $xxx to shareholders plus an additional $xxx distributed to MSP, was more than MIC showed as "total assets" on its 2012 financial statement.  The distribution in year 2013 of $xxx to shareholders was more than MIC showed as "total shareholders' equity" on its 2012 financial statement.  The shareholder distribution in year 2013 was more than the total

---

[27] Edwards Dep. at 78/13-82/2.

[28] ████████████████████████████████████████████████

combined amount of *all shareholder distributions in the eight years* from 2005-

2012. *Edwards had almost totally looted the company – in the months after this*

*Court denied MIC's motion for summary judgment.*

121.

The reason for those massive distributions and payments to Edwards in 2013

is clear – facing a massive liability in this case, Edwards made the decision to strip

MIC of all available assets and to render MIC judgment proof.

122.

This case was not the only litigation against, or regulatory investigation of,

MIC that was pending in 2013.  In early 2013, MIC learned that it was the target of

an investigation by the Federal Trade Commission relating to MIC's fraudulent

marketing tactics and violations of the federal Do Not Call list (the "FTC Action").

On June 25, 2013, the FTC filed its complaint against MIC in the United States

District Court for the Middle District of Florida along with a proposed order agreed

to by MIC, whereby MIC agreed to pay a $7.5 million fine and to cease and desist

a variety of its deceptive and misleading marketing practices to veterans.  The fine

agreed to by MIC was the largest fine in the history of the United States ever paid

for violation of the federal Do Not Call list.

123.

58

Three days after the FTC filed its action against MIC, a putative national class action was filed against MIC in the Superior Court of King County, Washington, seeking the certification of a nationwide class of veterans victimized by MIC's repeated deceptive and misleading marketing tactics and violations of the federal Do Not Call List (the "Washington Class Action").

124.

At or around the same time, MIC also was under investigation by the states of Minnesota, Washington and Florida for its fraudulent activities related to the marketing and sale of IRRRLs (the "State Investigations").

125.

Of the $xxx distributed to MIC's shareholders in 2013 more than $xxx was distributed to MIC's shareholders between August 2, 2013 and October 21, 2013. By the time Edwards directed those distributions, MIC had already agreed to pay $7.5 million to settle the FTC Action, and knew about the pendency of this case plus the Washington Class Action and the State Investigations.

126.

The shareholder distributions made in 2012 and 2013 dwarfed all previous distributions and payments to MIC.  The annual shareholder distributions for years 2005 – 2013 were:

2005: $xxx
2006: $xxx
2007: $xxx
2008: $xxx
2009: $xxx
2010: $xxx
2011: $xxx
2012: $xxx
2013: $xxx

Just in the thirteen months after this Court denied MIC's motion for summary

judgment, MIC distributed to its shareholders a total of $xxx which was *seven*

*times* the amount of distributions made in the seven previous calendar years

**combined.**

127.

In just 2012 and 2013, a total of $xxx was paid by MIC to Edwards and to

Edwards' wholly owned entity MSP.  Those payments were made directly to

Edwards' Trust and to Edwards' offshore bank accounts located in the Bahamas.

128.

MIC did not reveal to this Court or to Relators that Edwards had distributed

nearly all of MIC's assets during calendar year 2013.  Instead, from the beginning

of this case MIC did everything in its power to hide the fact that Edwards was

looting the company's assets.

129.

On December 5, 2012, Relators served upon MIC various discovery, including Relators' First Requests for Production of Documents ("First RPDs"), seeking, *inter alia*,  financial information "relating to MIC's profitability and/or its corporate structure" (RPD # 13), "stock records" including "dividend transfers paid to shareholders" (RPD # 20), "for 2010 to the present, all quarterly and annual financial statements" (RPD #25), and "audited financial statements" (RPD # 26).

130.

On February 6, 2013, MIC objected to Relators' First RPDs 13, 20, 25, and 26, but in response to RPD #26 MIC agreed to "produce audited financial statements for 2010 and 2011" (emphasis added).  Ultimately, MIC produced its financial statements for 2010-2012.  The 2010-2012 financial statements showed that MIC was still an operating entity with substantial servicing rights for IRRRLs and more than $xxx in assets.

131.

Ultimately, questions were raised, first by Relators, then by the Department of Justice, and then by this Court, about whether MIC remained an ongoing, solvent entity able to satisfy any judgment imposed by this Court.  *See* transcript 4/12/2013 at 29/8-20, 43/2-17; 5/11/2015 Tr. at 89/17-19;6/22/2015 Tr. at 29/8-

31/17.[29]  On all three of those occasions, MIC's representations to this Court were intended to communicate that there was no issue about MIC's solvency or its ability to pay a judgment entered by this Court.  *MIC knew those representations false when made.*

132.

Despite letters and 'meet & confer' sessions, MIC refused to produce financial statements for 2013 and 2014.[30]

133.

Pressured by this Court's June 9, 2015 Order requiring a Joint Submission by the parties and the imminence of a June 22 hearing in this case, MIC finally

---

[29] The DOJ raised its concerns about MIC's solvency in its filing of June 8, 2015. Doc. No. 131.

