IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.*, VICTOR E. BIBBY and BRIAN J. DONNELLY, | : | |
| | : | |
| | : | |
| | : | |
| Relators / Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MORTGAGE INVESTORS CORPORATION and WILLIAM L. "BILL" EDWARDS, | : | CIVIL ACTION NO. |
| | : | 1:12-CV-4020-AT |
| | : | |
| | : | |
| Defendants. | : | |

## ORDER

### I.   INTRODUCTION

The instant action, arising under the False Claims Act ("FCA"), 31 U.S.C. Section 3729 *et seq.*, began its life on March 3, 2006[1] with a thirty-one (31) page Complaint[2] naming a host of mortgage lenders, including Defendant Mortgage Investors Corporation and its principal William L. Edwards (collectively "MIC" or "Defendants"), which, according to Relators, defrauded the United States

---

[1]     The Relators' claims were originally filed under Docket Number 06-cv-547.  However, after many years of litigation, all but two Defendants remained given that all other Defendants (with the exception of Wells Fargo Home Mortgage, Inc.) had settled. As such, those two cases were ultimately severed, resulting in the instant action being assigned a new Docket Number. The only other remaining Defendant, Wells Fargo Home Mortgage Inc., settled its claims in 2017.  *See* 06-cv-547 at (Doc. 1336) (Stipulation of Dismissal).  Thus, MIC and Edwards are the last Defendants remaining in this epic saga.

[2]     The operative pleading in this case is the Fourth Amended Complaint ("FAC") (Doc. 383).

Government[3] through actions taken in connection with a mortgage loan refinancing program sponsored by the Department of Veterans Affairs (the "VA"). The *gravamen* of Relators' claims is that Defendants "have repeatedly violated the rules of the IRRRL [Interest Rate Reduction Refinancing Loan] program" by "over-charg[ing] veterans, charg[ing] unallowable fees, and then deliberately conceal[ing] those facts from the VA [Veterans Administration] to obtain taxpayer-backed guarantees for the loans" while at "the same time . . . falsely certif[ying] to the VA, in writing, that they were not charging unallowable fees." FAC ¶ 5.

In the almost thirteen years since this case was filed it was assigned to multiple district court judges[4] and amassed a dizzying array of docket entries (especially when taking into consideration filings made prior to this case being severed). Moreover, in light of the litigation methods employed and intractability of the parties throughout the course of this action, the Court has had little choice but to take on the role of a hyper-vigilant discovery referee. Thus, after refereeing this case for more than seven (7) consecutive years and working on

---

[3]     The Government contemplated whether to intervene in this action for approximately five years and in that regard requested a total of eighteen extensions of time within which to determine whether to do so. However, on September 30, 2011, the Government declined to intervene in this case leaving Relators to forge ahead on their own. *See* 06-cv-547, (Doc. 59).

[4]     The case was first overseen by Judge Marvin H. Shoob for approximately the first five years, during which it remained sealed and largely dormant while the government determined whether it would intervene. The case, apparently a proverbial "hot potato" was then transferred, in quick succession before landing at the feet of the undersigned, who has dutifully overseen the matter from December 16, 2011 through the present—a period spanning over seven (7) years.

various aspects with multiple law clerks, the Court will address the final dispositive motion as to the issue of liability.

Presently before the Court is Defendants' motion for summary judgment in accordance with Fed. R. Civ. P. 56 [Doc. 955]. Relators oppose the motion in all respects (Doc. 1004). After reviewing the evidentiary record, the parties' briefs as well as applicable law and for the reasons that follow, the Court is constrained to find that Defendants' motion must be **GRANTED** based upon recent developments in applicable FCA law.

Notwithstanding this ultimate finding, one final introductory remark is in order—namely that this action is rife with disputed issues of fact which, in general, would necessitate the need for this case to be decided at trial as opposed to summary judgment. However, while the parties vehemently dispute factual issues relating to every element of the FCA, the Court begins (and as it turns out, ends) its analysis with the element of materiality since, upon conducting an assiduous review of the record, the facts bearing upon that element represent the Achilles heel in Relators' case when viewed through the prism of the Supreme Court's decision in *Universal Health Services, Inc. v. United States*, 136 S. Ct. 1989, 1996, 195 L. Ed. 2d 348 (2016) and its circuit court progeny. Put another way, this case, in light of the record presently before the Court, fails to survive summary judgment not because no fact issues exist (they do) but rather, because the facts relevant to materiality, as presented and taken in the light most favorable to Relators as the non-moving party, simply cannot surmount the

3

"rigorous" and "demanding" materiality threshold required by *Universal Health*. *Universal Health Servs., Inc.*, 136 S. Ct. at 2003; *see id.* at 1996.  Thus, when analyzed through the lens of *Universal Health*, the Court is unable to find that the facts as presented here raise a genuine material issue warranting a trial. Rather, the stringent materiality standard espoused by the Supreme Court chokes the life out of Relators' case and mandates the end of this action, despite the abundance of factual disputes.

## II.   BACKGROUND

### A. Facts

While the Court would normally set forth those facts as contained in the parties' respective Rule 56.1 Statements for which no disputes exists, such a task would be a fool's errand under the present circumstances.  For example, of the 303 non-succinct paragraphs comprising Defendants' Statement of Undisputed Material Facts ("Defs.' 56.1") Relators have interposed objections to the majority of Defendants' purportedly "undisputed" factual statements leaving only the most basic of facts as actually undisputed.  After conducting some rudimentary math, it appears that Relators have lodged objections to 198 of the total 303 paragraphs comprising Defendants' 56.1 Statement which translates to approximately sixty-five percent (65%) or just under two-thirds.  *Compare* Defs.' 56.1 *with* Relators' Response to Defendant Mortgage Investors Corporation's Statement of Undisputed Material Facts ("Rels.' 56.1 Resp.").  Likewise, of the 82 paragraphs comprising Relators' Statement of Additional Material Facts ("Rels.' Addtl. 56.1"),

Defendants have interposed objections to all but three (3) factual statements which translates to approximately ninety-six percent (96%).  *Compare* Rels.' Addtl. 56.1 *with* Mortgage Investors Corporation's Responses and Objections to Relators' Statement of Additional Facts ("Defs.' 56.1 Resp.").

The Court points out that Local Civil Rule 56.1 B.(1) provides explicitly that "[a] movant for summary judgment shall include with the motion and brief a separate, **concise**, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried.  Each material fact must be numbered separately and supported by a citation to evidence proving such fact." *Id.* 56.1 B.(1) (emphasis added); *see Cheatham v. DeKalb Cty., Georgia*, 682 F. App'x 881, 884 (11th Cir. 2017).  While neither of the parties' submissions can be characterized as "concise," or otherwise a model of compliance, it is Defendants' 56.1 Statement totaling 64 pages and 303 paragraphs which expressly contravenes the letter and spirit of the Local Rule.  Indeed, while the Rule is intended to streamline the Court's task of determining whether a question of material fact exists warranting a trial, submissions such as those in the instant case needlessly complicate matters.  This is because the parties' 56.1 statements, at bottom, amount to no more than a "he said, she said" account in light of the mass-objections being volleyed back and forth.  This, in turn, places the Court in the untenable position of straining its limited judicial resources to conduct an assiduous review of the massive underlying record in this case.

The Court does not have the time or inclination to serve as a 56.1 Statement referee in order to untangle the knots tied by the parties themselves by virtue of either the profundity of their differences as to the facts at issue or their own intractability, or both.   Rather, in light of the monumental amount of objections on both sides, the Court will disregard the parties' respective 56.1 Statements (at least with respect to those facts which are disputed) and will instead cite only to the underlying record which consists of the source material.

Based upon the Court's position, given the parties' familiarity with the over-arching facts of this case and because the Court has previously set forth the factual contours at length in prior Orders, the facts will not be repeated here.  The reader is therefore directed to the Court's November 19, 2012 Order (Doc. 30) adjudicating Defendants' first motion for summary judgment as well as the Court's September 27, 2017 Order (Doc. 865) denying Defendants' Motion for Reconsideration, for an explication of the general facts of this case.   The background and facts as set forth in these previous Orders are hereby incorporated by reference.[5]

---

[5]    The facts as set forth in the Court' previous Orders are meant only to provide the reader with the proper context.  Therefore, such facts should not be construed as factual findings of the Court. *See Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000) ("'[F]acts,' as accepted at the summary judgment stage of the proceedings, may not [ultimately] be the 'actual' facts of the case."); *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013).  Rather, the Court gleans the facts from the evidence comprising the record and construes those facts in a light most favorable to the non-moving party.  Moreover, to the extent particularized facts bear upon the analysis of the individual elements comprising the claims in this case, such facts (and the evidence upon which those facts are derived) shall be set forth as necessary.

### B. The False Claims Act Generally

The driving catalyst for the conception and ultimate passage of the FCA was the Civil War, which necessarily created a thriving market for all manner of weapons, supplies and provisions required by the United States government to fight effectively in the conflict. *See United States v. Bornstein*, 423 U.S. 303, 309, 96 S. Ct. 523, 528, 46 L. Ed. 2d 514 (1976) ("The Act was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War.").  However, this burgeoning market had the unintended effect of encouraging unscrupulous contractors to engage in fraud upon the United States.  *See* James E. Nagle, *A History of Government Contracting* 19 (1999) (*quoting* E. Wayne Camp, *To the Army at Pleasure* (1984)).  Congress, recognizing the problem, formed a committee with the aim of investigating "the gross waste and squandering of the public funds."  1 Fred Albert Shannon, *The Organization and Administration of the Union Army*, 1861-65, at 55–56, 58 (1965) (quoting *Tomes, Fortunes of War*, 29 Harper's Monthly Mag. 228 (1864)). In conducting its inquiry, this congressional committee unearthed "an astounding amount of illegal and fraudulent activities . . . Through haste, carelessness, or criminal collusion, the state and federal officers accepted almost every offer and paid almost any price for the commodities, regardless of character, quality, or quantity . . . 'For sugar it [the government] often got sand; for coffee, rye; for leather, something no better than brown paper; for sound horses and mules, spavined beasts and dying donkeys; and for serviceable

7

muskets and pistols, the experimental failures of sanguine inventors, or the refuse of shops and foreign armories.'"  *Id.*; *see United States v. McNinch*, 356 U.S. 595, 599, 78 S. Ct. 950, 952, 2 L. Ed. 2d 1001 (U.S. 1958) ("The False Claims Act was originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department. Testimony before the Congress painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war.") (citing H.R. Rep. No. 2, Part 2, 37th Cong., 2d Sess.).

In the face of such widespread misconduct, Congress determined that "more stringent provisions are required for purpose of punishing and preventing these frauds."  Cong. Globe, 37th Cong., 3d Sess. 952 (1863) (remarks of Sen. Howard); *see McNinch*, 356 U.S. at 599, 78 S. Ct. at 952-53, 2 L. Ed. 2d 1001 (recognizing that "Congress wanted to stop th[e] plundering of the public treasury.").  This ultimately led to the introduction of Senate Bill 467 on January 16, 1863.  Cong. Globe, 37th Cong., 3d Sess. 348 (1863).  Significantly, the bill contained a *qui tam*[6] provision which authorized private persons to file suit on behalf of the United States.  *Id.* at 953.  The theory behind this provision, as explained by Senator Howard, was the "old-fashioned idea of holding out a

---

[6]     "*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which means 'who pursues this action on our Lord the King's behalf as well as his own.'  The phrase dates from at least the time of Blackstone."  *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 769, 120 S. Ct. 1858, 1860, 146 L. Ed. 2d 836 (2000) (internal citation omitted).

temptation and 'setting a rogue to catch a rogue,' which is the safest and most expeditious way I have ever discovered of bringing rogues to justice." *Id.* at 955-56.  After striking a provision subjecting dishonest contractors to martial law, Congress adopted the bill.  *Id.* at 1321, 1427.  The original FCA "imposed civil and criminal liability for fraud on the government, subjecting violators to double damages, forfeiture, and imprisonment."  *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1085–86 (11th Cir.), *cert. granted sub nom. Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 566 (2018); *see* Act of Mar. 2, 1863, ch. 67, 12 Stat. 696.

Since its initial passage in 1863, the FCA has been amended multiple times. *Cochise Consultancy, Inc.*, 887 F.3d at 1086.  One of the most significant of these amendments was passed in the wake of the Supreme Court's decision in *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S. Ct. 379, 87 L. Ed. 443 (1943).  In *Marcus*, the Supreme Court was faced with the issue of whether the FCA permitted suits by relators "having no information of their own to contribute, but who merely plagiarized information in indictments returned in the courts, newspaper stories or congressional investigations."  *U.S. v. Burmah Oil Co. Ltd.*, 558 F.2d 43, 46 n.1 (2d Cir. 1977).  Specifically, in *Marcus*, the Department of Justice sought to persuade the Court that the FCA prohibited suits where a relator did no more than copy the allegations contained in a parallel criminal indictment into a civil complaint alleging violations of the FCA.  *See Marcus*, 317 U.S. at 545-46, 63 S.

Ct. at 385-86, 87 L. Ed. 443 (1943).[7]   However, after considering the plain meaning of the statutory text, the Court found the Government's arguments unpersuasive.  *Id.* at 546, 63 S. Ct. at 385, 87 L. Ed. 443.  Instead, the Court determined that "[n]either the language of the statute nor its history lends support to the contention made by respondents and the government.  'Suit may be brought and carried on by any person', says the Act, and there are no words of exception or qualification such as we are asked to find."  *Id.*  In rejecting the Government's policy arguments, the Court stressed that "the entire force of these considerations is directed solely at what the government thinks Congress should have done rather than at what it did . . . [and that] the trouble with [this] argument[ ] is that [it is] addressed to the wrong forum.  Conditions may have changed [since the FCA was passed], but the statute has not."  *Id* at 546-47, 63 S. Ct. at 385-86, 87 L. Ed. 443.  Also important, in the Court's view, was the fact that

> one of the chief purposes of the Act, which was itself first passed in war time, was to stimulate action to protect the government against war frauds. To that end, prosecuting attorneys were enjoined to be diligent in enforcement of the Act's provisions, and large rewards were offered to stimulate actions by private parties should the prosecuting officers be tardy in bringing the suits.

---

[7]      "As originally enacted in 1863, the FCA placed no restriction on the sources from which a *qui tam* relator could acquire information on which to base a lawsuit."  *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 412, 131 S. Ct. 1885, 1893, 179 L. Ed. 2d 825 (2011).

*Marcus*, *Id*. at 547, 63 S. Ct. at 386, 87 L. Ed. 443.   Thus, to the extent the Government sought to effect a change to the FCA, its arguments would have to be addressed to Congress in the first instance.