[30] Relators counsel requested updated financial information by email and letter on June 4, 2015 and June 8, 2015.  On June 11, 2015, the parties had a meet and confer telephone call where MIC stated that it would consider, but not commit to, producing its financial statements.  After Relators sent another letter on June 12, 2015 and on the eve of required Joint Submission to the Court regarding outstanding disputes, MIC agreed to produce its financial statements, but did not set a date by when it would do so.  Relators raised the issue again by letter on June 18, 2015 and at the status conference on June 22, 2015.  Even after the Court directed MIC to produce its financial statements at the June 22, 2015 hearing, MIC still had not done so and Relators sent *another* letter to MIC asking when the financial statements would be produced.  It was only after Relators sent its *fifth* letter on June 24, 2015 demanding that the documents be produced, that MIC finally agreed to produce the 2013 and 2014 financial statements to Relators by no later than June 25, 2015.

relented and said that it would produce additional financial statements on June 15.

However, a week later, at the June 22 hearing, it still had not done so despite the

fact that MIC's outside lawyers already had copies of those documents.  Directed

by this Court on June 22 to do so, finally on June 25, 2015, MIC produced its 2013

and 2014 financial statements in response to Relators' First RPDs.

134.

The 2013 financial statement first produced by MIC on June 25, 2015

revealed for the first time the massive transfers of MIC's assets, including the $xxx

that went to Edwards in shareholder distributions and the $xxx *paid in "royalty*

*fees" to MSP* .  See Exhibit C, ██████████████████████████

███████████████████████████████████████

██████████████  That is a total of *at least* $xxx paid to Edwards in 2013

alone that was revealed for the first time on June 26, 2015 when Relators obtained

MIC's 2013 financial statements.[31]   At that time, this case had been unsealed for

three years, eight months, and Edwards had started the looting three years before,

---

[31] The words "at least" are used because the 2013 financial statement also shows
large outflows from MIC's assets for "rent," "title insurance," and "loan settlement
services" – which may well have also been payments to Edwards.  For example,
Edwards owns all of the building rented by MIC.  Edwards Dep. at 119/8-13.
Edwards also owns 40% of the stock of National Title Network Inc. to which MIC
paid $xxx in 2013.  Ex. C. Note 11; MIC's Resp. to Relators Amended First
Interrogatories at 43.

in 2012, yet Edwards and MIC had kept the looting concealed from this Court and from Relators.

135.

The 2013 and 2014 financial statements also revealed that as a result of the distributions and transfers of assets, MIC's assets have been diminished by at least 87.6% since 2011, when Edwards directed MIC to file its motion for summary judgment. At the end of year 2011, MIC had assets of $xxx. At the end of year 2014, MIC had assets of $xxx, but "cash or cash equivalents" of only $xxx. *See* Ex. D. at p 6. Most – 73% - of that dissipation of assets occurred *within months* after this Court denied MIC's motion for summary judgment on November 19, 2012. That cash has since been further diminished by the payment in 2015 of $7.5 million to settle the Washington Class Action and a related Oregon case, and most assuredly by other expenditures and distributions unknown to Relators.

136.

The 2014 financial statement first produced by MIC on June 25, 2015 revealed that

- In October 2013, MIC suspended the origination of new mortgage loans.

- MIC has liquidated substantially all assets other than cash and cash equivalents, and does not expect to resume mortgage lending and sale

64

operations in 2015 and thus, does not expect to earn material revenues or

conduct other operations in 2015.[32]

That information had not been revealed to this Court or to Relators prior to receipt

by Relators on June 26, 2015 of the 2014 financial statement.

137.

The 2014 financial statement also revealed that MIC had changed its

reporting *regarding this case*.  The previous MIC financial statements reported,

with respect to this case, that "management is not aware of any material expected

effects on the future financial condition, operations, or cash flows of the

Company."  The 2014 financial statement states "should the Company receive an

unfavorable outcome, the impact would likely be material to the financial

statements."  Ex. C at 12.  That was an understatement.  That dramatic change

resulted directly from, and was caused by, Edwards' looting of virtually all of

MIC's assets.

138.

---

[32] *See* Ex. C at p 7.  The 2014 financial statement first produced by MIC on June
25, 2015 also revealed that in the year 2014 MIC changed its auditors from the
national accounting & auditing firm Grant Thornton to a local Clearwater Florida
accounting firm, "Mayer Hoffman McCann PC."

The reason MIC refused to produce financial statements for 2013 and 2014 is thus self-evident: MIC and its shareholders were engaged in fraudulent transfers and a fraud upon this Court, in an attempt to defeat this Court's jurisdiction over MIC by rendering MIC effectively judgment-proof.

139.

It is irrefutably clear from MIC's own long-concealed 2013 and 2014 financial statements that after this Court denied MIC's motion for summary judgment, Edwards himself decided to grant MIC's motion for summary judgment – by effectively making MIC  judgment-proof.

140.

When MIC represented to this Court on three separate occasions – April 12, 2013, May 11, 2015, and June 22, 2015 – that the solvency of MIC and its ability to pay a judgment was not an issue, MIC did not inform this Court of the foregoing facts.