Not surprisingly, shortly after his arguments were rebuffed by the Supreme Court, the Attorney General voiced his concerns directly to Congress, which, in turn, began to take steps to amend the FCA.   One of the earliest House bills to be introduced was H.R. 1203, which contemplated eliminating all private actions seeking damages and penalties.   89 Cong. Rec. 194 (1943).   While the House quickly passed the bill, *id*. at 2800-01, H.R. 1203 ultimately encountered opposition by some members of the Senate Judiciary Committee, to which it had been referred for further review.   S. Rep. No. 291, Senate Comm. On the Judiciary, 78th Cong., 1st Sess. (1943).   Specifically, some Committee members were troubled by the fact that the bill, in its current state, would dissuade bona fide whistleblowers from sharing information concerning potential fraud with the Government.   *Id.*   Ultimately, the Committee determined that the FCA's *qui tam* component should not be completely jettisoned.   Rather, to strike a balance, the Committee put forth an amendment to H.R. 1203 aimed at allowing only private suits where the individual was the "original source" of the information giving rise to the action, where that person had provided the Attorney General with notice of the suit, prior to filing, and notwithstanding such notice, the Attorney General declined to prosecute the action.   89 Cong. Rec. 7570.

Debate on the Senate floor regarding these proposed FCA amendments proved divisive.   On one side, Senator Van Nuys, Chairman of the Judiciary Committee stated that, in his view, "the old statute had served a useful purpose . . . but conditions have changed, and today that statute has become one of the worst sources of racketeering since the days of Al Capone in the prohibition era." *Id.* at 7,571.   However, other members were not so convinced.   Indeed, Senator William Langer retorted that "the present statute now on the books is a most desirable one.   What harm can there be if 10,000 lawyers in America are assisting the Attorney General of the United States in digging up war frauds?"   *Id.* at 7,606. In the end, the Senate passed the measure as amended by the Committee. Nevertheless, the House disagreed with the Senate amendments which resulted in the bill being conferenced—which ultimately resulted in the "original source" provision being stricken.   *Id*. at 10,844.   The bill emerged from conference with both House and Senate approval.   *Id*. at 10,844-49 (House Approval); *Id*. at 10,752 (Senate Approval).

The 1943 amendments ushered in several important changes to the FCA including:  (1)  providing the Department of Justice with authority to take over a case initially brought by a relator; (2) requiring a relator to provide all supporting documentation to the Department of Justice contemporaneously with the filing of the complaint; (3) permitting the Department of Justice a period of 60 days to determine whether to intervene in the suit (and, in the event it chose to intervene, cutting off any role of the relator in the litigation);  (4) depriving courts

of jurisdiction over FCA actions "based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought[;]"[8] and (5) reducing a relator's share in any recovery obtained and failing to guarantee any minimum reward at all.  Act of December 23, 1943, ch. 377, 57 Stat. 608, codified as amended at 31 U.S.C. §§ 232 to 235 (1976).

The extensive changes to the FCA dictated by the 1943 amendments caused a proverbial deep freeze in FCA litigation in the ensuing decades.  Indeed, between 1943 and 1986 "relator suits under the statute averaged six per year." Elletta Sangrey Callahan & Terry Morehead Dworkin, *Do Good and Get Rich: Financial Incentives for Whistleblowing and the False Claims Act*, 37 Vill. L. Rev. 273, 318 (1992).  At the same time, fraud on the Government continued to increase at such a pace that by 1981, the General Accounting Office ("GAO") characterized it as "widespread."    General Accounting Office, *Fraud in Government Programs:—How Extensive is It?—How Can it Be Controlled* ii (1981).  However, despite the pervasiveness of such fraud and the scholarly interest in revitalizing and strengthening the FCA to combat such knavery, *see, e.g.*, Erwin Chemerinsky, *Controlling Fraud Against the Government: The Need for Decentralized Enforcement*, 58 Notre Dame L. Rev. 995 (1983) (recognizing that citizen suits to ferret out and prosecute fraud are an integral component of controlling fraud to increase Government's resources, to bring to light

---

[8]    This provision is commonly referred to as the "jurisdictional bar."

information the Government would not otherwise receive, and to control corrupt officials, and concluding that the False Claims Act should be amended to permit these suits), Congress sat idle until 1985, at which time Senators Charles Grassley, Carl Levin and Dennis DeConcini introduced S.B. 1562.  131 Cong. Rec. 22,266 (1985).

S.B. 1562 was joined by S.B. 1673, a similar measure backed by the Reagan administration, and hearings were held on both of these bills by the Committee on Administrative Practice and Procedure of the senate Committee on the Judiciary.  *See* False Claims Reform Act: Hearing Bef. the Subcomm. on Admin. Practice and Procedure of the Senate Comm. on the Judiciary, 99th Cong., 1st Sess. (Sept. 17, 1985).  Meanwhile, the House took up a its own bill, H.R. 3317, which similarly received a hearing by the Subcomittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary.  Hearings Bef. the Subcomm. on Admin. Law and Govern. Rel. of the House Comm. on the Judiciary, 99th Cong., 2d Sess. (Feb. 5, 1986).

During its hearing, the Senate Committee heard testimony from the Department of Defense Inspector General that "45 of the 100 largest defense contractors, including 9 of the top 10, were under investigation for multiple fraud offenses."  S. Rep. 99-345 (1986) *as reprinted in* U.S.C.C.A.N. 5266, 5267. However, this revelation, the Senate Committee learned, did "not include, of course, the cost of undetected fraud which is probably much higher because weak internal controls allow fraud to flourish."  *Id.*, *as reprinted in* U.S.C.C.A.N. at

14

5268 (citing the 1981 GAO report on fraud).   As a result of this and other testimony, the Committee ultimately determined that "perhaps the most serious problem plaguing effective enforcement is a lack of resources on the part of Federal enforcement agencies," which results in "'screening decisions.'"   126 Cong. Rec. 4580 (1980); S. Rep. No. 96-615 (1981).   As a result, "[a]llegations that perhaps could develop into very significant cases are often left unaddressed at the outset due to a judgment that devoting scarce resources to a questionable case may not be efficient.   And with current budgetary constraints, it is unlikely that the Government's corps of individuals assigned to anti-fraud enforcement will substantially increase."   *Id*.   Thus, the proposed amendments to the FCA, in large part attempted to close the resource gap by augmenting the Government's forces with that of the private citizenry.   *Id*.   In addition, the Committee noted that "[s]ince the act was last amended in 1943, several restrictive court interpretations of the act have emerged which tend to thwart the effectiveness of the statute" and the proposed amendments were "aimed at correcting restrictive interpretations of the act's liability standard, burden of proof, *qui tam* jurisdiction and other provisions in order to make the False Claims Act a more effective weapon against Government fraud."   S. Rep. 99-345, *as reprinted in* U.S.C.C.A.N. at 5269.

After the House and Senate bills were reconciled, Congress passed the False Claims Amendments Act of 1986, which was then signed into law by President Reagan.   False Claims Amendments Act of 1986, Pub. L. No. 99-562,

100 Stat. 3153, *codified as amended at* 31 U.S.C. §§ 3729 to 3733 (1994); 22 Weekly Comp. Pres. Doc. 1499 (Nov. 3, 1986). The resulting FCA amendments were extensive and included the following: (1) all *qui tam* actions were required to be filed under seal for 60 days and served on the United States to ensure no interference in an ongoing Government investigation; (2) the Government would retain the right to intervene at a later stage of a *qui tam* action in the event it had initially declined intervention so long as it could establish "good cause;" (3) in the event of Government intervention primary responsibility for prosecution remained with the Government and it would "not be boumd by an act of the person bringing the action;" (4) in an intervened case, the *qui tam* relator would still be at liberty to participate subject to certain limitations; (5) instituting a prohibition on lawsuits "based upon allegations or transactions in a . . . [government proceeding] or investigation, or from the news media, unless . . . the person bringing the action is an original source of the information;" (6) awarding attorney's fees to defendants who prevailed in an FCA suit found by a court to be "clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment;" (7) elimination of purely discretionary awards and calibration of rewards to align with the contribution of the relator; and (8) a right of action for those employees who report fraud and suffer retaliation as a result. *See generally* 31 U.S.C. § 3730.

Congress briefly revisited the FCA again in 1988 over concerns regarding the ability of a culpable relator to obtain a windfall recovery. In offering the

16

amendment, Senator Grassley explained that "the amendment I offer today is a clarification that Congress did not intend that the *qui tam* amendments would encourage individuals to first be a party to a false claims practice or fraud and later bring a *qui tam* action against other participants or their employer with the expectation of receiving a substantial share of the suit's recovery."  134 Cong. Rec. 31,530 (1986).  This amendment, passed as part of the Major Fraud Act of 1988, Pub. L. No. 100-700, § 9, 102 Stat. 4631, 4638 (1988), codified at 31 U.S.C. § 3730(d)(3), created an additional subsection in the FCA which provided that in the event a relator "planned and initiated the violation . . . upon which the action was brought" a court has the discretion to reduce the relator's reward.  Pub. L. No. 100-700, § 9, 102 Stat. at 4638-39.  Finally, if a relator was convicted of criminal conduct as concerned the violation a reward could be reduced to zero and the case could be dismissed, without prejudice.  *Id.*

Congress did not again revisit the FCA until 2009 when, in the wake of the economic crisis, it passed what is known as the Fraud Enforcement and Recovery Act ("FERA").  FERA embodied Congress' intent to "reinvigorate our Nation's capacity to investigate and prosecute the kinds of financial frauds that have so severely undermined our financial markets and hurt so many hard working people in these difficult economic times."  S. Rep. No. 111-10, at 3 (2009), *as reprinted in* U.S.C.C.A.N. 430, 431.  While the legislation amended various aspects of criminal laws housed in Title 18 of the United States Code, as is relevant to this discussion, FERA "improve[d] one of the most potent civil tools

for rooting out waste and fraud in Government–the False Claims Act." *Id.* at 4, 2009, *as reprinted in* U.S.C.C.A.N. at 433.[9]  Notwithstanding the myriad number of amendments, at its core, the FCA still remains focused on prohibiting the "making [of] false claims for payment to the United States," *Cochise Consultancy, Inc.*, 887 F.3d at 1086 (citing 31 U.S.C. § 3129(a)).  However, the FCA no longer imposes criminal penalties.  Rather, the present iteration provides for only "civil liability, which subjects [violators] to treble damages and civil penalties." *Id.* at 1086.[10]

## C. Regulatory Overview

### 1. Interest Rate Reduction Refinancing Loans

A veteran, in accordance with the statutory authority set forth in 38 U.S.C. §§ 3710(a)(8), (a)(9)(B)(i) and (a)(11), "may refinance an existing VA guaranteed, insured, or direct loan to reduce the rate payable on the existing loan[.]"

---

[9]      FERA's amendments to the FCA were the result of Congress' conclusion that the "effectiveness of the False Claims Act has recently been undermined by court decisions which limit the scope of the law and, in some cases, allow subcontractors paid with Government money to escape responsibility for proven frauds. The False Claims Act must be corrected and clarified in order to protect from fraud the Federal assistance and relief funds expended in response to our current economic crisis."  S. Rep. No. 111-10, at 4 (2009), *as reprinted in* U.S.C.C.A.N. at 433.  Specifically, the FCA amendments had the purpose of "clarify[ing] and correct[ing] erroneous interpretations of the law that were decided in *Allison Engine Co. v. United States ex rel. Sanders*, 128 S. Ct. 2123 (2008), and *United States ex. rel. Totten v. Bombardier Corp*, 380 F.3d 488 (D.C. Cir. 2004)." *Id.* at 10, 2009 U.S.C.C.A.N. at 438.  *Allison* had required that plaintiffs under the FCA must prove a defendant contractor's specific intent to induce the government approval of a payment or false claim.

[10]      An FCA violator is "liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9) (adjusting monetary penalties for inflation).

38 C.F.R. § 36.4307(a).  This type of loan is referred to as an Interest Rate Reduction Refinancing Loan ("IRRRL").  *See generally* 38 C.F.R. § 36.4307; MIC Exhibit ("Ex.") 2, VA Pamphlet 26-7, Revised (hereinafter "VA Pamphlet") § 6.01 ("An IRRRL is a new VA-guaranteed loan made to refinance an existing VA-guaranteed loan, generally at a lower interest rate than the existing VA loan, and with lower principal and interest payments than the existing VA loan.").  In order for a veteran to become eligible to refinance an existing VA loan, certain regulatory requirements must be met.  *See id.* § 36.4307 (a)(1)-(7).  In light of the over-arching purpose of IRRRLs (*i.e.*, to reduce the interest rate on an existing VA loan), 38 C.F.R. Section 36.4307(a)(3) makes clear that

> The monthly principal and interest payment on the new loan is lower than the principal and interest payment on the loan being refinanced; or the term of the new loan is shorter than the term of the loan being refinanced; or the new loan is a fixed-rate loan that refinances a VA– guaranteed adjustable rate mortgage; or the increase in the monthly payments on the loan results from the inclusion of energy efficient improvements, as provided by § 36.4339(a)(4); or the Secretary approves the loan in advance after determining that the new loan is necessary to prevent imminent foreclosure and the veteran qualifies for the new loan under the credit standards contained in § 36.4340.

38 C.F.R. § 36.4307(a)(3).  Other prerequisites include: limitations on the maximum amount of any such refinancing, refinancing in the face of a delinquent loan, maximum dollar amount of any subsequent guarantee as well as term limitations on the refinanced loan.  *See id.* § 36.4307 (a)(4)-(7).  Moreover, "the interest rate reduction refinancing loan may be guaranteed without regard to the

amount of guaranty entitlement available for use by the veteran, and the amount of the veteran's remaining guaranty entitlement, if any, shall not be charged for an interest rate reduction refinancing loan." *Id.* § 36.4307(b).

### 2. Charges and Fees

Based upon the fact that the "VA home loan program involves a veteran's benefit[,] VA policy has evolved around the objective of helping the veteran to use his or her home loan benefit." VA Pamphlet § 8.01. In light of this objective, "VA regulations limit the fees that the veteran can pay to obtain a loan." *Id.* As such, "[l]enders must strictly adhere to the limitations on borrower-paid fees and charges when making VA loans." *Id.* (emphasis omitted).