141.

More specifically, *MIC did not tell this Court* that after this Court denied MIC's motion for summary judgment Edwards caused MIC's assets to be reduced

by at least 87%;[33] or that Edwards had taken $xxx from MIC as so-called "bonuses" in 2012, even though Edwards was not working at MIC;[34] or that Edwards had caused MIC to distribute $xxx to shareholders in 2012 then $xxx to shareholders in 2013 – 77.5% of which went to Edwards; or that Edwards had transferred $xxx from MIC to Edwards' wholly owned corporation MSP in 2012 and 2013. *That is a total of over* $xxx *looted from MIC in just two years.*

142.

*MIC also did not tell this Court* that, in the words of the 2014 financial statement, MIC had liquidated substantially all assets. Given inquiries three times by the Court, and inquiries by Relators and by the Department of Justice, simple honesty compelled MIC to divulge that information.  Instead MIC deliberately withheld that information from the Court, from Relators, and from the Department of Justice – for as long as MIC could do so, until it was finally forced to produce the 2013 and 2014 financial statements.

143.

There is no doubt that MIC deliberately misled this Court.  On April 12, 2013, Relators' counsel raised concerns about the viability of MIC after Relators

---

[33] 2011 assets of $xxx minus 2014 assets of $xxx equals $xxx – a reduction of 87%.
[34] Edwards Dep. at 93/5-20.

learned that MIC was possibly being sold to Tampa based Home Banc.  MIC

counsel Souders, of the Weiner Brodsky law firm, told this Court, in response to

the Court's own question: "they're trying to get a bank holding company to

purchase it.  *But that changes nothing.  It's an ongoing concern. . . . And we're here*

*for the long haul."*  4/12/13 Tr. at 43/5-15 (emphasis added).  Then, after the long

delay caused by MIC's and WF's attempt to take advantage of the seal violations,

on May 11, 2015, the Court asked "Is there an issue as to MIC's financial viability?

Is that something that MIC is pressing?"  MIC counsel Kieval, also of Weiner

Brodsky, then told this Court "No, Your Honor. My client – it's not a secret that

my client stopped making loans some time ago, but ***that's it.***"  5/11/15 Tr. at

89/15-19 (emphasis added).  ***But then after*** MIC had finally agreed, the week

before the June 22 hearing, to produce financial statements for 2013 and 2014 –

which were long past due to Relators – MIC backtracked.  The Court said to MIC

counsel Kieval:  "Now, I understood your position as stated on behalf of MIC was

that you're solvent and your company's solvent and it's not an issue. But you're also

providing financial information; is that correct?"  MIC counsel Kieval responded:

"Your Honor, just to be clear, *I don't make any representation about the financial*

*state of the company*."  6/22/15 Tr. at 29/20-25 (emphasis added).

144.

Even when on June 22, 2015 this Court told MIC counsel that "we do have judicial economy interests here as well" (6/22/15 Tr. at 31/12-13), MIC *said nothing* about the fact, later revealed when on June 25 MIC finally produced financial statements for 2013 and 2014, that MIC's assets had been looted to the point it made no sense, for Relators or the Court, to continue the litigation against MIC **unless the looting can be undone**.

145.

MIC's outside counsel at Weiner Brodsky were aware ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ Neither they nor MIC disclosed that fact to this Court. Instead, on May 12, 2015, MIC's counsel represented to this court that "it's not a secret that my client stopped making loans some time ago, but **that's it.**" 5/11/15 Tr. at 89/15-19 (emphasis added).  MIC's decision to stop making loans was clearly not "it" and MIC and its counsel knew it and they were affirmatively misleading this Court into thinking there was no issue about MIC's solvency.

146.

---

[35] ████████████████████████████████████████████████████████

████████████████████████████████████████████

That granting judgment to MIC by rendering it effectively judgment-proof was Edwards' purpose and intention is revealed by what Relators have discovered – but which MIC of course already knew – about those MIC-originated loans that violated VA regulations ('dirty' loans).  MIC has produced HUDs for approximately 9000 of the 18,000 MIC-originated loans that went to claim as identified by the VA.  See Doc. 138 at pp. 3-4 (under "a. Missing HUDs, Loan Files, and Payment Information on MIC-originated IRRRLs.")  Relators have identified 1589 'dirty' loans from amongst the first 9000 HUDs studied by Relators.  That is a 17% 'dirty' rate.  But of those 1589 loans, 965 of them were acquired by the VA.  That is 80% of the 'dirty' loans.  Acquisitions result in much higher losses to the Government.  The actual damages to the Government as a result of *just those 965 acquired loans* is $99,235,639.  That is an average loss to the Government per loan of $102,834.  If the same percentage of the 9000 loans for which MIC has failed to produce HUDs are 'dirty,' then there are another 1530 loans at issue (17% of 9000 is 1530).  If the same percentage of those loans are acquisitions, then that means there are another 1224 loans on which the Government has lost an average of $102,834 per loan, for an additional amount of actual damages of $125,868,816.  The total *actual* damages to the Government thus appear to be *at least* $225,104,455.  That amount must be trebled, and civil

70

monetary penalties in some amount must be assessed for each loan.  ***MIC's***
***liability in this case is well in excess of $500 million.***

147.