In connection with a loan guaranteed or insured by the VA, the applicable regulations prescribe that "[n]o charge shall be made against, or paid by, the borrower incident to the making of a guaranteed or insured loan other than those expressly permitted under paragraph (d) or (e) of this section." 38 C.F.R. § 36.4313(a). Section (d), in turn, lays out a "schedule of permissible fees and charges [which] shall be applicable to all Department of Veteran Affairs guaranteed or insured loans." *Id.* § 36.4313(d). This schedule contains nine (9) types of permissible fees and charges, including, as relevant to this case, charges for "[t]itle examination and title insurance, if any." *Id.* § 36.4313(d)(1)(vii); VA Pamphlet § 8.02 (Itemized Fees and Charges Chart). Although this class of fees and charges is generally "permissible" under the regulation, Section (d)(1) makes clear that any such charge or fee enumerated must be "reasonable and

customary" in order to be permissible.[11]   *Id.* § 36.4313(d)(1) (stating that "[t]he veteran may pay reasonable and customary amounts for any of the following items").   Likewise, "[w]henever the charge relates to services performed by a third party, the amount paid by the borrower must be limited to the actual charge of that third party."   *Id.* § 8.02.

In addition to the itemized fees and charges outlined above, "[a] lender may charge and the veteran may pay a flat charge not exceeding 1 percent of the amount of the loan, provided that such flat charge shall be in lieu of all other charges relating to costs of origination not expressly specified and allowed" in the schedule of itemized fees set forth in Section (d)(1)(i)-((ix).   38 C.F.R. § 36.4313(d)(2).   This flat one-percent charge "is intended to cover all of the lender's costs and services which are not reimbursable as 'itemized fees and charges.'"   VA Pamphlet § 8.02.

The VA Pamphlet also sets forth examples of "items that cannot be charged to the veteran as 'itemized fees and charges.'"   *Id.*   Rather, "the lender must cover any cost of [such] items out of its flat fee."   *Id.*   Such prohibited charges, include, but are not limited to, "loan closing or settlement fees, document preparation

---

[11]    38 C.F.R. Section 36.4313 does not define the terms "reasonable and customary." According to Jeffrey London, Deputy Director of the VA's Loan Guaranty Service and its Fed. R. Civ. P. 30(b)(6) witness, there is no specific definition of what constitutes a reasonable and customary charge or fee other than the fact that the charge or fee had "to be the actual charge." March 9, 2016 Deposition of Jeffrey London ("London Dep.") (Doc. 957-14) at 33-36.   Rather, London opined that "[m]ost loan specialists, especially after reviewing . . . upwards of [a] hundred files a month [would] get a feel for what charges are 'customary and [reasonable],' because you see so many loans files.   So the loan specialist is empowered to question a particular fee . . . if a fee appears to be outside of particular dollar amount that they typically see" and in such a case they can "question a lender to justify that fee."   *Id.* at 38.

fees, [p]reparing loan papers or conveyancing fees, [a]ttorney's services other than for title work and loan application or processing fees." *See id.*

Attorney's fees are generally not reimbursable as a permissible itemized charge or fee—and therefore must be paid by the lender as part of its flat one-percent fee, unless the veteran has explicitly hired an attorney on his or her own behalf. To the extent an attorney's services solely encompass title work, the attorney's actual fee for such work (assuming the fee associated with such work is reasonable and customary) may be paid by the borrower since charges or fees for title work constitute an allowable itemized fee or charge. *See id.* § 8.03 (recognizing that "[t]he lender may not charge the borrower for attorney's fees" but qualifying that "[r]easonble fees for title examination work and title insurance can be paid [ ] by the borrower" since they "are allowable itemized fees and charges"); *id.* § 8.02 (stating that while attorney's fees are generally a disallowed itemized fee or charge, they may be allowable solely for title work).

Importantly, the regulation pertaining to fees and charges makes clear that "no loan shall be guaranteed or insured unless the lender certifies to the Secretary that it has not imposed and will not impose any charges or fees against the borrower in excess of those permissible" as enumerated in sections (d) and (e) of the regulation." 38 C.F.R. § 36.4313(a); *see also* VA Pamphlet § 17.02.

### 3. Sanctions / Defenses

The "VA is authorized to impose sanctions against persons or entities who take actions which are detrimental to the VA loan guaranty program. The type

and severity of the sanction imposed is based on [1] the type of participant (for example, lender, builder, management broker, etc.) [and 2] the nature of the actions (for example[ ], fraud, significant deficiencies in performance, ongoing disregard for VA requirements, and so on)." VA Pamphlet § 17 (Introduction). According to the VA Pamphlet, sanctions can take the form of (1) withdrawal of automatic authority; (2) withdrawal of LAPP [Lender Appraisal Program] authority; (3) Debarment and Suspension; and (4) Limited Denial of Participation. *Id.* §§ 17.01-.07. Specifically, as concerns false certifications, "[a]ny lender who knowingly and willfully makes a false certification may be subject to civil money penalties" as well as other sanctions, "including, but not limited to [1] debarment and suspension[12] and [2] loss of automatic authority." *Id.* § 17 (Introduction).

In addition, where there exists a "willful and material misrepresentation or fraud by the lender, or by a holder, or the agent of either, in procuring the guaranty" such behavior "shall relieve the Secretary of liability, or . . . shall

---

[12]   While the VA Pamphlet cites to 38 C.F.R. § 44.305 as authority for taking such actions, that citation is no longer applicable. Rather, as of May 31, 2007, "[t]he Department of Veterans Affairs (VA) [ ] mov[ed] its regulations on nonprocurement debarment and suspension from title 38, Code of Federal Regulations (CFR), to title 2 of the CFR, and [ ] adopt[ed] the format established by the Office of Management and Budget (OMB) in its interim final guidance on nonprocurement debarment and suspension, and OMB's final guidance on those matters." Department of Veterans Affairs Implementation of OMB Guidance on Nonprocurement Debarment and Suspension, 72 Fed. Reg. 30239-01, 2007 WL 1557032, at *30239. This change had no practical effect on the substantive aspects of the VA's procedures concerning debarment and suspension and were administrative only. Rather, "[t]his regulatory action [represented] a government-wide administrative initiative for purposes of simplification and clarity, and ma[de] no substantive changes to VA's policy or procedures for nonprocurement debarment and suspension." *Id.*

constitute a defense against liability on account of the guaranty or insurance of the loan." 38 C.F.R. § 36.4328(a)(1).

## III.  STANDARD OF REVIEW

This Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324-26. The essential question is "whether the evidence presents

a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## IV.   <u>DISCUSSION</u>[13]

The Court has previously determined that Relators' FCA claims are limited solely to a false document cause of action under 31 U.S.C. Section 3729(a)(2). *See* (Doc. 30 at 12-13 [stating that "the Court finds that Plaintiffs' allegations are sufficient to establish a false document claim under § 3729(a)(2), but not a presentment claim under § 3729(a)(1))"]).   That statutory section states that "[a]ny person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . is liable to the United States Government for a civil penalty . . . ." 31 U.S.C. § 3729(a)(2).   In order to plead and prove a false document claim under Section 3729(a)(2), Relators "must prove (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (internal citation omitted).[14]   The Court begins its analysis with the element of materiality.

---

[13]     In conducting its analysis, the Court relies upon and cites to the pre-FERA statutory language and numeration since the Court has previously determined that the "May 2009 FERA amendments of the [FCA's] statutory language do not apply retroactively to this case."  (Doc. 30 at 12, 17) (citing *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1327 n. 3 (11th Cir. 2009)).

[14]     While the pre-FERA FCA did not explicitly include a materiality requirement, courts interpreting the pre-FERA statute have nevertheless "imposed a materiality requirement on each of the provisions of the [pre-FERA] FCA."  *U.S. ex rel. Stephens v. Tissue Sci. Labs., Inc.*,

### A. Materiality

#### 1. Applicable Law

While materiality is a *sine qua non* of a claim arising under the FCA, what is the proper standard by which that element should be analyzed?  In *Universal Health Services, Inc. v. United States*, the Supreme Court, after reaffirming that in order for a "misrepresentation about compliance with a statutory, regulatory, or contractual requirement" to be actionable under the FCA it "must be material to the Government's payment decision," directly answered this question. *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1996, 195 L. Ed. 2d 348 (2016).

The Court began its analysis from the premise that because "[t]he False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations" the materiality standard is necessarily "demanding."  *Universal Health Servs., Inc.*, 136 S. Ct. at

---

664 F. Supp. 2d 1310, 1316 (N.D. Ga. 2009) (citing cases and recognizing that "[t]he materiality requirement for FCA claims is widely-applied and well-established"); *see United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008) (concluding that "the [pre-FERA] FCA includes a materiality requirement" and that "[t]his holding is consistent with the law in the First, Fourth, Fifth, Sixth and Eighth Circuits").  Notably, the post-FERA FCA explicitly includes a materiality requirement for false certification claims and specifically defines the term "materiality."  *See* 31 U.S.C. § 3129(a)(1)(B) ("any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government for a civil penalty. . . ."; *id*. § 3129(b)(4) (defining the term "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property").  In light of this authority and because the Eleventh Circuit in *Urquilla-Diaz* has included materiality as an indispensable element of a pre-FERA FCA false certification claim, *see Urquilla-Diaz*, 780 F.3d at 1045, 1052, the Court finds that materiality is a necessary element of Relators' claim arising under 31 U.S.C. § 3729(a)(2).

2003; *see id.* at 1996 (characterizing the materiality requirement as "rigorous"); *see also id.* at 2004 (emphasizing that the FCA "is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations"). Based upon this observation, the Court opined that

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

*Id.* at 2003. Rather, the Court stated that "under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002 (internal citation and alteration omitted). Thus, according to the Court, "proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* It follows that, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive" since "[w]hat matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Id.* at 1996, 2003. The Court also observed that where "the Government pays a

particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* at 2003.  Likewise, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* at 2004.

While these standards provide a helpful guide, they are presented primarily in the abstract.  Therefore, the Court finds it helpful to review some of the federal appeals court opinions decided in the wake of *Universal Health* in order to obtain a concrete sense of how these standards have in fact been applied.

In *United States v. Sanford-Brown, Ltd.*, the Seventh Circuit addressed claims brought against a "for-profit higher education enterprise, alleging fraudulent conduct in connection with claims for federal subsidies under the Higher Education Act (HEA)." *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445 (7th Cir. 2016).  In affirming the district court's grant of summary judgment to defendant with respect to the relator's implied certification claim, the court determined that the relator "failed to establish the independent element of materiality." *Id.* at 447.  After reviewing the materiality standard, as recently set forth by the Supreme Court in *Universal Health*, the court concluded that the relator failed to offer any "evidence that the government's decision to pay [defendant] would likely or actually have been different had it known of [defendant's] alleged noncompliance with Title IV regulations." *Id.*  Rather, the

court found persuasive the fact that "the subsidizing agency and other federal agencies in this case have already examined SBC multiple times over and concluded that neither administrative penalties nor termination was warranted." *Id.* Thus, the court concluded that "[a]t bottom, even assuming [relator's] allegations are true, the most he has shown is that [defendant's] supposed noncompliance and misrepresentations would have entitled the government to decline payment. Under *Universal Health*, that is not enough." *Id.* at 447-48.

In *United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, the First Circuit reviewed the district court's dismissal of an FCA complaint which alleged, in part, that the defendant, a manufacturer of metal-on-metal hip replacement devices, "made a series of false statements to the FDA [Food and Drug Administration] and doctors, but for which the FDA would not have approved the [ ] device for hip replacements or would have withdrawn the approval, and doctors would not have certified the devices for government reimbursement." *United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 32 (1st Cir. 2017), *cert. denied sub nom. Med. Device Bus. Servs., Inc. v. U.S. ex rel. Nargol*, 138 S. Ct. 1551, 200 L. Ed. 2d 770 (2018). On appeal, the relators asserted that "the district court should have found that they plausibly and particularly alleged that every claim submitted to the government for payment, directly or indirectly, was false because the Pinnacle MoM device was

dangerously designed." *Nargol*, 865 F.3d at 34.[15]  In finding relators' pleading

insufficient as to the above allegations, the First Circuit initially recognized that

the FDA's streamlined device approval process

> constitutes the government's method of determining whether a device is safe and effective as claimed. That determination is what makes the product marketable, and Relators offer no suggestion that government reimbursement rules require government health insurance programs to rely less on section 510(k) approval than they do other forms of FDA approval.

*Id.*  In addition, the court observed that

> The FDA, in turn, possesses a full array of tools for detecting, deterring, and punishing false statements made during . . . approval processes. Its decision not to employ these tools in the wake of Relators' allegations so as to withdraw or even suspend its approval of the Pinnacle MoM device leaves Relators with a break in the causal chain between the alleged misstatements and the payment of any false claim. It also renders a claim of materiality implausible.

*Id.*  (internal quotations and citations omitted).  In finding that the pleading

failed to contain plausible allegations of materiality, the court stressed that the

complaint did not include an "allegation that the FDA withdrew or even

suspended product approval upon learning of the alleged misrepresentation"

---

[15]    The particular device at issue in *Nargol* was approved by the FDA in accordance with a streamlined procedure available under Section 510(k) of the Food, Drug and Cosmetic Act, 21 U.S.C. § 360e(b)(1)(b)(ii), on the basis that defendant "represented to the FDA that the [ ] device was 'substantially equivalent to . . . an earlier [metal-on-metal] hip-replacement device for which [defendant] had previously received premarket approval." *Nargol*, 865 F.3d at 32. Significantly, "the FDA does not independently assess the safety and effectiveness of a medical device that qualifies for approval under Section 510(k).  Rather, the process under section 510(k) allows a device manufacturer to piggyback on the full-scale review and approval of another device by demonstrating that the new device is 'substantially equivalent' to a predicate device which itself may be marketed pending the completion of a full premarket approval process." *Id.* at 34 (internal quotations and citations omitted).

notwithstanding that it did contain facts that the relators "told the FDA about every aspect of the design of the [ ] device that they felt was substandard, yet the FDA allowed the device to remain on the market until [defendant], on its own volition, discontinued the device in 2013."

    The court concluded that where

> the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Such very strong evidence becomes compelling when an agency armed with robust investigatory powers to protect public health and safety is told what Relators have to say, yet sees no reason to change its position. In such a case, it is not plausible that the conduct of the manufacturer in securing FDA approval constituted a material falsehood capable of proximately causing the payment of a claim by the government.

*Id.* at 35.  (internal quotations and citation omitted).