Edwards and MIC cannot defend or justify the distributions revealed by the
financial statements.  Thus far they have not tried to do so. The law requires that a
corporation and its directors favor its creditors over its shareholders.  MIC is an
Ohio corporation.  As a matter of Ohio law, MIC was precluded from paying
dividends or distributions to its shareholders "when the corporation is insolvent or
there is reasonable ground to believe that by such payment it would be rendered
insolvent."  Ohio Stat. § 1701.33.

148.

Just since this case was unsealed, more than $xxx of MIC's assets have been
transferred as a result of shareholder distributions, "executive bonuses" and
payments to Edwards' wholly owned entity MSP.  The effect of those payments
has been to render MIC insolvent.  Edwards knew when he made the decisions to
pay himself that money that the effect of the payments would be to leave MIC with
no ability to pay a judgment entered against the company in this or any other case.

149.

Edwards alone made the final decisions about how much MIC was going to pay to MSP, how much Edwards was going to pay to himself in the form of "executive bonuses",[36] how much money Edwards was going to transfer from MIC to his wholly owned corporation MSP,[37] and how much MIC was going to distribute to MIC's shareholders.[38]

150.

Before making those massive distributions and payments to himself, Edwards was aware that this Court had denied MIC's motion for summary judgment and that nearly all of MIC's co-defendants had settled, but he *claims* he never spoke to or sought the advice of his outside counsel who were representing him in this case.  Edwards testified that the first time he ever spoke to any of the lawyers from the Wiener Brodsky firm was on September 16, 2015 the day before Edwards was deposed by Relators in this case.

151.

---

[36] ███████████████
[37] Edwards Dep. at 124/24-125/4.
[38] Edwards Dep. at 192/24-194/5 (Edwards called it a "collaborative" decision, in which Edwards' accountant Garavaglia, MIC and Edwards Group CFO Lattner and MIC CEO Crilley were involved.  But all of them worked for Edwards.  Other shareholders were not consult).



152.

MIC has never had a 'defense' to this action, as demonstrated by the fact that six of the eight defendants originally involved in the case settled, and as demonstrated by Relators' identification of so many 'dirty' loans originated by MIC, and as even more poignantly demonstrated by MIC's decision to transfer virtually all of its assets, mostly to Edwards, *after this Court denied MIC's motion for summary judgment.*

## DEFENDANT EDWARDS' ABUSE OF THE CORPORATE FORM AND LACK OF CORPORATE FORMALITIES

153.

Defendant Edwards has exercised unilateral control over MIC since he purchased the company in 1995.  Edwards operated MIC without regard to

---

39 ███████████████████████████
40 ███████████████████████████
41 ███████████

corporate formalities, failing to follow even the most basic of corporate requirements, looting the corporation at will, commingling MIC's assets with his personal assets and those of his other wholly owned entities (e.g. transfers to MSP and the Edwards Group), and ignoring Ohio corporate law. *The result is that MIC was a corporation in name only.*

154.

In consistently diverting most of MIC's assets to himself, Edwards failed to follow the most basic of corporate record keeping requirements:

- Each year, Edwards would decide how much of MIC's income to pay to MSP, his wholly owned entity.  Edwards treated MSP like his personal piggybank and took money out of that corporation whenever he felt like it.[42]  There are no board resolutions, corporate meeting minutes or corporate documentation of any kind authorizing the payment of more than $xxx to MSP in 2012 and 2013 after this case was unsealed.

- Each year, ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

---

[42] Edwards Dep. at 123/6-8 ("Q.  How are you paid by Marketing Solutions? A. I'm paid whenever I feel like taking money, I take it.").

███████████████████ Edwards had no employment

contract that authorized the payment of "executive bonuses" to himself –

in truth, Edwards was not even an "executive", serving for the last

several years only as the "Chairman" of MIC's single member "Board of

Directors." ██ There are no board resolutions, corporate meeting minutes

or corporate documentation of any kind authorizing the payment of

executive bonuses to Edwards, including the more than $xxx paid to him

in 2012, a year during which Edwards himself testified he was not

working at MIC. [45]

155.

Edwards directed the payment of more than $xxx to MIC's shareholders in

2012 and 2013.  There are no signed board resolutions, corporate meeting minutes

or corporate documentation of any kind authorizing the payment of $xxx in

shareholder distributions in 2012 and 2013.  Other than accounting records, there is

literally no document in the corporate books and records of MIC authorizing or

even acknowledging the payment of $xxx to MIC's shareholders after the Court

denied summary judgment in this case.

---

[44] ████████████████████████████

[45] Edwards Dep. at 93/5-20.

156.