    In *United States ex rel. Kelly v. Serco, Inc.*, the Ninth Circuit addressed an FCA claim brought by the relator "against his former employer, Serco, Inc., a technology and project management services provider, alleging that Serco submitted fraudulent claims for payment to the United States for work done under a government contract." *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 328 (9th Cir. 2017).  In affirming the district court's grant of summary judgment to defendant, the Ninth Circuit rejected relator's argument which posited that "Serco's omissions were material because the government relied on Serco's reports to manage the AWS [Advanced Wireless Systems Spectrum Relocation] Project and its budget." *Id.* at 333.  Following this line of reasoning,

relator concluded that "'[i]f Serco had disclosed [sic] that it did not have a compliant EVMS [Earned Value Management System] or that its EVM reports were fraudulent, it is doubtful Serco's payment vouchers would have been paid.'" *Id.* at 333-34 (first and second alteration in original).  The Ninth Circuit was not persuaded, finding that relator had "failed to establish a genuine issue of material fact regarding the materiality of Serco's obligations to . . . provide valid EVM reports." *Id.* at 334.  Rather, the court found that "no reasonable jury could return a verdict for [relator]" in light of the "demanding standard required for materiality under the FCA, the government's acceptance of Serco's reports despite their non-compliance . . . and the government's payment of Serco's public vouchers for its work under Delivery Orders 49 and 54[.]" *Id.*

In *United States ex rel. McBride v. Haliburton Company*, the relator filed suit under the FCA alleging that KBR, the government contractor she worked for, "inflated headcount data, reflecting inaccurate headcount numbers for MWR [morale, welfare and recreation] facilities at Camp Fallujah and Camp Ar Ramadi from July 2004 to March 2005."[16] *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1029 (D.C. Cir. 2017).   The district court "granted summary

---

[16] "Shortly after the U.S. military's March 2003 invasion of Iraq, KBR began providing services under Task Order 59, which was effective from June 2003 to May 2005. Task Order 59 required KBR to provide a wide range of support services for U.S. troops, such as camp construction, power generation, dining facilities, potable and non-potable water services, fire protection, laundry, and—relevant here—morale, welfare, and recreation ("MWR") services. KBR performed MWR services by maintaining recreation centers where U.S. troops could exercise, play games, watch television, and use the internet, among other things. MWR services were a relatively small part of KBR's overall effort, representing about 1.5% of total costs incurred under Task Order 59. *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1029 (D.C. Cir. 2017).

judgment for KBR," "concluding that [relator] failed to offer evidence that any misrepresentation regarding [recreation center] headcount data (if one existed) was material to the Government's decision to pay KBR." *Id.* at 1028.  On appeal, relator contended that "KBR failed to disclose violations of its obligations to maintain accurate data to support its costs, and as such, rendered its claims impliedly false."  In affirming the district court's grant of summary judgment in favor of KBR, the D.C. Circuit found Plaintiff's theory unsupported by the evidence, which instead tended to establish that "headcount data (false or not) had no bearing on costs billed to the Government," and that "[a]bsent any connection between headcounts and cost determinations, it is difficult to imagine how the maintenance of false headcounts would be relevant, much less material, to the Government's decision to pay KBR." *Id.* at 1033.

In addition, the court made it clear that it was not persuaded by Plaintiff's purportedly "dispositive" evidence consisting of "an Administrative Contracting Officer's (ACO) statement in a declaration that he 'might' have investigated further had he known false headcounts were being maintained, and that such an investigation 'might' have resulted in some charged costs being disallowed." *Id.* Rather, the court stated that

> At most, the statement amounts to the far-too-attenuated supposition that the Government *might* have had the "option to decline to pay." *See Universal Health*, 136 S. Ct. at 2003 ("Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance."). Given the speculative and generic

> nature of the ACO's statement, and the "rigorous" and
> "demanding" materiality standard that must be met, *id.*
> at 2002−03, McBride's evidence will not suffice to
> defeat summary judgment.

*Id.* at 1033-34.  In conclusion, the court stressed that since it had "the benefit of

hindsight" it "should not ignore what actually occurred: the DCAA [Defense

Contract Audit Agency] investigated [relator's] allegations and did not disallow

any charged costs.  In fact, KBR continued to receive an award fee for exceptional

performance under Task Order 59 even after the Government learned of the

allegations.  This is very strong evidence that the requirements allegedly violated

by the maintenance of inflated headcounts are not material."  *Id.* at 1034

(internal citation omitted).

     While the above decisions reinforce the notion that the materiality

standard set forth in *Universal Health* is a "rigorous one," *Universal Health*

*Services*, 136 S. Ct. at 2004, n. 6, it is not insurmountable.  For example, in

*United States v. Luce*, the Seventh Circuit addressed a claim brought by the

United States under the FCA which alleged that defendant "had defrauded the

Government by falsely asserting that he had no criminal history so that his

company could participate in the FHA's [Fair Housing Act] insurance program"

as a loan correspondent.[17] *United States v. Luce*, 873 F.3d 999, 1000 (7th Cir.

---

[17]     "A loan correspondent is an entity that has as its principal activity the *origination* of
mortgages for sale or transfer to other mortgagees . . . [which involves] soliciting the mortgagor
and verifying employment information, earnings, and assets. In short, a loan correspondent
"originate[s] and verif[ies] the initial information on an FHA loan." *Luce*, 873 F.3d at 1001
(alterations in original).  Loan correspondents, similar to other mortgagees, must, in order to
participate in the FHA loan insurance program, annually certify that "none of the principals,

2017).  On appeal, defendant asserted, in part, that "his false certifications were not material and that lingering issues of material fact preclude[d] summary judgment."  *Id*. at 1000.

In rejecting defendant's materiality challenge, the court focused on the fact that the Government, upon learning of defendant's unrelated indictment for wire fraud, mail fraud, making false statements and obstruction of justice, immediately "instituted debarment proceedings to end [defendant's] participation in the program," which, according to the court, "confirm[ed] the centrality of this requirement."  *Id*. at 1002, 1007.  Significantly, in finding the requisite materiality, the court highlighted the fact that "the Government's actions following its discovery of [defendant's] fraud support, rather than undercut, a finding of materiality" since "[a]lthough new loans were issued, the Government also began debarment proceedings, culminating in actual debarment.  There was no prolonged period of acquiescence."  *Id*. at 1008.

### 2. Analysis

Having carefully reviewed the materiality standard and accompanying principles set forth in *Universal Health* as well as courts of appeal decisions applying that standard and in light of the issues raised in the parties briefs, the

---

owners, officers, directors, and/or employees of the above named mortgagee are currently involved in a proceeding and/or investigation that could result, or has resulted in a criminal conviction, debarment, limited denial of participation, suspension, or civil money penalty by a federal, state, or local government."  *Id*. (emphasis omitted).  The certification requirement stems from 24 C.F.R. Section 202.5(j)(2) which "affirmatively prohibits program participation by loan correspondents who have had a principal 'indicted for, or . . . convicted of, an offense' bearing on the loan correspondent's integrity."  *Id*. at 1007.

Court finds the following considerations relevant to its analysis of materiality:  (1) whether there existed an unambiguous statutory or regulatory requirement that the VA designated as a condition of payment; (2) the VA's general knowledge and treatment of impermissible fees; (3) whether (and if so, when) the VA obtained actual knowledge of Relators' allegations; and (4) to the extent the VA gained such knowledge, its behavior in the wake of learning about the nature of Relators' allegations.

### i.   Condition of Payment

38 C.F.R. Section 4313(a) contains a provision that can be construed as a condition of payment.  That section prescribes, in part, that "no loan shall be guaranteed or insured unless the lender certifies to the Secretary that it has not imposed and will not impose any charges or fees against the borrower in excess of those permissible under paragraph (d) or (e) of this section."  38 C.F.R. § 36.4313(a); *see also* 38 C.F.R. § 36.4340(k) ("Lenders originating loans are responsible for determining and certifying to VA on the appropriate application or closing form that the loan meets all statutory and regulatory requirements. Lenders will affirmatively certify that loans were made in full compliance with the law and loan guaranty regulations as prescribed in this section.").  This certification requirement (among others) is contained on VA Form 26-1820, Section II, which requires the Lender's signature.  Relators' Ex. 72.

According to Relators, this condition of payment, in itself, is "proof the requirement is material under the FCA."  Relators' Response to Defendant

Mortgage Investors Corporation's Second Motion for Summary Judgment ("Rels.' Opp'n") at 41; *see id.* at 42-43 ("The fact that federal regulations make a truthful certification of compliance a condition precedent to the guaranty, and establish that fraud and misrepresentation are grounds for a complete defense to making payment on the guaranty, proves MIC's fraudulent certifications of compliance are material under the FCA.").

In contrast, MIC, in its moving brief, fails to mention the existence and impact, if any, of this regulatory requirement to the instant inquiry.   *See* Memorandum of Law in Support of Mortgage Investors Corporation's Motion for Summary Judgment ("MIC's Mem.") at 42-52.   MIC only addresses this regulatory section in its reply brief.   Reply in Further Support of Mortgage Investors Corporation's Motion for Summary Judgment ("MIC's Reply") at 4-6. Essentially, MIC's position is that while the regulatory "language might be minimally relevant . . . both *Escobar* and a substantial body of post-*Escobar* precedent explain that the focus of the analysis must be on how the relevant agency—here the VA—actually acted vis-à-vis the alleged unlawful conduct." *Id.* at 4-5 (citing cases).  In addition, MIC asserts that "even if the statutory language were relevant, the evidence contradicts relators' premise that the at-issue fee regulations are designated a condition of payment." *Id.* at 5.

Initially, the Court points out that to the extent MIC attempts to assert that 38 C.F.R. Section 4313(a) does not contain an explicit condition of payment based upon the fact that the VA, according to MIC "distinguishes between IRRRL

requirements that affect the guarantee, and those that do not," *id.* at 5-6, such an argument is without merit.  MIC cites no case law authority, nor is the Court aware of any, which posits that in order for a statutory, regulatory or contractual requirement to qualify as a condition of payment a court should disregard the language itself and instead look to the subjective behavior of the particular agency charged with oversight.  Rather, *Universal Health* makes clear that the Government has the prerogative to "expressly identify a provision as a condition of payment" in a regulation, statute or contract.  *Universal Health Services, Inc.*, 136 S. Ct. at 2003; *id.* at 1996 (stating that a "requirement" may be "expressly designated as a condition of payment").  Indeed, in *United States ex rel. Petratos v. Genentech Inc.*, the Third Circuit, in the context of analyzing the materiality of a Complaint alleging violations of the FCA, noted that a particular statutory section qualified as a condition of payment based solely upon the language utilized in the statute itself.  *See United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 486–87 (3d Cir. 2017) (recognizing that "[t]he Medicare statute [42 U.S.C. Section 1395y(a)(1)(A)] provides that 'no payment may be made' for items and services that 'are not reasonable and necessary for the diagnosis and treatment of illness or injury'" and concluding that this statutory section constitutes "a condition of payment.").  Notably absent was any discussion surrounding the Centers for Medicare and Medicaid Services subjective application of this provision to such a determination.  Thus, the Court finds that the explicit language set forth in 38 C.F.R. Section 4313(a) does qualify as a

condition of payment (or in this case of obtaining the loan guarantee).  To conclude otherwise would be to effectively ignore the plain meaning of the text of that particular regulatory section.  This the Court declines to do.

However, Relators fare no better in their attempt to characterize this regulatory section as dispositive on the materiality issue.  *See* Rels.' Opp'n at 41-43.  Contrary to Relators' suggestion, the mere fact that this regulatory section qualifies as a condition of obtaining a loan guarantee does not lead to the inexorable conclusion that such a requirement is material on that basis alone.  To the contrary, the Supreme Court in *Universal Health* made clear that "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment."  *Universal Health Services, Inc.*, 136 S. Ct. at 2003.  Rather, "the Government's decision to expressly identify a provision as a condition of payment is relevant but not automatically dispositive."  *Id.*; *see Petratos*, 855 F.3d at 490 ("The mere fact that § 1395y is a condition of payment, without more, does not establish materiality.").  It follows that while the condition of payment language set forth in 38 C.F.R. Section 4313(a) is relevant in the context of a materiality analysis, it is but one piece of the puzzle.

### ii.   VA's General Knowledge & Treatment of Impermissible Fees

There is no question that during the relevant timeframe encompassing this lawsuit the VA was generally aware that lenders were charging unallowable fees

to borrowers in the context of originating IRRRL loans. London Dep. at 117, 121. Indeed, Mr. London, the VA's 30(b)(6) witness, confirmed that "finding unallowable fees on HUD-1s [constituted] one of the most common loan deficiencies that RLCs [Regional Loan Centers] find in their reviews" and, as such, it was his "understanding" that "the VA has been aware of [the problem of lenders charging borrowers unallowable fees] for as long as [RLCs] have been sampling loans." *Id.* at 117. In fact, London agreed that it was "not a surprise to the VA that lenders charge unallowable fees to borrowers." *Id.* at 122. Moreover, during the timeframe within which the VA RLCs were auditing "at least a 10 percent" sample of loans originated within each of their respective jurisdictions (2000-2010), *id.* at 39, London confirmed that the VA "infer[red] that there were fee issues with other loans that [they] did not review." *Id.* at 117.[18]

There being no question as to the VA's knowledge that the charging of unallowable fees constituted one of the most prolific loan deficiencies encountered during the RLCs' audits, *see id.* at 117, what actions did the VA generally take in the face of such issues? Again, Mr. London offers some perspective. During his deposition, London testified that where an unallowable fee is charged to the borrower, the VA's general practice is to direct the lender to issue a refund (either in cash or through reduction of the principal balance of the

---

[18]     At least during the relevant time period of this lawsuit, the VA had three separate ways in which it monitored lenders' compliance: (1) the RLCs, which performed audits; (2) the national monitoring unit, which performed additional audits; and (3) a team of "loan specialists and management analysts" in the oversight unit located at the VA's Central Office ("VACO") who, although primarily responsible for "internal control reviews . . . could have reviewed loan files as well." London Dep. at 54.

loan).  *Id*. at 99-102.   While London qualified that this course of action "assume[s] that [the overcharge] was [ ] inadvertent" or a "good faith" error, when pressed, he nevertheless agreed that the VA never took any action under any set of circumstances (at least those circumstances described at the time of his deposition) involving unallowable fees other than directing the lender to issue a refund.  *See id*. at 102-103 (stating "no" when asked "[w]ell, in any circumstances [described during the deposition], have you ever seen the VA do anything other than instruct a lender to refund an overcharge on a closing fee?"); *but see id*. at 174 (stating that the VA's course of action in seeking only a refund was based on the notion that the fees issues were "inadvertent" and "not a deliberate intent to misrepresent"), 202 (same).[19]   The VA's pattern and practice of exclusively utilizing the refund mechanism in the face of unearthing unallowable fees was fleshed out further during the following exchange:

> Q:    Did you find any instance in which the VA had sought to void the guarantee of a VA loan because of an unallowable closing fee or cost being charged on the HUD-1?
>
> A:    No.
>
> Q:    Did you find any instance in which the VA ever voided a guarantee of a VA loan because of an unallowable closing fee or cost that had been hidden on a HUD-1?