Edwards also routinely abused MIC's corporate form in the following ways:

- Edwards frequently used MIC's resources to pay for his own or his
  wholly owned entities' expenses.  MIC officers and employees frequently
  performed work for Edwards or his wholly owned companies while on
  MIC time and while being paid only by MIC.

  o David Lattner serves as both the Chief Financial Officer of MIC
    and █████████████████████████████████████████
    ███████████████████████████████████████████
    ███████████████████████████████████████████
    ███████████████████████████████████████████
    █████████████████████

  o Until late 2015 when Relators uncovered that commingling of
    assets between MIC and the Edwards Group, the same was true for
    Wes Bailey who serves as Chief Corporate Counsel for MIC and
    as General Counsel to The Edwards Group ████████████████



███████████ In addition, for at least a decade Bailey has performed legal work for dozens of other Edwards' entities while only being paid by MIC.█

o By using MIC's corporate assets to pay for Edwards' own personal legal and accounting expenses, Edwards is commingling MIC's assets with his own and abusing the corporate form. Upon information and belief, after Relators exposed this blatant commingling of MIC's funds on December 9, 2015 at the deposition of David Lattner, Edwards directed that Lattner's and Bailey's salaries be split between MIC and the Edwards Group.

- Edwards made decisions about the company's direction without any oversight by MIC's shareholders. MIC has produced *no evidence* that it ever had annual shareholder meetings or any official meetings of the MIC "board of directors" that were recorded on the books and records of the company.

- Edwards made the decision for MIC to stop originating loans, MIC's only source of income, in late 2013. There is no documentary corporate

---

███████████████████

record of Edwards' decision to shut the company down, no board resolutions, no corporate meeting minutes and no approval of such a drastic action by MIC's shareholders.

## COUNT I: VIOLATION OF CIVIL FALSE CLAIMS ACT, 31 USC §§ 3729-33 *ET SEQ.*

157.

Paragraphs 1 through 156 are incorporated as if fully set forth herein.

158.

Defendants knowingly or recklessly disregarded applicable laws, regulations, and rules by either presenting false and fraudulent claims to the Veterans Administration or by causing false and fraudulent claims to be presented to the Veterans Administration, in direct violation of, *inter alia* 31 U.S.C. § 3729(a)(1)(A).

159.

Defendant MIC made false statements to obtain Government guarantees, which caused false or fraudulent claims to be paid or approved, in violation of *inter alia* 31 U.S.C. § 3729(a)(1)(B).

160.

More specifically, Defendant MIC caused false certifications to be made and submitted to the VA.  Truthful and accurate certifications are a condition precedent to both issuance of and payment under a guaranty of an IRRRL.

161.

Had the Government or the Veterans Administration known that the federal regulations and VA guidelines were violated or that Defendant MIC's express certifications were false, the VA could not have guaranteed the VA loans.  Federal regulations prohibit Defendant MIC or other lenders from including unallowable and illegal fees in any IRRRL.  The Government could not have issued a guaranty had it known the lender certifications were false.

162.

As a result of the Government's reliance upon the false and misleading statements and certifications by Defendant MIC, the Government has been damaged and will continue to be damaged as tens of thousands of VA loans which contain unallowable fees go into default.  Once these loans go into default, the Government's exposure as guarantor is triggered and the Government begins to spend taxpayer dollars in an attempt to delay or avoid foreclosures on the refinanced homes of veteran borrowers.

163.

The Government and the VA were not aware of MIC's misconduct or that MIC's certifications were false or that claims made on MIC loans were false. The Government and the VA, in reliance on the accuracy of the statements and certifications by Defendant MIC, guaranteed thousands of VA IRRRLs for the purposes of assuring payment if and when default occurred.  The VA has stated that payments were made by the Government on some 15,000 MIC-originated IRRRLs as a result of defaults, foreclosures, refundings, and/or acquisitions.  In addition, the Government suffered other losses as a result of the failure of such MIC-originated IRRRLs.

164.

In situations where the VA has information that a lender has acted intentionally or repeatedly in failing to adhere to the program guidelines, the VA can expel the lender from participation in the VA lending program.  2 C.F.R. §§ 180 and 801; *see also* VA Pamphlet 26-7, Ch. 17, 17-6 to 17-17.  Had the VA known that Defendant MIC was repeatedly committing the fraud referenced herein, Defendant MIC would surely have been removed from the VA Loan Guaranty Program.  The taxpayers would then have saved hundreds of millions of dollars from losses related to VA IRRRLs.

165.

The fraudulent acts of Defendants totally undermined one of the core purposes of the IRRRLs which was to provide VA guarantees in exchange for the limiting of fees and charges paid by the veteran at the closing of an IRRRL.

166.

As a result of Defendants' actions set forth above, the United States has been severely damaged and will continue to incur damages in the future.

167.

Any guaranty which was issued for an IRRRL with respect to which Defendant MIC failed to comply with federal regulations and VA guidelines, and/or any guaranty that was issued where the certification to the VA was false, is void.  Defendants should be required to reimburse the Government for all costs the Government has incurred following default of any such loan.  These damages are trebled under the False Claims Act.

168.

The False Claims Act requires that each lender pay the Government a civil penalty of between $5,500 and $11,000 for each false claim.  The maximum penalty should be imposed upon Edwards and MIC for each dirty loan which resulted in loss to the Government.

169.