---

[19]    Mr. London based his (as well as the VA's) answers on conversations he had with long-time VA employees who had been "with the agency for at least two decades, if not more" as well as a former employee "who had a much longer tenure with the program."  London Dep. at 104. These individuals confirmed that they had never seen the VA respond to an unallowable closing fee in any fashion other than directing the lender to issue a refund.  *Id*.

A:     No.

Q:     [H]as the VA ever asserted a defense to a VA loan because of an unallowable closing fee or cost being charged on the HUD-1?

A:     Not to my knowledge.

Q:     [H]as the VA ever asserted a defense to a VA loan because of an unallowable closing fee or cost that was hidden on a HUD-1?

A:     Not to my knowledge.

Q:     [D]id you ever find any instance in which the VA had reduced the amount of an allowed claim on the guarantee because of an unallowable closing fee?

A:     No.
. . .

Q:     To your knowledge, has the VA ever revoked the guarantee on any IRRRL[s] that were originated by MIC because of an unallowable fee or a fee being charged above that [ ] is reasonable and customary?

A:     To my knowledge VA has never revoked an MIC guarantee because of those reasons.
. . .

Q:     [T]o your knowledge, did the VA ever tell MIC that they could not [originate] IRRRL loans anymore?

A:     To my knowledge that did not occur.

*Id.* at 107-08, 167-68; *see also id.* at 106 (agreeing that the VA never withdrew a guarantee on any loan or required the lender to execute an indemnification agreement due to a fee issue uncovered during loan audits).

Notwithstanding the generalized practice of the VA in relying exclusively on the refund mechanism when dealing with unallowable fees, according to London, "if the VA either suspected or found fraud" such a suspicion or finding "would [be] take[n] seriously and the appropriate channels would be alerted." *Id.* at 240, 237-38 (opining that if the VA had suspicions or otherwise knew lenders were bundling unallowable fees into allowable fees "we would have elevated that issue and also alerted the Office of Inspector General").

Similar to the testimony of Mr. London, Mr. White, who retired from the VA in 2013 as a supervisory loan specialist, stated that "if there was an unallowable fee, notwithstanding the lender certification, the presumption was [to] tell them to refund the fee[.]" March 11, 2016 Deposition of William White ("White Dep.") (Doc. 957-16) at 22-23, 94. Indeed, White clarified that "in any way, shape or form if it's determined [the lender] charged an unallowable fee, whether honest mistake or whatever . . . we would say [the lender] need[ed] to refund that fee to the veteran" and that once "the lender refunds the fee, the [loan] guaranty would stay in place." *Id.* at 120-21. However, according to White, the VA's consistent and exclusive use of the refund mechanism in the face of a lender levying unallowable fees "presumes that it's an oversight." *Id.* at 121; *see also id.* (stating that "if evidence came to light that there was a deliberate attempt to conceal[,] the fact that unallowable fees were rolled in, then that would be a different ball game"). White clarified that in his view if "there was ever a situation where there was some sort of broad pattern of knowingly doing

43

something like [charging unallowable fees] then it would be elevated . . . up the road" and that if the fee issues resurfaced "over and over again, then the field stations can . . . suggest monitoring[.]" *Id.* at 121.

The VA's apparent acquiescence—evidenced by its sole use of refunds to the exclusion of other administrative sanctions, mandating indemnification, voiding the loan guarantee or reducing the claim amount—to the widespread practice of lenders charging unallowable fees does not bode well for Relators. This is because what matters is "not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement *that the defendant knows* is material to the Government's payment decision." *Universal Health Services, Inc.*, 136 S. Ct. at 1996 (emphasis added).   Under these factual circumstances it is difficult for the Court to envision exactly how MIC could be affirmatively charged with knowledge that the certification requirement concerning charges or fees is material (*i.e.*, central) in view of the VA's seemingly complacent and lackadaisical attitude (*i.e.*, continually seeking only that lenders issue refunds in response to lenders charging borrowers unallowable fees) in the face of widespread violations of that requirement by lenders over the course of many years.

This is not to say that MIC had no knowledge of what was going on inside its own doors concerning compliance with this regulatory requirement.  Indeed, the record is replete with documents which, at minimum, create a permissible

44

inference that intentional violations of the charges and fees regulation were (or likely were) occurring.  Some examples include:

- MIC's correspondence with its settlement agents which creates an inference that MIC was attempting to reduce its out-of-pocket costs as concerns payment of any closing fee and instead shifting that cost to borrowers.  *See* Relators' Ex. 4, 34 (April and June 2009 email correspondence between MIC's Vice President J.T. Taylor and Paula Pautauros, Chief Operating Officer of National Title Agency concerning closing fee charges)

- MIC fee sheets which arguably show fee shifting/bundling.  *See, e.g.*, *id*. Ex. 37 (Performance Title Agency fee sheet showing $950 "flat fee" and indicating this amount included a closing fee), Ex. 40 (Montgomery Home Title fee sheet indicating, in parentheses, that title exam fee includes a closing fee), Ex. 43 (Netco fee sheet indicating that a $100 closing fee but noting, via a hand-written remark, that $250 should be added); Ex. 46 (Transcontinental fee sheet showing reduction of closing fee and increase of title exam fee); Ex. 47 (same with respect to Netco fee sheet); Ex. 48 (same with respect to Fulco fee sheet)

- MIC HUD-1s which create an inference that fee shifting/bundling was likely occurring.  *See, e.g.*, Rels.' Opp'n at 22-28 (setting forth the different ways in which MIC's HUD-1s create an inference of fee shifting/bundling and setting forth underlying record evidence supporting these assertions)[20]

---

[20]    The Court does take issue with Relators' claim that "MIC IRRRL HUDs can be compared to MIC HUDs for non-IRRRLs to reveal bundling" since, according to Relators, "[u]nlike IRRRLs, there is no rule precluding a borrower from paying a closing fee on conventional VA loans and FHA loans."  Rels.' Opp'n at 22.  Relators' provide no citation for this assertion and indeed, at least with respect to VA loans, the statement is incorrect.  Rather, 38 C.F.R. Section 36.4313(d) makes clear that the "schedule of permissible fees and charges shall be applicable to *all Department of Veterans Affairs guaranteed or insured loans*."  Thus, an itemized closing or settlement fee is not only prohibited when originating an IRRRL but also when originating any other type of VA loan.  *See* VA Pamphlet § 8.02 (explicitly setting forth that a loan closing or settlement fee cannot be levied against the borrower as an itemized charge on any type of VA loan but rather, must be included, if at all, in the 1% flat fee); *compare* 38 C.F.R. § 36.4313 (permissible fees and charges applicable to all VA loans) *with* 24 C.F.R. § 206.31 (permissible fees and charges applicable to all FHA loans).

However, despite this evidence, and MIC's likely knowledge of these practices, it remains true that "not every violation of a [regulatory] requirement gives rise to liability [under the FCA]." *Universal Health Services, Inc.*, 136 S. Ct. at 1996. In this case, notwithstanding MIC's actions as concerns the fee regulation, it is the VA's attitude in the face of this continuous stream of fee violations which creates a wide chasm between any such violations by MIC on the one hand and a finding (or at minimum a material issue of fact) of materiality on the other.

Indeed, in light of London's own characterization as to the pervasive nature of the problem coupled with the overall duration of the VA's awareness of the same (*i.e.*, "for as long as [RLCs] have been sampling loans"), it is somewhat difficult for the Court to imagine that such a widespread and apparently systemic problem was consistently treated as nothing more than a stream of "inadvertent" or "good faith" errors, especially where the VA itself concedes that it "infer[red] that there were fee issues with other loans that it did not review." London Dep. at 117, 122. This observation is not surprising given that during his deposition, London appears to intimate that the charging of unallowable fees, in and of themselves, would not rise to the level of an "egregious" violation warranting any elevation in review. London Dep. at 17-18. Rather, according to London, violations warranting an elevated review included issues surrounding "creditworthiness," "collateral," and "eligibility"—matters central to the underwriting and ultimate guarantee of a VA loan. *Id.* at 18. These facts further

attenuate the purported materiality of the certification requirement as pertains to the imposition of charges and fees (which are in fact applicable to all VA insured or guaranteed loans, not just IRRRLs).  *See* 38 C.F.R. § 36.4313(a), (d).

Further, it is true that both London and White testified that had the VA suspected or otherwise had knowledge that the scope of the problem crossed the line from good faith mistakes to intentional conduct, the VA would have conducted further inquiries or embarked on an investigation.  However, such speculative and seemingly self-serving *post hoc* statements primarily serve only to illustrate that the VA, assuming it unearthed such misconduct, would have the option of declining to pay (or revoke the guarantees). Yet the existence of that "option," by itself, is insufficient to establish (or raise a genuine issue) as to materiality.  *See Universal Health Services, Inc.*, 136  S. Ct. at 2003 ("Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the [ ] noncompliance); *McBride*, 848 F.3d at 1033-34 (finding that contracting officer's statement that he "'might' have investigated further" and that "such an investigation 'might' have resulted in some charged cost being disallowed" was insufficient to survive summary judgment as to element of materiality"); *Sanford-Brown, Limited*, 840 F.3d at 447-48 (recognizing allegations of materiality as insufficient where "the most [plaintiff] has shown is that [defendant's] supposed noncompliance and misrepresentations would have entitled the government to decline payment" and concluding that "under *Universal Health*, that is not enough").

47

The above analysis leads to the conclusion that the VA's actual practice upon learning of widespread fee violations was limited solely to directing that the lender issue refunds to veteran borrowers, to the exclusion of all else, despite the many other arrows available in its quiver.  And it is the VA's continuous pattern of inaction (*i.e.*, relying only on the refund mechanism) under such circumstances that creates a high mountain for Relators to climb as to this element of their claim.  Nevertheless, while relevant, the VA's inaction in the face of such generalized knowledge of fee violations does not, in itself, constitute the proverbial nail in the coffin of Relators claims.  Rather, the VA's behavior after being apprised of the specific allegations contained in this lawsuit serves as the ultimate death knell with regard to materiality.  *See U.S. ex rel. Thomas v. Black & Veatch Special Projects Corp.*, 820 F.3d 1162, 1174 (10th Cir. 2016) (stating that "evidence of the government's inaction after learning of *alleged* violations [is] sufficient to establish the lack of materiality) (emphasis in original) (citing cases).

Before proceeding with its analysis, the Court takes a moment to further reflect on the VA's issuance of refunds in the face of fee noncompliance.  Such a pause is warranted since the VA's direction to lenders to issue refunds in the face of an unallowable fee—notwithstanding the Court's previous observations—is meaningful in that it distinguishes this case from other FCA actions where materiality was found lacking.  This case, in contrast, does not involve a situation in which the Government contracts for a good or service and continues to pay

48

claims under the contract in full and otherwise takes *no* other action despite noncompliance by the vendor (whether such noncompliance is based upon the delivery of non-conforming goods or other statutory, regulatory or contractual requirements). *See, e.g.*, *United States ex rel. Bachert v. Triple Canopy, Inc.*, 321 F. Supp. 3d 613, 620-21 (E.D. Va. 2018) (concluding that government contractor's alleged falsification of weapons inspection records was not material to the Government's decision to pay, in part, because "the State Department never asked for any money back from defendant upon learning of Bachert's allegations. Instead, the State Department repeatedly renewed defendant's Base Contract and TO–5 every time it had the option to do so, even after it learned of Bachert's allegations."); *United States v. Salus Rehab., LLC*, 304 F. Supp. 3d 1258, 1260 (M.D. Fla. 2018) (finding, in the context of a post-trial motion seeking judgment as a matter of law, that government contractor's failure to maintain the required care plan and consistent submission of defective paperwork were not material to the Government's decision to pay medical claims since the Government "has [not] ceased to pay or even threatened to stop paying the defendants for the services provided to patients . . . continuously since long before this action began in 2011.").

Here, by directing that refunds be issued, the VA took an affirmative, level and consistent approach when IRRRL audits uncovered lenders charging unallowable fees to borrowers.  Thus, such behavior on the part of lenders, when spotted by the VA, elicited a direct response, albeit an altogether consistent and

mechanical one.  As such, at least in some sense, the act of lenders charging unallowable fees could be viewed, in general, as triggering some sort of VA enforcement action since it had the effect of causing a response in the form of directing the issuance of refunds.  And this fact is not insignificant since it illustrates that the VA did not simply ignore the issue (when the same was spotted) or else tacitly acquiesce by doing nothing in the face of such lender noncompliance.

However, this observation, in turn, begs the following question: would an additional piece (or pieces) of information concerning the distinct facts and issues in play in this case—to the extent such facts entered into the VA's sphere of knowledge—prove to elicit a more particularized and targeted response from VA over and above the baseline reaction of merely directing that a refund be issued? This is significant because when analyzing materiality in connection with the FCA, a court should consider "whether a piece of information is sufficiently important to influence the behavior of the recipient." *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110 (1st Cir. 2016) (internal citation omitted).  In other words, if the VA acquired knowledge of MIC's alleged fraudulent activities (*i.e.*, hiding unallowable fees within allowable fees on HUD-1s thereby shifting impermissible costs onto borrowers), and, upon doing so, elevated its response from merely directing refunds to something more substantial, this would go a long way in illustrating "whether the misrepresentation had 'a natural tendency to influence, or be capable of

influencing, the payment or receipt of money or property[.]'" *Marsteller for use & benefit of United States v. Tilton*, 880 F.3d 1302, 1313 (11th Cir. 2018) (quoting 31 U.S.C. § 3729(b)(4)).

### iii.   VA's Actual Knowledge of Relators' Claims

Beginning February 27, 2006, Relators' counsel started discussing the joint prosecution of this action with the Government.  *See* MIC Ex. 70 (Relators' Privilege Log [December 24, 2015]) at 1.  Approximately 9 days later, on March 8, 2006, the original Complaint was filed under seal.  (Doc. 1).  Thereafter, beginning on April 7, 2006, Relators' counsel continued their discussions not only with the Department of Justice and the United States Attorney's Office but also with investigators from the VA's Office of the Inspector General ("OIG").  *See id*. at 2.  These discussions concerned the allegations in the Complaint, namely, "Defendants' unlawful practices, including the charging of unallowable fees and false certifications under the [IRRRL] Program" as well as "any other relevant issues arising out of this litigation."  *Id*.   Relators' discussions with the Government (including investigators for VA OIG) concerning the specific allegations in the Complaint (and later the Second Amended Complaint) spanned a period of approximately five years. Ultimately, after the district court judge advised the Government that no further extensions would be granted, the Government decided not to intervene in this case.  *See* 06-cv-547, (Doc. 58) (Order stating that no further extensions of time would be granted); (Doc. 59) (Government's September 30, 2011 declination statement).