Edwards has operated MIC as his alter ego, has failed to follow required corporate formalities, and has commingled MIC's assets with his own and with the assets of his wholly owned entities.

170.

Edwards' control over MIC was so complete that MIC had no separate mind, will or existence of its own.  All major decisions were made by Edwards and all decisions about MIC's assets were made by Edwards.

171.

By directing MIC to distribute more than $xxx to Edwards, his wholly owned corporations, and to other MIC shareholders after this case was unsealed – mostly after this Court denied MIC's motion for summary judgment – Edwards has exercised complete control over MIC in order to commit a fraud on the U.S. Government and Relators.  Those massive payments have caused the U.S. Government and Relators harm – Edwards now has most of the money that should be available to pay a judgment in this case.

172.

Because Edwards has taken actions intended to hinder or defraud MIC's creditors, has ignored corporate formalities, and has commingled MIC's assets

with his own and with those of his wholly owned entities, MIC's corporate veil should be pierced.  Edwards is, legally, MIC.  Any judgment against MIC for violation of the FCA should be entered against Edwards personally.

## COUNT II: AVOIDANCE OF FRAUDULENT TRANSFERS

173.

Paragraphs 1-156 are incorporated by reference as if set forth fully herein.

174.

By virtue of their claims against MIC in this case, the United States *ex rel.* Relators has a right to payment from MIC and therefore is a creditor of MIC.

175.

Relators are guaranteed by statute to share between 25 and 30% of any recovery against MIC in this action and to be awarded their actual attorneys fees and costs in bringing this action.  Relators therefore have a right to payment from MIC and are creditors of MIC.

176.

MIC made the 2012 and 2013 payments and distributions to Edwards and the remaining MIC shareholders at the direction of Edwards.

177.

The payments and distributions were concealed from the United States *ex rel.* Relators and from the Court when made.

178.

At or around the time that MIC made the 2012 and 2013 payments and distributions, MIC owed the United States *ex rel.* Relators well in excess of $225 million.

179.

At or around the time that MIC made the 2012 and 2013 payments and distributions, MIC and Edwards knew what MIC's exposure was in this case, and knew it exceeded $172 million, the amount paid by the settling co-defendants.

180.

MIC was precluded from making any distributions to shareholders when the company was insolvent or when there was reasonable ground to believe that by such distributions MIC would be rendered insolvent.  Ohio Stat. § 1701.33

181.

The 2012 and 2013 distributions transferred substantially all of MIC's assets to MIC insiders with the vast majority going to Defendant Edwards.

182.

As a result of the 2012 and 2013 distributions, MIC was rendered effectively insolvent because the sum of all of MIC's debts, including its debt to the United States *ex rel.* Relators, was greater than all of MIC's assets.  Specifically, as a result of the 2012 and 2013 payments and distributions, MIC's total assets are less than $xxx and MIC owes the United States *ex rel.* Relators well in excess of $225 million.

183.

Edwards is an insider of MIC and MIC did not receive a reasonably equivalent value in exchange for the transfer of more than $xxx to Edwards after this case was unsealed.

184.

Edwards well knew that the distributions he and MIC planned for 2012 and 2013 would render MIC effectively insolvent; that was the very purpose of those distributions.

185.

MIC made the 2012 and 2013 distributions with the actual intent to hinder, delay or defraud MIC's creditors, including the United States *ex rel.* Relators.

186.

The fraudulent 2012 and 2013 payments and distributions were made in connection with the following badges of fraud, among others:

- The payments and distributions were made after MIC had been sued in this case – most of them after this Court had denied MIC's motion for summary judgment and after six of the eight original defendants had settled for $172 million.

- The payments and distributions were made to MIC insiders;

- The payments were made without proper corporate documentation and, if Edwards is believed, without any legal advice;

- The value of consideration received by MIC in exchange for the payments and distributions was not reasonably equivalent – MIC received nothing in exchange for the massive transfer of its funds to Edwards and his wholly owned corporation MSP;

- The payments and distributions remain under the control of MIC because they were in the possession of MIC's alter-ego Edwards;

- The payments and distributions were of substantially all of MIC's assets,

- The payments and distributions were concealed when made; and

- The distributions have rendered MIC effectively insolvent.

187.

The 2012 and 2013 payments were made to the Edwards Trust, which Trust accepted the funds.  Upon information and belief, the funds that remain from the 2012 and 2013 payments are held in bank accounts owned by the Edwards Trust.

188.

The United States *ex rel.* Relators is entitled to a judgment under O.C.G.A. §§ 18-2-74 and 18-2-75 avoiding the 2012 and 2013 payments and distributions.

## COUNT III: CIVIL CONSPIRACY

189.

Paragraphs 1- 156 are incorporated by reference as if set forth fully herein.

190.

Edwards and MIC along with current or former MIC officers Jeff Crilley, Jim Shatz, David Lattner, and Michael Garavaglia and separate entities, MSP, the Edwards' Trust, and the Edwards Group, along with other presently unknown individuals and entities (collectively referred to as the "Conspirators") have acted in concert with each other to harm the United States *ex rel.* Relators by fraudulently transferring assets with the intent to hinder, delay or defraud MIC's creditors.