51

While the information contained in Relators' privilege log concerning the "[d]escription, [s]ubject, and [p]urpose" of the communications between their counsel and various governmental entities is understandably vague, what is self evident is the fact that extensive discussions centering on Relators' allegations remained ongoing over a period of years and specifically included investigators from VA's OIG. *See, e.g.*, MIC Ex. 70 at 2, 4, 14, 17. For example, on August 21, 2009, Relators' counsel prepared a memorandum containing a "Short Summary of Fraudulent Acts [and] discussing mental impressions about the case [concerning] fraud, damages, and investigation" that was shared with both the Department of Justice and the VA. *Id.* at 17.

In addition, during his deposition, London testified as follows:

> Q:   In 2009 did [the] VA become aware of a lawsuit that was filed in Georgia over unallowable fees being charged on IRRRLs?
>
> A:   Yes.
>
> Q:   And more specifically, did the VA become aware that there were allegations that unallowable fees were being added to allowable fees on the HUD-1s for IRRRLs
>
> A:   Yes.

London Dep. at 125-26.[21]   Thus, at least as of 2009, the VA arguably had knowledge not only of the general fact of the existence of this lawsuit (assuming it

---

[21]   It is worth pointing out that after this action was filed in 2006, third-party veterans filed unsealed cases, including at least one class action, which involved similar fraud claims (but not FCA claims) against Wells Fargo. *See, e.g.*, *Gaston v. Wells Fargo Home Mortg.*, Civ. A. No. 08 CV 12515E (Clayton Cnty., Ga., State Ct. Dec. 17, 2008); *Wynn v. Wells Fargo Bank, N.A.*, Civ.

did not have such knowledge at a prior date based upon discussions between Relators' counsel, VA OIG and the U.S. Attorney's Office that predate 2009) but also as to the nature of Relators' specific allegations concerning the alleged bundling by lenders (including MIC) of unallowable fees into allowable fees on the HUD-1s.   Moreover, as a direct result of the VA's knowledge of Relators' allegations in the non-FCA mortgage fraud parallel lawsuits, additional audits were conducted.  *See, e.g.*, *id.* at 127 (agreeing that "the audit of Wells Fargo in December of 2009 was triggered by the allegations that came to light in November 2009 concerning unallowable fees being charged on IRRRLs").

On the flip side of the coin, London nevertheless disclaimed any knowledge on the part of the VA that lenders were in fact engaging in unauthorized bundling of fees.  *Id.* at 237-38.  Specifically, when asked "[d]id the VA [ ] know that lenders . . . had been deliberately and systematically bundling unallowable fee[s] into allowable fees and concealing that fact from the VA?" London stated that "[n]o, the VA is not aware of that.  And if it had any suspicion [the VA] would have elevated that issue and also alerted the [OIG]."  *Id.*; *see id.* at 240 (stating that "if [the] VA either suspected or found fraud that [it] would take that seriously and the appropriate channels would be alerted").

---

A. No. 1:09-CV-00165, Doc. 1 (N.D. Ga. Jan. 20, 2009).  Thus, London's testimony may be referring to these other actions.  Regardless, in light of the ongoing contacts and exchange of information as between Relators and various factions of the Government concerning the allegations in this case and occurring during this timeframe, London's testimony still has force since it unambiguously illustrates that the VA was appraised of the very problem at issue in this case.  Additionally, later on during his testimony, London was asked "[i]n 2009 and 2010 were you personally aware of the existence of this False Claims Act lawsuit" to which he responded that "[y]es, I was aware."  London Dep. at 238.

While London's testimony might at first blush appear irreconcilable, it is arguably consistent with the perspective of a self-protective agency officer. Further, the testimony bears directly on the inquiry concerning whether the VA had actual knowledge of the allegedly fraudulent acts.  While London's earlier testimony concedes that the VA had actual knowledge of the allegations concerning Defendants' alleged fraudulent acts, his later testimony denies that the VA had actual knowledge of the wrongdoing itself.  *Compare id.* at 125-26 *with* 237-38.   Essentially, then, the VA's position, based upon London's testimony, is that while it knew full well the nature and scope of Relators' allegations, it never on its own took any action in order to substantiate the validity of Relators' claims, even though it conducted audits which identified a continuing pattern of the mortgage companies' noncompliance with the charges and fees regulation.

Thus, in the VA's view, it lacked knowledge of the wrongdoing itself despite being placed on notice of the purported misconduct through the well-pleaded allegations in Relators' Complaint as well as the multi-year internal discussions with Relators' concerning the prosecution of this action.   As such, whether the VA can be said to have had actual knowledge that certain regulatory requirements were violated based upon Defendants' alleged conduct turns directly upon whether such knowledge can be predicated solely upon learning of Relators' allegations or whether the VA must have actually unearthed or otherwise confirmed the nature of the allegations through its own investigative

efforts.  To shed light on this question, the Court turns to some recent courts of appeal decisions on the issue.

In *U.S. ex rel. Thomas v. Black & Veatch Special Projects Corp. ("Black & Veatch")*, the Tenth Circuit, in analyzing materiality in the context of an appeal of the district court's summary judgment ruling, was faced with the question of whether actual knowledge could be imputed to the Government for materiality purposes based solely upon the Government being appraised of the relator's allegations or, in the alternative, whether such information would be insufficient to charge the Government with knowledge without it actually ferreting out the wrongdoing for itself.  *See id.* at 1173.  In finding that the Government's knowledge of the relators' allegations to be sufficient, the court pointed out that the case upon which relators' had relied (which had taken the opposite approach) "appear[ed] to be the sole case in which a court has concluded the government's actions are irrelevant to the materiality analysis in the absence of confirmation of the relators' allegations" while also noting that "[o]ther courts have found evidence of the government's inaction after learning of *alleged* violations sufficient to establish the lack of materiality."  *Id.* at 1174 (emphasis in original) (citing cases).

The conclusion reached by the *Black & Veatch* court as to this discrete issue appears to constitute the majority view.  That is, courts generally find that the Government's knowledge of a relator's *allegations* and its subsequent action (or inaction) based upon that knowledge is relevant to the issue of whether a

certain requirement is material to the Government's decision to pay. *See D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) ("The fact that CMS has not denied reimbursement for Onyx in the wake of D'Agostino's allegations casts serious doubt on the materiality of the fraudulent representations that D'Agostino alleges."); *Nargol*, 865 F.3d at 34 (recognizing that "[t]he FDA . . . possesses a full array of tools for detecting, deterring, and punishing false statements made during . . . approval processes" and concluding that "[i]ts decision not to employ these tools in the wake of Relators' allegations so as to withdraw or even suspend its approval of the Pinnacle MoM device . . . renders a claim of materiality implausible."); *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 667 (5th Cir. 2017), *cert. denied sub nom. U.S. ex rel. Harman v. Trinity Indus., Inc.*, No. 17-1149, 2019 WL 113076 (U.S. Jan. 7, 2019) (observing that "[b]y June 2014, [the Government] had knowledge of all of Harman's allegations and still approved the ET-Plus" and opining that "continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality."); *United States ex rel. Berg v. Honeywell Int'l, Inc.*, 740 F. App'x 535, 538 (9th Cir. 2018) (unpublished) (finding that "[r]elators [ ] failed to raise a triable issue as to the element of materiality," in part, where "the Army began paying Honeywell's claims in 2003, and continued up to at least 2008, despite being aware of Relators' fraud allegations since 2002. . . .").

The prevailing circuit authority as to this issue is persuasive. After the Government is presented with particularized allegations concerning a defendant's wrongdoing, it cannot logically be said that following such presentation and further discussions with a relator, the Government nevertheless continues to lack concrete awareness of the wrongdoing, even where it may have initially been ignorant of the misconduct precisely because a defendant's fraudulent behavior concealed the nature of its own nefarious acts. To conclude otherwise would require indulging in the fiction that the Government, despite hearing what relators have to say concerning allegations of fraud (through the complaint and discussions surrounding a decision to intervene in the lawsuit), could nonetheless continue to insist that it remained bamboozled or hoodwinked by a defendant's fraud—thus precluding it from taking some kind of action to attempt to stamp it out. In the Court's view, at least under the present circumstances, appears untenable.

Based upon the above analysis, the Court finds that the VA's awareness of the particular allegations contained in this lawsuit coupled with the many years that it (both the VA itself and its OIG unit) was involved in discussions with both Relators and officials from the Department of Justice militates in favor of finding that the VA's knowledge of the Relators' allegations is relevant to the Court's materiality inquiry. Specifically, the VA was on notice of the alleged fraud at least as of 2009 and its actions in the wake of these revelations—even if it employed a refund requirement based on individual audits—are an important aspect of the

57

materiality inquiry. *See Universal Health Services, Inc.*, 136 S. Ct. at 2003-04 ("[I]f the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.").

### iv.   VA's Post-Knowledge Actions

Having determined that the VA had the requisite knowledge of the alleged fraud, the next question is how the VA reacted, including any specific actions it took with respect to Defendants, after acquiring that knowledge. *See United States v. Salus Rehab., LLC*, 304 F. Supp. 3d 1258, 1260 (M.D. Fla. 2018) (finding element of materiality not met where despite the Government's awareness of "the defendants' disputed practices, aware[ness] of this action, aware[ness] of the allegations, [and] aware[ness] of the evidence" there was no evidence that the Government "threat[ened] [ ] non-payment," made a "complaint or demand" against defendant nor otherwise "resort[ed] to an administrative remedy or other sanction" based upon defendants' practices).

After surveying the evidentiary record, the Court has been unable to find, nor has either party identified, a single instance where the VA has deviated, even slightly, from its standard practice of simply requesting that a lender issue a refund to the veteran in the event it discovered that the lender has charged the borrower an unallowable fee. *See* London Dep. at 103 (agreeing that during his many years with the VA's loan division he has "[n]ever seen the VA do anything

58

other than instruct a lender to refund an overcharge of a closing fee"). Rather, notwithstanding the continuing loan audits conducted by the RLC from 2009 onward as well as two extensive on-site audits conducted by the Loan Guarantee Service Monitoring Unit in 2010 and 2012—all of which found violations akin to those at issue in this case—the VA never so much as issued even a written warning. Such a warning could have alerted MIC that continued noncompliance with applicable regulatory requirements could lead to administrative sanctions, including debarment or suspension, and/or that the VA would resort to voiding loan guarantees or requiring that the lender sign an indemnification agreement concerning the at-issue loans. Instead, the record shows only that the VA, after learning what Relators had to say, seems to have regarded "the disputed practices with leniency or tolerance or indifference or perhaps with resignation to the colossal difficulty of precise, pervasive, ponderous, and permanent" oversight required to ensure complete compliance with the dictates of the loan program. *Salus Rehabilitation, LLC*, 304 F. Supp. 3d at 1260. The only conclusion that logically follows is that the VA, even after acquiring knowledge of Defendants' alleged conduct, did not treat this kind of behavior as "egregious," *see* London Dep. at 16-17, but rather viewed it as a minor or cumbersome issue such that when it was spotted—even continually in documents submitted by the same lender—it would be dealt with in the same mechanical fashion without fail—the directive to issue a refund. Moreover, London and White's speculative testimony concerning the nature of the VA's reaction had it suspected or found fraud, *see id.*

at 240; White Dep. at 97, 121, is of minimal relevance in light of the fact that the Court has before it evidence of what actually happened in the wake of the VA learning about the nature of alleged fraudulent activities which transpired here. *See McBride*, 848 F.3d at 1034; *Harman*, 872 F.3d at 667-68.   The Court addresses each of the above observations in further detail below.

First, with respect to the audits conducted by each RLC from 2000 through 2013, which included a random ten percent sampling of loans originated in each respective jurisdiction, *see* London Dep. at 39, 43, the record demonstrates that during these audits, the VA unearthed the same unallowable fees and charges violations at issue in this lawsuit—after becoming aware of Relators' allegations. For example, on February 9, 2009 the Atlanta RLC sent MIC a post-audit deficiency letter which indicated that MIC had charged the veteran borrower an unallowable fee and that a refund should issue.   *See* MIC Ex. 69.   Additional letters involving the same deficiency followed on March 17, 2010, November 4, 2010, December 27, 2010, January 13, 2011 and February 9, 2011.   *Id*.; MIC Ex. 45.   In addition, each letter merely contained the same boilerplate verbiage advocating that MIC "bring these deficiencies to the attention of the appropriate staff members as a training tool."   *See, e.g*., MIC Ex. 69.   Significantly, there is no indication in the record that any of these fee issues, after being flagged by the RLC, were ever elevated through channels or otherwise treated any differently than an inadvertent "good faith" error despite the fact that the VA, at this point,

had actual knowledge that lenders, including MIC, could be engaging in fraudulent acts with respect to the fees and charges regulation.

Second, and perhaps more important than the RLC spot audits, were the extensive on-site audits conducted by the Loan Guarantee Service Monitoring Unit ("LGSMU") in July 2010 and December 2012. *See* MIC Exs. 63-64 (Initial and Final Reports of On-Site Audits).[22]  This unit was charged with "identify[ing] a specified number of loans to review" with the "purpose of . . . assess[ing] compliance with laws, regulations, policies and procedures" and, as such, was required to "actually review loan documents."  London Dep. at 169.  In the course of both of these audits, which, together reviewed 221 IRRRL loans originated by MIC, the LGSMU flagged "[n]oncompliance with 38 CFR 36.4313(d) – fees and charges" as a "major deficienc[y]."  *Id*.  However, notwithstanding the discovery of these compliance issues in the wake of the VA learning of the Relators' fraud allegations against MIC, there does not seem to be any indication, either in the preliminary or final reports or elsewhere in the record, that the noncompliance was treated as anything other than a mere administrative error.  Rather, the VA simply expressed to MIC that it "should review the VA *Lender's Handbook* and make the necessary adjustments to ensure future compliance" and that it "should

---

[22]    While the LGSMU conducted an on-site audit of MIC in March 2004, MIC Ex. 61, the Court does not find this audit relevant to the present inquiry since it pre-dates the earliest timeframe within which the VA could have gained knowledge of Relators' allegations.

encourage its loan origination staff to use the reports as a guide to improving

compliance with VA's requirements." *Id.*[23]

London's testimony bears out the VA's post-audit inaction in this regard, as

illustrated by the following testimony:

Q:    Are you familiar with the VA's audits of lenders?

A:    Yes.

Q:    [ ] And you're familiar with the outcome of those audits?

A:    I am.