191.

The Conspirators facilitated the payment of the 2012 and 2013 payments and distributions to Edwards and to his wholly owned corporation MSP. Those payments were made to and accepted by MSP, the Edwards' Trust, and the Edwards Group (who allowed MIC to pay for certain of its expenses).

192.

The Conspirators have acted and are continuing to act in furtherance of a scheme and common design to harm the United States *ex rel.* Relators by fraudulently transferring and dissipating MIC's assets.

193.

The Conspirators have conspired with one another to commit fraudulent acts, including the fraudulent transfers of assets.

194.

As a proximate result of the conduct alleged, the United States *ex rel.* Relators has suffered and will continue to suffer financial injury.

195.

As a matter of law, after a conspiracy is formed, all members of the conspiracy are jointly and severally liable for acts of co-conspirators done in furtherance of the conspiracy.  Thus, Edwards and MIC are liable for each and

every act done by any of the Conspirators that furthered MIC's and Edwards' aim of rendering itself effectively judgment proof by dissipating its assets in an effort to frustrate this Court's jurisdiction and the ability of Relators' and the Government's to collect on any judgment.

## COUNT IV: PUNITIVE DAMAGES

196.

Paragraphs 1-156 are incorporated by reference as if set forth fully herein.

197.

Edwards and MIC have intentionally undertaken acts to hinder, delay, defraud, and cause harm to the creditors of MIC, including the United States *ex rel.* Realtors and the Relators and have misrepresented material facts to both Relators and the Court in an attempt to conceal their fraud.

198.

MIC's and Edwards' wrongful actions constitute willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to the consequences, rendering Edwards and MIC liable to Relators for punitive damages.

199.

Because Edwards and MIC acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT V: PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

200.

Paragraphs 1-156 are incorporated by reference as if set forth fully herein.

201.

Edwards and MIC caused and perpetrated the fraudulent 2012 and 2013 payments and distributions to be made in the face of at least $225 million in liability to Relators.

202.

As a result of the fraudulent 2012 and 2013 payments and distributions, MIC has been rendered effectively insolvent and will never be able to satisfy a judgment entered against it in this case.

203.

Edwards and MIC have intentionally placed the funds available to satisfy the debt owed to the United States beyond the reach of the United States and in all likelihood, given the past conduct by Edwards and MIC, the remaining funds are surely being dissipated as well.

204.

There is not merely a substantial threat that the United States and Relators
will suffer irreparable injury if an injunction freezing the proceeds from the
fraudulent 2012 and 2013 distributions is not issued – the threat is *certain*.
Edwards and MIC have caused MIC's cash available to pay a judgment to be
dissipated down to some amount less than $7 million – an amount that makes
continuing this litigation untenable, unless the looting can be undone and further
looting is stopped.

205.

Under cross-examination, Edwards refused to reveal how much remains of
the hundreds of millions of dollars wrongfully paid to him in 2012 and 2013 and
refused to post a bond sufficient to pay a judgment entered in this case.

206.

The threatened injury to Relators and the Government outweighs the
threatened harm that the injunction may do to the Defendants.

207.

There is a substantial likelihood that Relators will prevail on the merits of
their claims against MIC.  There is overwhelming evidence that MIC overcharged

veterans when closing IRRRLs and then falsely certified to the government that it had not done so.

### 208.

Granting the requested injunction will not disserve the public interest.

### 209.

The fraudulent 2012 and 2013 payments and distributions were made in connection with multiple badges of fraud demonstrating that the transfers were done with the actual intent to hinder, delay and defraud MIC's creditors.

### 210.

Edwards and MIC have intentionally attempted to place the funds available to satisfy the amount MIC will owe the United States and Relators beyond the reach of Relators. The shareholder distributions and payments were made to the Edwards Trust and to Edwards' bank accounts in the Bahamas for the express purpose of hiding and shielding those assets from collection.

### 211.

Pursuant to Federal Rule of Civil Procedure 65, Relators are entitled to injunctive relief enjoining MIC from making any further transfers of its assets and enjoining Edwards from transferring or encumbering any of his assets, including

the proceeds of all distributions and payments made to him since this case was unsealed on October 3, 2011.

## COUNT VI: ATTORNEYS FEES

### 212.

By fraudulently transferring assets that could be used to satisfy MIC's obligations to the United States, Edwards and MIC have acted in bad faith and with the intent to defraud and have caused Relators unnecessary trouble and expense in this action.

### 213.

Relators respectfully request an award of attorneys fees pursuant to O.C.G.A. § 13-16-11.