Q:    [ ] In connection . . . with all of those audits . . . did the VA withdraw the guarantee on any loan as it relates to any of those lenders because of a problem that it found with the closing fee on an IRRRL?

A:    No.

Q:    As a result of the findings of those IRRRL audits, did the VA require any lender to sign an indemnification agreement over a fee issue found in those audits?

A:    Over a fee issue, I do not think so.

---

[23]    This apparent nonchalance on the part of the VA with respect to the violations found in these audits is especially disconcerting in light of the fact that the VA has conceded that the December 2009 audit of another IRRRL lender "was triggered by the allegations that came to light in November 2009 concerning unallowable fees being charged on IRRRLs."  London Dep. at 127 (stating "that's correct" in response to the question of whether "the audit of Wells Fargo in December 2009 was triggered by the allegations that came to light in November 2009").  As such, it is difficult to comprehend why a further review and/or investigation was not considered here given the credible information imparted by Relators' allegations and subsequent contact pointing to the fact that the noncompliance that the VA was dealing with may not have in fact been merely repetitive administrative errors.  Nor does the record provide a window into the VA's thought process behind this omission or a "business as usual" course of action.

While this testimony does not address the full range of responses that the VA was authorized to take, it does shed light on the VA's attitude following the completion of these audits.

It is true that the VA's loan specialists at both the RLCs and the LGSMU "are not trained fraud investigators" and, therefore, they are generally "looking for documents[24] to ensure to the best of [their] abilities [that a lender is in] compliance with [the] regulations, policies, and procedures" and as consequence they might not "necessarily be aware that [a] . . . charge is higher than it should be because it includes a fee that shouldn't be assessed."  London Dep. at 334; White Dep. at 90.  However, it is undisputed that the VA had knowledge of the allegations during this timeframe.  *See* London Dep. at 334 (acknowledging that "[y]es, we did have knowledge [of the allegations involved in this lawsuit] during that time frame").  Nevertheless, the record strongly suggests that the VA failed to channel this information to their loan specialists to enable these auditors to exercise heightened vigilance when conducting audits in light of the allegations. Nor does it appear that the VA further elevated the fees and charge deficiencies that were uncovered to the OIG in order to conduct a more in-depth inquiry aimed at ferreting out any wrongdoing and taking corrective action against MIC if

---

[24]    RLC auditors primarily relied upon the HUD-1 settlement statements when conducting sample audits of IRRRL lenders.  *See* London Dep. at 62 (stating that RLC auditors "certainly do review the HUD-1 settlement statement").  However, the HUD-1 is not the only document submitted by the lender if a loan has been selected for a 10% sample review.  *See id.* at 59-60; *see also* MIC Ex. 35 (VA Home Loan Training Power Point Presentation).  Thus, "[i]t's possible that the VA loan specialist can review more than the HUD-1" when conducting a sample audit. London Dep. at 62.  The Court recognizes that under the circumstances, however, this would only create more work for the auditor and fall outside his or her routine — and therefore was unlikely to occur frequently.

warranted.  In fact, there is not a stitch of evidence indicating that the VA did anything at all in recognition that this noncompliance presented a larger issue than a simple case of a lender making inadvertent missteps in the levying of charges and fees.  And MIC was a lender that the VA itself acknowledged was one of the highest volume IRRRL originators in its stable.  *See* MIC Ex. 64 (identifying MIC as one of the VA's "highest volume [IRRRL] lenders").

Finally, the Court acknowledges London's testimony that in his opinion (and presumably the VA's as well since he testified as a 30(b)(6) witness) "if the VA either suspected or found fraud that we would take that seriously and the appropriate channels would be alerted" and that in his "personal experience in the program . . . we take fraud seriously and we would have alerted the appropriate channels" if fraud was uncovered or otherwise suspected.  London at 240.   Likewise, during White's deposition, he agreed with the proposition that "the VA would never let intentional fraud be treated as a mere administrative offense if the VA knew it was intentional fraud" while observing that "if there was ever a situation where there was some sort of broad pattern of knowingly doing something [like the actions alleged in this case], then it would be elevated" and that "if it happens over and over again, then the field stations can, and they have done this, [ ] suggest monitoring."  White Dep. at 97, 121.

The problem with London and White's testimony on this topic is that it is entirely generalized and speculative.  Indeed, neither London nor White testified that they had in the past encountered particular fraudulent practices by lenders

during their tenure with the VA and the VA affirmatively reacted by taking a certain course of action. To the contrary, their respective testimony merely suggests that if fraud was suspected or uncovered, the VA would have taken that seriously. However, under the present circumstances, where the Court has the benefit of hindsight, the testimony offers little assistance to the materiality inquiry. This is because the VA's response (or lack thereof) after being informed of Relators' specific allegations is clear from the record. That is, where continued violations were uncovered, the VA merely required that MIC issue refunds to borrowers, without fail. In the face of such knowledge, coupled with its consistent and unwavering inaction, the testimony provided by the VA (through London) and White in this area is not particularly helpful.

Before proceeding, the Court takes a moment to circle back to its earlier observation concerning the VA's issuance of refunds. *See supra* at 38-41. The use of this mechanism by the VA in the face of generalized noncompliance by lenders does have merit and serves to distinguish this case from others of the same ilk. However, its ultimate effect on the materiality inquiry is seriously muted by the VA's behavior in the wake of acquiring knowledge of the Relator's allegations. Indeed, the record reflects that refunds were utilized exclusively despite the VA's knowledge of the allegations in this case. As such, while the VA's use of refunds is relevant to the overall materiality inquiry, the utilization and ultimate significance of this mechanism, when viewed through the lens of

materiality, is simply overshadowed by the VA's complete lack of any heightened response following such revelations.

### v.   The Absence of Materiality

"The [FCA]requires proof that a vendor committed some non-compliance that resulted in a material deviation in the value received and requires proof that the deviation would materially and adversely affect the buyer's willingness to pay." *Salus Rehabilitation, LLC*, 304 F. Supp. 3d at 1263.  In *Universal Health*, the Supreme Court clarified how the FCA's "rigorous" materially element should be interpreted and enforced.  *See generally Universal Health Services, Inc.*, 136 S. Ct. 1989.   In evaluating materiality, the Court observed that where "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Universal Health Services, Inc.*, 136 S. Ct. at 2003.  In addition, "though not dispositive, continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality."  *Harman*, 872 F.3d at 663 (surveying cases).  Moreover, "[s]uch very strong evidence becomes compelling when an agency armed with robust investigatory powers . . . is told what Relators have to say, yet sees no reason to change its position." *Nargol*, 865 F.3d at 35.

In the present case, the Court is faced with an important regulatory requirement that is, without doubt, a condition of obtaining a loan guarantee.

*See* 38 C.F.R. § 36.4313(a). However, the Supreme Court has made clear that such a requirement, in and of itself, is not sufficient to establish (or in this instance to raise a genuine fact issue) as to materiality. *Universal Health Services, Inc.*, 136 S. Ct. at 2003 (recognizing that "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive"); *see also Petratos*, 855 F.3d at 490 (recognizing that "the [FCA] is not a blunt instrument to enforce compliance with all . . . regulations") (internal citation omitted). In addition, the relevant evidence in the record as surveyed by the Court in this opinion—including evidence pertaining to the VA's generalized and particularized knowledge of MIC's alleged noncompliance and its responses to the same—significantly belies the notion that the VA characterized the alleged noncompliance in this case as material. To the contrary, the opposite appears true. That is, the VA seemed to regard the rampant noncompliance, even after gaining knowledge that there could be wide-ranging fraud afoot, as an administrative error subject to facile correction, as evidenced by its altogether laissez faire attitude in dealing with the problem (*i.e.*, requiring offending lenders to continually issue refunds even in the face of Relators' allegations concerning the potential scope of the problem and fraudulent dimension). *See* London Dep. at 107-08, 167-68.

In view of the sheer weight of the countervailing facts in the present record coupled with the current state of the law as concerns materiality, the Relators' claims appear to founder. Therefore, in order to survive summary

judgment, Relators must do more than merely rely on the existence of the regulatory provision in order to raise a genuine issue of material fact as to the element of materiality.  However, after surveying the record and considering Relators' arguments, the Court does not find that Relators have offered sufficient evidence from which a reasonable trier of fact could find in their favor as to this element.  In other words, Relators have not pointed to any evidence that the VA regarded the disputed practices as material (*i.e.* central as opposed to collateral) such that noncompliance would have a palpable and concrete effect on the VA's decision to honor the loan guarantees as concerns MIC.[25]  Nor have Relators offered evidence tending to show that MIC knew that the VA itself regarded the noncompliance as material as opposed to administrative errors subject to correction.  Thus, although MIC may have had full knowledge of its ongoing gaming of established VA fee requirements, it was not placed on notice that the

---

[25]   The Court points out that 38 U.S.C. Section 3721, known as the Incontestability Provision, requires the VA to honor loan guarantees, even where fraud is later uncovered, in cases where the loans (and associated guarantees) have been sold on the secondary market to holders-in-due-course.  *See* 38 U.S.C. § 3721 ("Any evidence of guaranty or insurance issued by the Secretary shall be conclusive evidence of the eligibility of the loan for guaranty or insurance under the provisions of this chapter and of the amount of such guaranty or insurance.").  Thus, while the VA is statutorily obligated to honor the guarantee as to such a third-party bona-fide purchaser, the statute makes clear that "[n]othing in this section shall preclude the Secretary from establishing, *as against the original lender*, defenses based on fraud or material misrepresentation. The Secretary shall not, by reason of anything contained in this section, be barred from establishing, by regulations in force at the date of such issuance or disbursement, whichever is the earlier, partial defenses to the amount payable on the guaranty or insurance." *Id.* (emphasis added).  The VA has established such regulations.  *See* 38 C.F.R. § 4328.  Despite the Incontestability Provision and the regulations promulgated thereunder, which provide the VA a mechanism through which to take adverse action against a lender even where the loan and associated guarantee have been sold on the secondary market, there is no evidence in the record that the VA, notwithstanding its knowledge of Relators' allegations, has once exercised such authority as against MIC.  *See* London Dep. at 107-08, 167-68

VA would view such fee practices as material and grounds for sanctions beyond the mere refund requirement identified in VA audits of a fraction of the mortgages extended by MIC.  *See Universal Health Services, Inc.*, 136 S. Ct. at 2003 (pointing out that proof of materiality can include "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement").   Although the Court views this conjunction of evidence in the record as highly disturbing, the Court finds such omissions to be legally fatal given the current status of the law, even though this conclusion may fly in the face of the original goals of the FCA.

It is worth pointing out that "[t]he fraud in *Escobar*—unqualified mental health providers and substandard mental health care—profoundly and manifestly affects a government's willingness to pay, a fact undoubtedly obvious to the provider . . . [and] . . . *Escobar* offers the hypothetical but instructive example of a vendor selling to the government a gun that will not shoot, a defect that renders the weapon useless and valueless, as the vendor well knows." *Salus Rehab., LLC*, 304 F. Supp. 3d at 1264.  In contrast, the alleged unauthorized fees and charges at the heart of this action, when considered against the backdrop of this evidentiary record, do not appear to rise to such a level.  Rather, according to White, IRRRL loans are "just another product that the veteran could take advantage of" with the primary purpose of "reduc[ing] the interest rate [so] that the [veteran's monthly] payment would go down ultimately saving the veteran

some money."   White Dep. at 27-28; *see also id.* at 29 (explaining that the payment nevertheless may still go up "if the person went from a 30-year loan to a 15-year loan" or if the veteran "has an [Adjustable Rate Mortgage] loan, a hybrid [Adjustable Rate Mortgage] or a traditional [Adjustable Rate Mortgage] . . . and they [have] refinanced to a fixed rate loan, that [is] a situation where the rate can remain the same or increase").

To be clear, the Court is not of the opinion that the charges and fees regulation is no more than an insignificant regulatory requirement.   *See, e.g.*, *Universal Health Servs., Inc.*, 136 S. Ct. at 2004 (recognizing that "the [FCA] is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations.").   Rather, the limitations imposed upon the types of charges and fees which can be paid by veteran borrowers and the concomitant certification by the lender as to its compliance with this requirement furthers the purpose of "limit[ing] the fees that the veteran can pay to obtain a loan" which, in turn, ensures that a veteran borrower can effectively "use his or her home loan benefit."   VA Pamphlet § 8.01.   Indeed, the overall importance of the limitations on borrower-paid charges and fees comes into focus if one contemplates what happens if lenders run roughshod over this requirement.   In such cases, the overall cost of the IRRRL loan to the borrower would increase based upon the erroneously allocated charge or fee.   To be sure, when juxtaposed against a $100 or $200 thousand-dollar home loan, the erroneous fee, which may only turn out to be in the hundreds of dollars, is but a

tiny fraction.   However, at the same time, this small fraction nevertheless represents a cost that is not meant to be shouldered by the borrower (either via a cash payment or otherwise rolled into the overall loan balance) or alternatively added as a profit or cost reimbursement to the mortgage company or bank.   In addition, the significance of this requirement is underscored by the fact that the VA has conditioned the loan guarantee upon a lender's certification that it has in fact complied with this regulatory provision.   *See* 38 C.F.R. § 36.4313(a); VA Pamphlet § 8.01 (setting forth that "[l]enders must strictly adhere to the limitations on borrower-paid fees and charges when making VA loans.") (emphasis omitted).

The regulation of charges and fees thus undoubtedly plays a small but important part in furthering the goal of reducing a borrower's monthly loan payment over the long term.   Yet it is equally true that neither this Court's view as to the regulation's overall importance nor the fact that the VA has identified the provision as a condition of obtaining a loan guarantee satisfies the materiality inquiry.   *See Universal Health Servs., Inc.*, 136 S. Ct. at 2003.   Put another way, the question is whether, in light of the unique circumstances present here, the charges and fees at issue are analogous in centrality to the provision of unqualified mental health care providers and substandard mental health care (as in *Universal Health*), guns that will not shoot (the *Universal Health* hypothetical) or protective services personnel charged with the safety of diplomats who failed to fulfill the contract's weapon's qualification requirement

71

(*United States ex rel. Beauchamp v. Academi Training Center, Inc.*, 2005 F. Supp. 3d 676 (E.D. Va. 2016)).  In light of the particularized facts contained in the present record and the VA's interactions with this particular Defendant, the Court answers this question in the negative.[26]

"Courts can properly dismiss an FCA claim on summary judgment based on a claimant's failure to meet the rigorous standard for materiality under the FCA."  *Kelly*, 846 F.3d at 333 (citing *Universal Health Services, Inc.*, 136 S. Ct. at 2004, n. 6).  The Court, after conducting an assiduous review of the record evidence germane to this element, is constrained to find that this "rigorous standard" has not been met here.   Therefore, although the Court is not persuaded that the standards set forth in *Universal Health* concerning materiality provide a sufficiently adaptive standard or level playing field for claimants (and the Government) seeking to successfully allege and later establish the existence of this element, where fraudulent practices have abounded, the Court is nevertheless constrained by all pronouncements of the Supreme Court and must faithfully apply those directives to the case at hand.

---

[26]    The Court stresses that this finding should not be interpreted as a blanket pronouncement that the fees and charges regulation and any associated noncompliance with the same is, in all cases, immaterial.  To the contrary, this finding is entirely dependent upon the precise facts and circumstances at issue on this record.  Thus, the reader is strongly cautioned that the Court's holding in this regard should not be blindly applied to a different case involving varied facts concerning this same requirement.  In other words, this finding is limited to the discrete facts of this case.  As such, the finding should not be interpreted as a broad pronouncement of materiality vis-à-vis the regulation, but rather a narrowly-tailored finding necessitated by the facts and circumstances present here involving the VA's handling of MIC's practices.

On that basis, the Court finds that Relators have failed to raise a triable factual issue as to this element and their FCA claims fail as a matter of law.

## V.   CONCLUSION

This case lays plain what happens when zealous advocacy crosses the line into scorched-earth tactics. Defendants' strategies, tactics and behavior throughout the pendency of this litigation—including the filing of a plethora of motions and inconsistent and incomplete evidentiary disclosures—all of which brought this litigation to a crawl—have repeatedly vexed the Court over the years. However, Relators too have not always taken the proverbial high road during the pendency of this case during their pursuit of victory.  That is not to say that Defendants have been successful in pulling the wool over the Court's eyes with respect to the charges and fees issues that are clearly present on the face of this record.  To quote Shakespeare, "[s]omething is rotten in the state of Denmark."[27] Although the Court harbors its own very strong concerns as to what was really going on at MIC with respect to the imposition of charges and fees on veteran borrowers during the origination of IRRRL loans, the Court is not permitted to jettison or otherwise ignore the lens of controlling law in assessing the evidentiary record.

In that regard, it is again worth mentioning that factual issues pervade this case and, as such, resolution would normally require a full trial before a trier of fact.  But, as the Court has previously stated early in this Order,  "in light of the

---

[27]    *Hamlet*, Act I, Scene 4.

record presently before the Court, [this action] fails to survive summary judgment not because no fact issues exist (they do) but rather, because the facts relevant to materiality, as presented and taken in the light most favorable to Relators as the non-moving party, simply cannot surmount the 'rigorous' and 'demanding' materiality threshold required by *Universal Health*." *Supra* at 3-4 (quoting *Universal Health Servs., Inc.*, 136 S. Ct. at 2003; *see id.* at 1996).

The Court also takes a moment to lament the VA's complete lack of action in the wake of being informed of Relators' allegations and the ensuing discussions that took place concerning the nature of the claims in this lawsuit. As previously stated, the VA, upon learning the nature of the alleged fraudulent activity, could have pursued a myriad of avenues in order to attempt, on its own, to establish whether such fraud was taking place and, if so, weed it out while taking appropriate actions against those entities responsible for perpetrating any such fraud. Indeed, the VA is armed with an OIG for such an express purpose.[28] However, neither the VA nor its OIG division appeared to take any interest in what Relators had to say as evidenced by any modicum of serious investigative action with respect to Defendants' alleged conduct or through the issuance of even a stern written warning when continued noncompliance with the fee and charges regulation was uncovered and persisted. Instead, the VA assumed and proceeded as if the noncompliance was nothing more than a parade of

---

[28]    The VA OIG's mission is "[t]o serve veterans and the public by conducting effective oversight of the programs and operations of the [VA] through independent audits, inspections, reviews, and investigations." *See* www.va.gov/oig.

inadvertent errors.  Even upon conducting on-site audits of MIC in 2010 and 2012, which uncovered fees and charges violations, the VA did nothing except resort to its standard practice of directing that a refund be issued to the borrower. While the cause of the VA's paralysis after being confronted with Relators' allegations is anyone's guess, its complete inaction not only dooms Relators' claims but also calls into question the VA's own position as to the overall importance *vel non* of this requirement.  In a word, the Court expected more from the VA and the Government.

It must be stressed that "[i]t is cheating the government at which the [FCA] aims and Congress [is] entitled to protect the government against those who would swindle it regardless of questions of constitutional authority as to the operations that the government is conducting." *United States v. Kapp*, 302 U.S. 214, 218, 58 S. Ct. 182, 184, 82 L. Ed. 205 (1937); *see United States v. Griswold*, 24 F. 361, 366 (D. Or. 1885) ("The statute is a remedial one. It is intended to protect the treasury against the hungry and unscrupulous host that encompasses it on every side, and should be construed accordingly. It was passed upon the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain. Prosecutions conducted by such means compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel.").  Congress has

made a valiant effort, over the course of many years and through different iterations of the FCA, in fashioning a law which protects the Government (and by extension the taxpayers) from unscrupulous actors whose primary aim is to poach funds from the treasury.   However, despite Congress's best efforts, it appears to this Court that the very aim of the FCA may be undermined by a rigid interpretation of *Universal Health's* requirements that does not recognize the unique statutory importance of the private enforcement mechanism in FCA litigation, especially when the government falls down on fulfilling its administrative duty of investigation of fraudulent practices and initiating related sanctions or enforcement actions or becomes captive to the industry it regulates.

In this Court's view, the high materiality requirements set forth in *Universal Health* and its progeny, may ultimately eviscerate the independent statutory role of *qui tam* relators as independent litigation agents under the FCA for rooting out fraud from government programs because bureaucratic failures, industry capture, or limitations in government investigative capacity or commitment, may effectively translate into an insurmountable "materiality" defense.   Whether this result is consistent with Congressional intent and legislative objectives for the FCA's private enforcement mechanism, falls ultimately, though, to Congress to address.

Indeed, by inextricably tying materiality to the "likely or actual behavior" of the Government, the Supreme Court may have effectively as a pragmatic matter — whether intentionally or not — made a relator's burden akin to summiting

76

Mount Everest in a winter storm. *Universal Health Services, Inc*, 136 S. Ct. at 2002 ("under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."). This is because the Government may harbor a vast array of reasons as to why it refuses to act in the face of fraud, waste and abuse on the public treasury— reasons which a relator has no control over and which may ultimately have no nexus to the overarching goal of the FCA. Thus, in many cases, Government passivity in the wake of the discovery of fraud may be intentional despite the fact that such action runs counter to the tenets enshrined within the FCA. Likewise, even if the Government begins to ponder embarking upon a course of action, it may well be stymied in light of the many bureaucratic layers which exist and which necessarily encompass competing policy interests and goals or alternatively, dysfunction.

While the Court is sensitive to the fact that the FCA "is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations," *Universal Health Servs., Inc.*, 136 S. Ct. at 2003, neither is it of the opinion that protracted Governmental paralysis, after fraud is uncovered, should effectively doom a relator's chances of successfully prosecuting an FCA claim brought on behalf of the Government and the public (assuming all other statutory elements are met). Thus, while the Government is at liberty to close it eyes and do nothing in the face of what may amount to pervasive fraud, such governmental inaction should not be inextricably intertwined with whether

the element of materiality has been satisfied.  Put another way, keying materiality

to the likely or actual behavior of the Government may lead, in many cases, to the

wrong result—immunizing from liability those who would plunder the

Government's coffers.  Indeed, such an end result would seem to run completely

at odds with Congress's intent in creating and amending the private right of

action provisions—to strengthen the capacity of a knowledgeable private litigant

to vindicate the public interest in rooting out fraudulent contractor practices that

prey on the Government's funds because of the Government's blindly acceding to

business as usual.

In *Marcus*, the Supreme Court long ago recognized the statutory

importance of the FCA's private enforcement mechanism by pointing out that

> one of the chief purposes of the Act, which was itself
> first passed in war time, was to stimulate action to
> protect the government against war frauds. To that end,
> prosecuting attorneys were enjoined to be diligent in
> enforcement of the Act's provisions, and large rewards
> were offered to stimulate actions by private parties
> should the prosecuting officers be tardy in bringing the
> suits.

*Marcus*, *Id.* at 547, 63 S. Ct. at 386, 87 L. Ed. 443.  While *Marcus* predates

a number of important amendments to the FCA, its observations concerning the

role of private enforcement actions remain no less relevant given the core

function of that mechanism in the present-day FCA statutory scheme.  Indeed,

during the hearings on the 1986 amendments, the Senate Committee voiced its

concern that "[s]ince the act was last amended in 1943, several restrictive court

interpretations of the act have emerged which tend to thwart the effectiveness of

the statute" and the proposed amendments were therefore "aimed at correcting restrictive interpretations of the act's liability standard, burden of proof, *qui tam* jurisdiction and other provisions in order to make the False Claims Act a more effective weapon against Government fraud." S. Rep. 99-345, *as reprinted in* U.S.C.C.A.N. at 5269.

Having discussed the above serious concerns at length as well as the analysis dictated by governing law at this moment, the Court **GRANTS** Defendants' motion for summary judgment [Doc. 955] **in its entirety**. The Clerk's Office is **DIRECTED** to terminate as moot all other pending motions (except motions to seal which are discussed below) and close this case.

The Court finally takes a moment to address the issue of public access to the information contained in (1) Defendant MIC's motion and reply [Docs. 955, 1008] as well as the documents comprising Relators' opposition and sur-reply (Docs. 1004, 1017]) and (2) Defendant Edwards' summary judgment motion and reply regarding piercing the corporate veil [Docs. 1050, 1070] as well as the documents comprising Relators' opposition and sur-reply (Docs. 1067, 1076). It is beyond dispute that "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern, and [t]he common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process[.]" *Romero v. Drummond Co.*, 480 F.3d 1234, 1245 (11th Cir. 2007) (second alteration in original). A corollary to this proposition is that "[m]aterial filed in connection with any

substantive pretrial motion, unrelated to discovery, is subject to the common law right of access." *Id.* (clarifying that "material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right"). Nevertheless, "[t]he common law right of access may be overcome by a showing of good cause, which requires balanc[ing] the asserted right of access against the other party's interest in keeping the information confidential." *Id.* at 1246 (second alteration in original). "In balancing the public interest in accessing court documents against a party's interest in keeping the information confidential, courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." *Id.*

After considering the factors bearing upon this issue, and in light of the fact that MIC is no longer an actively operating business entity,[29] the Court finds good cause to be lacking to support the parties' extensive sealing requests.[30] As a result, these filings must be unsealed. Put another way, any interest held by MIC in the confidentiality of the documents submitted in conjunction with its

---

[29]    The Court takes judicial notice of the information listed on the Florida Department of State official website which designates the status of MIC as "Inactive." *See* http://search.sunbiz.org/Inquiry/CorporationSearch/.

[30]    The Court acknowledges that Relators were required to file motions to seal as a direct consequence of MIC's Protective Order.

dispositive motion are significantly outweighed by the public's interest in having unfettered access to this material.[31]  *See Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001) ("Not unlike the Rule 26 standard, the common-law right of access requires a balancing of competing interests.").  This position is consonant with the "right of public access to pretrial motions of a nondiscovery nature, whether preliminary or dispositive, and the material filed in connection therewith." *Romero*, 480 F.3d at 1246; *see Chicago Tribune Co.*, 263 F.3d at 1312 (holding that "discovery material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right [of access]").  Thus, all material relating and responding to MIC's summary judgment motion [Doc. 955] and Edwards' summary judgment motion [Doc. 1050] will be unsealed.  Despite the Court's ruling in this regard, there remain very real concerns that Personally Identifiable Information ("PII") may be present on the face of various mortgage documents filed as part of MIC's motion.  In addition, as part of Edwards' motion, there exists financial information relating solely to Edwards' in his individual capacity (as opposed to financial information related to MIC and its financial expenditures, transfers, etc., which may remain unredacted) which should not be made public.  As such, certain information encompassed within each of these motions must be redacted for public consumption, as set forth more fully below.

---

[31]      The Court finds that with respect to Edwards' motion, the balance similarly tips in favor of permitting access by the public, with certain qualifications as discussed more fully here.

Turning first to MIC's motion for summary judgment [Doc. 955], MIC and Relators are **DIRECTED** to review all filings in connection with MIC's motion (Docs. 1004, 1008, 1017) and redact all PII that exists on the face of all IRRRL loan documents (HUD-1s as well as any other document containing PII) and any associated documents.  The term "PII" as used in this Order refers to those categories of information as set forth in the Northern District of Georgia Standing Order Number 04-02.  However, in addition to the categories of PII referenced therein, the parties shall also redact any telephone numbers that appear on the face of any mortgage documents.  The redacted versions of all documents related to MIC's motion **SHALL BE** filed on the Court's electronic docket not later than July 19, 2019.  Each party is responsible for redacting PII in the documents it filed.

Turning next to Edwards' summary judgment veil-piercing motion [Doc. 1050], MIC and Relators are **DIRECTED** to review all filings in connection with MIC's motion (Docs. 1067, 1070, 1076) and redact all PII, to the extent any exists, as well as any and all financial information related to Edwards in his individual capacity (as opposed to financial information related to MIC and its financial expenditures, transfers, etc., which may remain unredacted).  Similar to the redactions associated with MIC's motion, these redactions **SHALL BE** filed on the Court's electronic docket not later than July 19, 2019.  Each party is responsible for redacting PII in the documents it filed.

The Clerk's Office is hereby: **(1) DIRECTED** to **GRANT**, **IN PART**, **AND DENY**, **IN PART**, all pending motions to seal whether filed by MIC or Relators (thus effectively sealing these initial versions which may include PII and financial information related to Edwards), subject to the parties' compliance with the above filing directives; and **(2) FURTHER DIRECTED** to identify each redacted filing (once submitted by the parties) as a replacement version of the originally filed document(s) and cross-reference these filings accordingly.  In that regard, the explanatory docket text should reflect that these newly filed redacted versions contain more information than was available in the originally filed redacted versions.   By way of example, when a revised redacted version of Doc. 955 (or any documents comprised within that main filing) is submitted by Defendants, the Clerk's Office shall clearly identify this new filing as a replacement version containing further textual disclosure than the originally filed redacted document but cross-reference it with the originally filed version.  Such labeling will help to ensure continued docket clarity for those individuals who search the docket in the future.  To assist the Clerk's Office in this task, the parties are likewise **DIRECTED** to clearly identify all revised redacted submissions upon filing.

**IT IS SO ORDERED** this 1st day of July, 2019.

**Amy Totenberg**
**United States District Judge**

83