**WHEREFORE**, Relators pray for judgment against Defendants Edwards and MIC as follows:

(a)    That Defendant MIC be ordered to cease and desist from submitting and/or causing the submission of false claims, false certifications and illegal demands for payment in violation of 31 U.S.C. §§ 3729-33;

(b)    That Defendant MIC be ordered to cease and desist from imposing unallowable charges upon veterans and from concealing such charges by falsely inflating allowable charges or otherwise violating 31 U.S.C. §§ 3729-33;

(c)     That judgment be entered in favor of the United States *ex rel.* Relators and against Defendants Edwards and MIC for all damages available pursuant to 31 U.S.C. §§ 3729-33, plus a civil penalty of not less than Five Thousand Five Hundred and No/100 ($5,500.00) Dollars, and no more than Eleven Thousand and No/100 ($11,000.00) Dollars per false claim, as provided by 31 U.S.C. § 3729(a);

(d)     That the United States *ex rel.* Relators be awarded the maximum amount permissible according to 31 U.S.C. § 3730(d);

(e)     That judgment be granted for the United States *ex rel.* Relators against Defendants Edwards and MIC for any and all costs including, but not limited to, court costs, expert fees, and all Relators' attorneys fees incurred to prosecute this action;

(f)      That the Court exercise its power to pierce MIC's corporate veil and order that any judgment against MIC also be entered against Edwards personally;

(g)     That the Court avoid and set aside all payments and distributions to shareholders and to Defendant Edwards and to entities owned by him made at any time since this case was unsealed on October 3, 2011;

(h)     That upon entry of a judgment against Edwards and MIC the Court authorize Relators to levy executions on the assets transferred or on their proceeds;

94

(i)     That the Court impose a constructive trust on all property obtained or acquired with the fraudulent payments and distributions made to Edwards;

(j)     That the Court award the United States *ex rel.* Relators their actual damages sustained as a result of MIC's, Edwards' and other unnamed co-conspirators' civil conspiracy;

(k)     That the Court grant preliminary and permanent injunctions against further disposition of MIC's assets and against any transfer or encumbrance of the proceeds of the 2012 and 2013 payments and distributions to Edwards, to other shareholders, and to entities owned by Edwards;

(l)     That the Court award punitive damages against Edwards and MIC;

(m)     That the Court award attorneys fees and expenses of litigation to Relators; and

(m)     That the United States and Relators be granted such other and further relief as the Court deems to be equitable and just.

*[signatures continued on next page]*

Respectfully submitted this 19th day of January, 2016.

BUTLER WOOTEN CHEELEY & PEAK LLP

WILBANKS & GOUINLOCK, LLP

BY: s/ James E. Butler, Jr.
JAMES E. BUTLER, JR.
  jim@butlerwooten.com
  Georgia Bar No. 099625
BRANDON L. PEAK
  brandon@butlerwooten.com
  Georgia Bar No. 141605
JOSEPH M. COLWELL
  joseph@butlerwooten.com
  Georgia Bar No. 531527
ROBERT H. SNYDER, JR.
  rob@butlerwooten.com
  Georgia Bar No. 404522
2719 Buford Highway
Atlanta, Georgia  30324
(404) 321-1700
(404) 32101713 Fax

BY: s/ Marlan B. Wilbanks
MARLAN B. WILBANKS
  mbw@wilbanksgouinlock.com
  Georgia Bar No. 758223
TY M. BRIDGES
  tmb@ wilbanksgouinlock.com
  Georgia Bar No. 081500
3414 Peachtree Street, N.E., Ste. 1075
Atlanta, Georgia 30326
(404) 842-1075
(404) 842-0559 Fax

PHILLIPS & COHEN

BY: s/ Mary Louise Cohen
MARY LOUISE COHEN
  mlc@phillipsandcohen.com
  DC Bar No. 298299
2000 Massachusetts Avenue, N.W.
Washington, DC 20036
(202) 833-4567
(202) 833-1815 Fax

Attorneys for Relators/Plaintiffs

# CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font and size requirements and is formatted in Times New Roman, 14 point font.

s/  James E. Butler, Jr.
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
BRANDON L. PEAK
  Georgia Bar No. 141605
JOSEPH M. COLWELL
  Georgia Bar No. 531327
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
Butler Wooten Cheeley & Peak LLP
2719 Buford Highway
Atlanta, Georgia  30324
(404) 321-1700
(404) 321-1713 Fax

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on January 19, 2016, I electronically filed
RELATORS' FOURTH AMENDED COMPLAINT with the Clerk of the Court
using the CM/ECF system which will automatically send email notification of such
filing to the following attorneys of record:

Matthew R. Rosenkoff
Raanon Gal
Taylor English Duma LLP
1600 Parkwood Circle – Suite 400
Atlanta, GA 30339

Mitchel H. Kider
David M. Souders
Michael Y. Kieval
Weiner Brodsky Kider PC
1300 19th Street, NW, Fifth Floor
Washington, DC 20036

Lesli C. Esposito
John D. Huh
DLA Piper
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA  19103-7300

I certify I have served this document on the following via e-mail:

*United States of America:*

Alan S. Gale
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC  20044
  *Alan.Gale@usdoj.gov*

*-and-*

Paris Wynn
Assistant U.S. Attorney
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA  30303
  *Paris.Wynn@usdoj.gov*

This 19th day of January, 2016.


BY: <u>s/  James E. Butler, Jr.     </u>
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
BRANDON L. PEAK
  Georgia Bar No. 141605
JOSEPH M. COLWELL
  Georgia Bar No. 531327
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
Butler Wooten Cheeley & Peak LLP
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax