[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No.  19-12736

———————————————

D.C. Docket No. 1:12-cv-04020-AT

UNITED STATES OF AMERICA EX REL,

Plaintiff,

VICTOR E. BIBBY,
BRIAN J. DONNELLY,

Plaintiffs-Appellants
Cross-Appellees,

versus

MORTGAGE INVESTORS CORPORATION,
WILLIAM L. EDWARDS,
"Bill",

Defendants-Appellees
Cross-Appellants,

WILLIAM L. EDWARDS, AS TRUSTEE OF WILLIAM
L. EDWARDS REVOCABLE TRUST,

Defendant.

———————————————

Appeals from the United States District Court
for the Northern District of Georgia

———————————————

(January 15, 2021)

Before WILSON, NEWSOM, and ED CARNES, Circuit Judges.

WILSON, Circuit Judge:

More than 14 years ago, Appellants Victor Bibby and Brian Donnelly (Relators) brought this qui tam action against Mortgage Investors Corporation (MIC) under the False Claims Act (FCA).

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). As an enforcement mechanism, the FCA includes a qui tam provision under which private individuals, known as relators, can sue "in the name of the [United States] Government" to recover money obtained in violation of § 3729. *Id.* § 3730(b)(1).[1]

———————————————

[1] The government has the option to intervene in the action, either within 60 days after receiving the complaint or upon a later showing of good cause. 31 U.S.C. § 3730(b)(2), (b)(4), (c)(3). In this case, the government communicated with Relators about their allegations but eventually decided not to intervene.

If the relators prevail, they are entitled to retain a percentage of any proceeds as a reward for their efforts. *Id.* § 3730(d).

The Relators in this case are mortgage brokers. For years, they specialized in originating United States Department of Veterans Affairs (VA) mortgage loans, particularly Interest Rate Reduction Refinance Loans (IRRRL). Relators learned through their work with IRRRLs that lenders often charged veterans fees that were prohibited by VA regulations, while falsely certifying to the VA that they were charging only permissible fees. In doing so, these lenders allegedly induced the VA to insure the IRRRLs, thereby reducing the lenders' risk of loss in the event a borrower defaults.

On March 3, 2006, Relators filed this qui tam action under the FCA against MIC to recover the money the VA had paid when borrowers defaulted on MIC-originated loans.[2] Relators later amended their complaint to add a state law fraudulent transfer claim against MIC executive William L. Edwards. The district court granted Edwards's motion to dismiss the fraudulent transfer claim for lack of standing. And it granted MIC's motion for summary judgment on the FCA claim, holding that no reasonable jury could find MIC's alleged fraud was material. Relators now appeal. In a conditional cross appeal, MIC argues that if we reverse

---

[2] Relators originally filed suit against 27 other mortgage lenders, but MIC is the only remaining defendant.

the district court's ruling on materiality, the FCA claim is nonetheless barred by previous public disclosure.

We conclude that summary judgment was improper on Relators' FCA claim because genuine issues of material fact remain as to whether MIC's alleged false certifications were material. Further, we agree with the district court that Relators' claim is not barred by previous public disclosure. Finally, we hold that Relators lack standing on the fraudulent transfer claim because their pre-judgment interest in preventing a fraudulent transfer is a mere byproduct of their FCA claim and cannot give rise to an Article III injury in fact.

## I.      BACKGROUND

### A.      IRRRL Program Background

An overview of the IRRRL program is necessary to understand Relators' claims on appeal. The program seeks to help veterans stay in their homes by allowing them to refinance existing VA-backed mortgages at more favorable terms. In keeping with the program's goal of helping veterans, VA regulations restrict the fees and charges that participating lenders can collect from veterans. 38 C.F.R. § 36.4313(a). And to hold lenders accountable, the regulations require lenders to certify their compliance as a prerequisite to obtaining a VA loan guaranty. *Id.* Specifically, § 36.4313(a) permits lenders to collect only those fees and charges that are "expressly permitted under paragraph (d) or (e) of this section

. . . ." *Id.* Relevant to this appeal, paragraph (d) allows veterans to pay "reasonable and customary" charges for "[t]itle examination and title insurance," as well as various other itemized fees. *Id.* § 36.4313(d)(1).[3] Attorney fees are not among the permitted fees and charges. *Id.* § 36.4313(d).

The mechanics of the loan certification process work like this. Once a lender has approved an IRRRL, it "gives closing instructions to the attorney or title company handling the closing for the lender."[4] The lender or its agent then prepares a statement, known as a HUD-1, listing all the closing costs and fees. The HUD-1 requires lenders to break out the costs they incurred and the amounts they are collecting for various charges and fees, such as title search and title examination. Before closing, the lender is to review the HUD-1 for accuracy. Then, after the lender's agent closes the loan, the lender sends the HUD-1 to the VA along with a certification that it has not imposed impermissible fees on the veteran borrower. Only upon this certification does the VA issue a guaranty to the lender.

Complicating matters, once lenders such as MIC obtain VA loan guaranties on IRRRLs, they sell those loans on the secondary market to holders in due course.

---

[3] Paragraph (d) further provides that "[a] lender may charge . . . a flat charge not exceeding 1 percent of the amount of the loan, provided that such flat charge shall be in lieu of all other charges relating to costs of origination not expressly specified and allowed in this schedule." 38 C.F.R. § 36.4313(d)(2).

[4] In outlining the loan certification process, we rely in part on allegations in Relators' Fourth Amended Complaint that MIC does not appear to contest.

This is an important wrinkle because when a holder in due course holds the IRRRLs, the VA is required by statute and regulation to honor the guaranties corresponding to those loans. *See* 38 U.S.C. § 3721 (the Incontestability Statute) ("Any evidence of guaranty or insurance issued by the Secretary shall be conclusive evidence of the eligibility of the loan for guaranty or insurance under the provisions of this chapter and of the amount of such guaranty or insurance."); 38 C.F.R. § 36.4328(a)(1) (providing that misrepresentation or fraud by the lender shall not constitute a defense against liability as to a holder in due course). In other words, the guaranties are incontestable vis-à-vis holders in due course. The VA must turn to the originating lender to seek a remedy for that lender's fraud or material misrepresentation—it cannot simply refuse to honor the guaranties. *See id.*

## B.     Procedural Background

Relators filed suit under the FCA's qui tam provision in 2006, alleging the following facts. MIC charged veterans impermissible closing fees and attempted to cover its tracks by "bundling" the unallowable charges with allowable charges, listing them together as one line-item on HUD-1 forms. For example, MIC would collect prohibited attorney fees from veterans and bundle those fees with allowable title examination and title insurance fees, so that the attorney fees were concealed. By doing so, and by falsely certifying its compliance with VA regulations, MIC

induced the VA to guaranty IRRRLs and to ultimately honor those guaranties
when borrowers defaulted.  MIC countered, in relevant part, that the FCA claim is
barred because a 2002 court filing had already publicly disclosed Relators'
allegations.

In late 2011, as Relators' case against MIC proceeded, MIC began to
distribute assets to its shareholders—in large part to Edwards, MIC's majority
shareholder and chairman of its Board of Directors.  This trend escalated in 2012
and 2013.  During that two-year period, MIC allegedly transferred a whopping
$242,006,838 to Edwards and MSP (Edwards's wholly-owned entity), leaving
MIC insolvent.  According to Relators, MIC then shut down its operation to
prevent Relators from collecting any judgment they might obtain in this FCA
action.  MIC initially insisted that it remained solvent and was "here for the long
haul."  But by May 2015, when the district court inquired about MIC's continued
solvency, counsel for MIC responded that "it's not a secret that my client stopped
making loans some time ago, but that's it."  And in June 2015, MIC's counsel
could not "make any representation about the financial state of the company."
Relators amended their complaint in January 2016 to add a state law fraudulent
transfer claim against Edwards.

In a series of orders, the district court first dismissed Relators' fraudulent
transfer claim for lack of standing.  It then found that Relators' FCA claim was not

barred by public disclosure but ultimately granted MIC summary judgment on the ground that Relators provided insufficient evidence to create a genuine issue of material fact on the element of materiality.

## II.   STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment on the FCA claim, applying the same standard applied by the district court. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015). Under this standard, summary judgment is appropriate only if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Even self-serving and uncorroborated statements can create an issue of material fact. *United States v. Stein*, 881 F.3d 853, 856 (11th Cir. 2018) (en banc). And all reasonable inferences from the evidence are to be drawn in favor of the non-moving party; the court may not resolve factual disputes by weighing conflicting evidence. *Ryder Int'l Corp. v. First Am. Nat. Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991).

We also review de novo the district court's dismissal of Relators' fraudulent transfer claim for lack of standing. *Ga. State Conf. of NAACP Branches v. Cox*, 183 F.3d 1259, 1262 (11th Cir. 1999).

## III.   DISCUSSION

First, we address the district court's grant of summary judgment on Relators' FCA claim.  After careful review, we reverse the district court because it impermissibly resolved factual disputes by weighing conflicting evidence, a task that should have been left to the factfinder.  Because genuine issues of material fact remain on the element of materiality, MIC is not entitled to summary judgment.[5]

Second, we affirm the district court's finding that Relators' FCA claim is not barred by previous public disclosure.  The previous court filings at issue did not disclose the allegations on which Relators' claim is based.

Third, we affirm the district court's finding that Relators lack standing to bring the fraudulent transfer claim.  Relators have standing to pursue an FCA action only through the government's assignment of its damages claim.  And because the FCA does not assign the right to bring additional causes of action related to the FCA claim, Relators lack Article III standing to assert this claim.

### A.   The FCA's Materiality Standard

To prevail on their FCA claim, Relators must prove: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Urquilla-Diaz*, 780

---

[5] MIC also asserts that it is entitled to summary judgment because Relators failed to establish causation.  Because the district court has not yet addressed that issue, we remand to give the district court an opportunity do so.

F.3d at 1045.  In a comprehensive 83-page order, the district court granted MIC

summary judgment, finding that Relators failed to provide sufficient evidence to

create a genuine issue of material fact on the third element—materiality.

The Supreme Court recently addressed materiality under the FCA in a

landmark decision.  *Universal Health Servs., Inc. v. United States ex rel. Escobar*,

136 S. Ct. 1989 (2016).  In *Escobar*, the Court emphasized that the FCA's

"materiality standard is demanding."  *Id.* at 2003.  The FCA is not "an all-purpose

antifraud statute," nor is it "a vehicle for punishing garden-variety breaches of

contract or regulatory violations."  *Id.*  Therefore, "noncompliance [that] is minor

or insubstantial" will not satisfy the FCA's materiality requirement.  *Id.*

Materiality is defined as "having a natural tendency to influence, or be

capable of influencing, the payment or receipt of money or property."  *Id.* at 2002.

And while several factors can be relevant to the analysis, "materiality cannot rest

on a 'single fact or occurrence as always determinative.'"  *Id.* at 2001 (quoting

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)).  Accordingly,

several of our sister circuits have described the test as "holistic."  *United States ex*

*rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016)

(*Escobar II*); *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 661

(5th Cir. 2017); *United States v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d

822, 831 (6th Cir. 2018), *cert. denied sub nom. Brookdale Senior Living Cmtys.,*

*Inc. v. United States ex rel. Prather*, 139 S. Ct. 1323 (2019); *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 541 (10th Cir. 2020), *cert. denied sub nom. United States, ex rel. Janssen v. Lawrence Mem'l Hosp.*, No. 20-286, 2020 WL 5883407 (U.S. Oct. 5, 2020).

While no single factor is dispositive, some factors that are relevant to the materiality analysis include: (1) whether the requirement is a condition of the government's payment, (2) whether the misrepresentations went to the essence of the bargain with the government, and (3) to the extent the government had actual knowledge of the misrepresentations, the effect on the government's behavior.[6] *Escobar*, 136 S. Ct. at 2003 & n.5, 2004.  We address these factors in turn.

### 1.      Condition of Payment

"[T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive" to the materiality analysis.  *Id.* at 2003.  Here, we agree with the district court's conclusion that a lender's truthful certification that it charged only permissible fees was a condition of the government's payment on IRRRL guaranties.  The relevant VA regulation clearly designates that requirement a condition to payment: "no loan shall be guaranteed or insured unless the lender certifies . . . that it has not imposed

---

[6] While *Escobar* does not impose a rigid three-part test or an exhaustive list of factors, it gives guidance on factors that can be relevant to the materiality inquiry.

and will not impose any [impermissible] charges or fees . . . ." 38 C.F.R. §

36.4313(a). Therefore, this factor weighs in favor of materiality.

## 2.    Essence of the Bargain

We also consider the extent to which the requirement that was violated is

central to, or goes "to the very essence of[,] the bargain." *Escobar*, 136 S. Ct. at

2003 n.5; *see also Escobar II*, 842 F.3d at 110 (considering "the centrality of the

. . . requirements" in the context of the regulatory program); *John T. Boese, Civil*

*False Claims and* Qui Tam *Actions* 2-268–69 (5th ed. 2020) (explaining that it is

*Escobar*'s "basic requirement" to show that the "misrepresentation [went] to the

very essence of the bargain") (internal quotation mark omitted).

When viewing the evidence in the light most favorable to Relators, a

reasonable factfinder could conclude that the VA's fee regulations were essential

to the bargain with IRRRL lenders. The central aim of the IRRRL program was to

help veterans stay in their homes, and fee regulations contributed to that goal. VA

Pamphlet 26-7 draws this connection neatly, summarizing the purpose of the

IRRRL program as follows: "The VA home loan program involves a veteran's

benefit. VA policy has evolved around the objective of helping the veteran to use

his or her home loan benefit. Therefore, VA regulations limit the fees that the

veteran can pay to obtain a loan." The Pamphlet further provides:

> The limitations imposed upon the types of charges and
> fees which can be paid by veteran borrowers and the

12

> concomitant certification by the lender as to its
> compliance with this requirement furthers the purpose of
> "limit[ing] the fees that the veteran can pay to obtain a
> loan" which, in turn, ensures that a veteran borrower can
> effectively "use his or her home loan benefit."

These excerpts suggest that fee compliance was essential to the bargain, rather than an ancillary requirement that the government labeled a condition of payment. Therefore, a reasonable factfinder could conclude that the requirement went to the essence of the bargain.

### 3.    Effect on the VA's Behavior

The government's reaction to the defendant's violations is also a factor in the materiality inquiry. *Escobar*, 136 S. Ct. at 2003–04. *Escobar* discusses three ways the government might behave upon learning of noncompliance and instructs us on how that behavior factors into the materiality analysis.

First, the government might refuse to pay claims. *Id.* at 2003. If "the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance," that is evidence of materiality. *Id.* Second, and "[c]onversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is *very strong evidence* that those requirements are not material." *Id.* (emphasis added). And third is a middle possibility: "if the Government regularly pays a particular *type* of claim in full despite actual knowledge that certain requirements were

violated, and has signaled no change in position, that is *strong evidence* that the requirements are not material." *Id.* at 2003–04 (emphases added).

Because these three possibilities each hinge on the government discovering the defendant's violations, the logical first step in this analysis is to determine what the government actually knew.

### a.      The VA's Actual Knowledge

Assessing the government's actual knowledge requires that we drill down to when that knowledge was acquired, and what exactly the government learned. *See Harman*, 872 F.3d at 668 (finding no materiality as a matter of law only after determining that there was "no question about 'what the government knew and when'"). Here, the district court determined that the VA had gained "the requisite knowledge of the alleged fraud" by 2009, largely through communication with Relators about their allegations and through the VA's own investigatory audits.

As to the first of these two sources, Relators' counsel discussed Relators' allegations with the government in February 2006, shortly before filing the initial complaint. Then, after filing the complaint, Relators' counsel engaged in discussions with the Department of Justice, the United States Attorney's Office, and the VA Office of Inspector General. And for the next several years, Relators continued to correspond with the government. Therefore, the VA was aware of Relators' allegations since 2006.

MIC argues that this knowledge of Relators' allegations is sufficient to establish the VA's actual knowledge of noncompliance during the relevant timeframe.  We have not previously addressed whether the government's knowledge of *allegations* is tantamount to knowledge of *violations* for purposes of the materiality analysis.  And decisions by our sister circuits have varied in their treatment of this issue.  *Compare Escobar II*, 842 F.3d at 112 ("[M]ere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance."); *with United States ex rel. Nargol v. DePuy Orthopaedics, Inc*., 865 F.3d 29, 34 (1st Cir. 2017) (holding that government inaction "in the wake of Relators' allegations . . . renders a claim of materiality implausible").

Yet we need not answer this question here because, in any event, the VA had actual knowledge of MIC's noncompliance through another source—the VA audit findings.  VA investigatory audits came in two varieties: (1) ongoing spot audits of loan samples by the VA's Regional Loan Centers (RLC Audits); and (2) periodic onsite audits by the Loan Guarantee Service Monitoring Unit (LGSMU Audits).  The RLC Audits, which reviewed ten percent of all IRRRLs, revealed instances of MIC and other lenders violating fee regulations.  In fact, according to VA representative Jeffrey London, lenders collecting impermissible fees and charges was "one of the most common loan deficiencies" identified in the RLC Audits.  As

a result, the VA sent MIC post-audit deficiency letters between 2009 and 2011, indicating that MIC had charged veteran borrowers unallowable fees and that those fees should be refunded.  Likewise, the LGSMU Audits in both 2010 and 2012 identified noncompliant fees and charges by MIC.  The VA subsequently directed MIC to "review the VA *Lender's Handbook* and make the necessary adjustments to ensure future compliance."  Based on these audit findings, it is undisputed that the VA was aware of MIC's violation of fee regulations.

Relators contend, however, that the VA believed that any noncompliance was the result of inadvertent, good faith mistakes.  Relators urge us to draw a distinction between the VA's knowledge of inadvertent violations based on audit findings and its knowledge of actual fraud.  Specifically, Relators point to the testimony of London and former VA employee William White that the VA would have investigated further if it had been aware of IRRRL lenders intentionally bundling fees and knowingly submitting false certifications of compliance. Relators argue that the district court erred when it discounted that testimony as "speculative and seemingly self-serving."

We agree that to the extent the testimony was self-serving, it must nevertheless be credited as true at this stage.  *See Stein*, 881 F.3d at 856.  But even taking that testimony as true, *Escobar* does not distinguish between inadvertent mistakes and intentional violations.  What matters is simply whether the

government knew "that certain requirements were violated." *Escobar*, 136 S. Ct. at 2003–04.  For this reason, our sister circuits have declined to explain away the government's actual knowledge of violations based on post hoc rationalizations that the government *might* have done more if it had investigated further.  *See United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) (explaining that the analysis should remain focused on "what actually occurred" rather than on testimony that hypothesizes what might have occurred). Here, regardless of whether the VA assumed MIC's noncompliance was inadvertent, it is undisputed that VA audits had revealed MIC's violations of IRRRL fee requirements by 2009.  Therefore, the VA had actual knowledge of MIC's noncompliance during the relevant time frame.

### b.    The VA's Reaction

Having considered the VA's actual knowledge of MIC's violations, we now consider the VA's reaction in the wake of discovering those violations.  *Escobar*, 136 S. Ct. at 2003–04.  But before proceeding, we must address a threshold question: Which government action is relevant to the materiality inquiry in this case?  MIC argues that what matters is the government's decision to continue paying claims, despite knowledge of noncompliance.  In support of its position, MIC points to language in *Escobar* that appears to link materiality to the government's *payment* decision.  *Id.*; *see also id.* at 2002 (looking to whether

17

noncompliance has a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property").  Relators, along with the government as amicus curiae, contend that the VA's continued payment merits little weight because the payments were required by law, regardless of any fraud by the originating lender.

While we agree with MIC that, under *Escobar*, the government action relevant to the materiality inquiry is typically the payment decision, the significance of continued payment may vary depending on the circumstances.  *See United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 906 (9th Cir. 2017) (cautioning that "to read too much into the FDA's continued approval—and its effect on the government's payment decision—would be a mistake" where there were other reasons for that approval).  Here, there was a reason for the VA's continued payment of IRRRLs other than violations of fee regulations being immaterial.  Once the VA issues guaranties, it is required by law to honor those guaranties and to pay holders in due course in possession of the IRRRLs, regardless of any fraud by the original lender.  38 U.S.C. § 3721.  Given this constraint, we disagree with the district court that much can be drawn from Relators' failure to submit "any evidence that . . . noncompliance would have a palpable and concrete effect on the VA's *decision to honor the loan guarantees* . . . ." (emphasis added).  The VA was bound to honor the guaranties.

Consequently, the facts of this case require that we cast our materiality inquiry more broadly to consider "the full array of tools" at the VA's disposal "for detecting, deterring, and punishing false statements," and which of those it employed.  *See Nargol*, 865 F.3d at 34 (internal quotation mark omitted).

With that in mind, we return to the framework *Escobar* provides.  In order to find "very strong evidence" that MIC's conduct was *not* material, we would need to find that the VA paid particular claims—or as relevant here, took comparable action—despite its actual knowledge of violations.  *Escobar*, 136 S. Ct. at 2003. That is, while the Incontestability Statute rendered the VA's *payment* decision less probative, MIC might have established "very strong evidence" of materiality by showing, for example, that the VA agreed to *guaranty* a particular loan despite actual knowledge that MIC had falsely certified fee compliance on that loan.[7]  But on the quite voluminous record before us, MIC has not pointed to a single such instance.  *See* Oral Argument Recording at 32:43–33:15 (Oct. 21, 2020).

Next, in order to find even "strong evidence" that the requirements were not material, we would need to find that the VA paid a particular *type* of claim—or took comparable action—despite its "actual knowledge" of violations.  *Escobar*,

---

[7] We find support for looking to the government's guaranty decision in a post-*Escobar* FCA case from the Fifth Circuit.  *United States v. Hodge*, 933 F.3d 468 (5th Cir. 2019).  In *Hodge*, lenders were accused of "fraudulently obtaining FHA insurance for loans that later defaulted."  *Id.* at 472.  The Fifth Circuit said that the "gist of this [materiality] inquiry is whether false representations . . . *induced HUD to issue insurance*."  *Id.* at 474 (emphasis added).

136 S. Ct. at 2003–04.  Here, MIC fares better if we consider the VA's issuance of a guaranty to be the relevant government action.  Although the VA never issued a guaranty with knowledge that improper fees were collected on that particular loan, it did issue loan guaranties related to a "particular type of claim," despite its knowledge of audit findings that MIC imposed impermissible fees on a certain percentage of its loans.[8]  *Id.*

But once we divorce our analysis from a strict focus on the government's payment decision, we see no reason to limit our view only to the VA's issuance of guaranties.  Looking at the VA's behavior holistically, the record shows that the VA took a number of actions to address noncompliance with fee regulations.  First, the VA released Circular 26-10-01 on January 7, 2010, reminding lenders of the applicable fee regulations and warning of the consequences of noncompliance.  Citing VA regulations, the Circular reminded lenders that they are to charge only the "reasonable and customary amount for certain itemized fees," and that "[t]he lender may NOT charge the veteran for attorney's fees associated with settlement."  The Circular further stated: "Lenders must comply with these policies when making VA loans.  Any lender who does not comply with these policies is subject

---

[8] London testified that, based on the VA's audit findings, the VA "infer[red] that there were fee issues with other loans" that had not been audited.

to removal from the program, fines by the VA, government-wide debarment, and
other civil and criminal penalties that may be applicable."

Second, after learning of Relators' allegations, the VA implemented more
frequent and more rigorous audits in 2010 and 2011 to root out improper fees and
charges.  The change in audit methodology incorporated data from a website,
Bankrate.com, that surveys lenders and provides information on average fees and
charges in the mortgage industry.  By comparing actual fees and charges imposed
by IRRRL lenders with industry averages, the VA hoped to identify fraudulent fee
bundling more effectively.  Although the change in methodology apparently
proved ineffective, it is nonetheless evidence of the VA attempting to use tools at
its disposal to detect and address false statements.

Third, the VA consistently required lenders to refund any improperly
charged fees that they discovered.  Both London and White offered testimony to
that effect in their depositions.

MIC argues that the VA could have pursued more severe remedies such as
recoupment, debarment, or suspension from the IRRRL program.  Certainly,
imposing such remedies would have been evidence of materiality.  *See United
States v. Luce*, 873 F.3d 999, 1007 (7th Cir. 2017) (finding materiality as a matter
of law where the government debarred the defendant from the relevant government
program upon discovering its noncompliance).  But these were not the only tools in

the VA's toolbox.  The bottom line is that, because the Incontestability Statute

precludes us from focusing narrowly on the VA's payment decision, we must

broaden our view to consider the VA's pattern of behavior as a whole.  And while

the VA did not take the strongest possible action against MIC, it did take some

enforcement actions.

To recap, we have thus far considered the following indicators of

materiality: (1) whether the requirement is a condition of payment, (2) whether the

misrepresentation was essential to the bargain, and (3) the VA's relevant actions

based on its actual knowledge of violations.  On the first point, the VA's fee

requirements are a condition of payment.  That is indicative of materiality but does

not, by itself, "automatically" establish materiality.  *Escobar*, 136 S. Ct. at 2003.

The *Escobar* Court drove home that the government cannot take "insignificant

regulatory or contractual violations" and imbue them with materiality simply by

labeling them as such.  *Id.* at 2004.

But here, the requirement's centrality within the regulatory scheme also

points toward materiality.  As the district court found, "the [VA's] charges and fees

regulation is . . . more than an insignificant regulatory requirement."  The

requirement promoted the IRRRL program's central purpose, and a reasonable

factfinder could have found that it was essential to the bargain between the VA and

MIC.  So both the requirement's designation as a condition of payment and its centrality to the government program favor materiality.

The district court, however, weighed this evidence against countervailing evidence of the VA's knowledge and its reaction to noncompliance.  This countervailing evidence, the court found, "significantly belie[d] the notion that the VA characterized the alleged noncompliance in this case as material."  The court thus held that the "sheer weight" of the evidence militated against materiality.

To resolve the issue by weighing conflicting evidence was error.  *See Ryder*, 943 F.2d at 1523.  The materiality test is holistic, with no single element— including the government's knowledge and its enforcement action—being dispositive.  To be sure, the materiality standard is "demanding," and courts may dismiss FCA cases at summary judgment where relators fail to create a genuine issue of material fact on that element.  *Escobar*, 136 S. Ct. at 2003, 2004 n.6.  That is particularly true where "'very strong evidence' . . . of . . . continued payment remains unrebutted."  *See Harman*, 872 F.3d at 665.  But here, we do not have "very strong evidence" of immateriality.  *Escobar*, 136 S. Ct. at 2003.  And even if we viewed the VA's continued issuance of guaranties as "strong evidence" of immateriality, that evidence is not unrebutted.  *Id.* at 2004.  A factfinder would still have to weigh that factor against others, including, as relevant here, the fee and charges requirement being a condition to payment and essential to the IRRRL

program.  Because there is sufficient evidence to support a finding of materiality, we must leave that determination to the factfinder.  We therefore reverse the district court's grant of summary judgment.

## B.      The FCA's Public Disclosure Bar

Next, because we reverse the district court's grant of summary judgment on the issue of materiality, we must address MIC's conditional cross-appeal arguing that Relators' FCA claim is barred by previous public disclosure.  An FCA action cannot be based on allegations that are already publicly disclosed.  31 U.S.C. § 3730 (2006).[9]  The relevant provision of the FCA provides that:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*Id.* § 3730(e)(4)(A).

The reason for the public disclosure bar is fairly obvious.  Without it, opportunistic relators—with nothing new to contribute—could exploit the FCA's

---

[9] Congress amended this section in 2010.  The pre-2010 version categorized documents as "public" if they were filed on the publicly available docket.  In the post-2010 version, Congress significantly narrowed the scope of a public disclosure, making it easier for relators to clear the public disclosure hurdle.  While the facts of our case straddle the pre- and post-amendment timeframes, the district court reasoned that it need not determine which version applied because there was no public disclosure even under the broader pre-2010 version.  Our analysis follows the same trajectory.

qui tam provisions for their personal benefit.  *See United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994) (recalling the "notorious plaintiff who copied the information on which his *qui tam* suit was based from the government's own criminal indictment").  Here, MIC argues that Relators' allegations had already been publicly disclosed in a 2002 South Carolina consumer protection case, *Cox v. Mortgage Investors Corp. d/b/a Amerigroup Mortgage Corp.*, in which a solitary MIC HUD-1 (the Cox HUD-1) was filed on the docket—first in state court and later in federal court.  Case No. 2:02-cv-3883-DCN (D.S.C. Nov. 15, 2002).  At his deposition, Relator Donnelly admitted that the Cox HUD-1 appears to reflect fee bundling.  MIC argues that if fee bundling is apparent on the face of the Cox HUD-1—based on inflated fees listed on a particular line-item—then the filing of that form in 2002 was a previous public disclosure of Relators' allegations.

We have framed the public disclosure inquiry as a three-part test: "(1) have the allegations made by the plaintiff been publically disclosed; (2) if so, is the disclosed information the basis of the plaintiff's suit; (3) if yes, is the plaintiff an 'original source' of that information."  *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 n.4 (11th Cir. 1994) (per curiam).  So, under the *Cooper* framework, the first prong becomes dispositive where the plaintiff's allegations have not been publicly disclosed.

Here, on the first *Cooper* prong, we must determine whether the Cox HUD-1 publicly disclosed the "allegations" on which Relators' claim is based. *Id.* Because the *Cooper* test does not further define "allegations," we have found instructive the D.C. Circuit's *Springfield* formula. Under that formula, "one generally must present a submitted statement or claim (X) and the true set of facts (Y), which shows that X is untrue. These two things together allow the conclusion (Z) that fraud has occurred." *United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 841 F.3d 927, 935 (11th Cir. 2016) (citing *Springfield*, 14 F.3d at 654). There is no allegation of fraud under this formula unless each variable is present. "[W]here only one element of the fraudulent transaction is in the public domain (*e.g.*, X), the *qui tam* plaintiff may mount a case by coming forward with either the additional elements necessary to state a case of fraud (*e.g.*, Y) *or* allegations of fraud itself (*e.g.*, Z)." *Springfield*, 14 F.3d at 655.

The Cox HUD-1 is not an "allegation" under the *Springfield* test. Even if we were to view the form as presenting the "statement or claim" that MIC did not impose excess fees and charges on veterans, it would set forth only the (X) variable. *Id.* at 654. To be an allegation of fraud, the Cox HUD-1 would also have to reveal the true set of facts (Y): that MIC actually collected impermissible fees and bundled those fees on the same line-item as permissible fees.

As the district court found, the Cox HUD-1, standing alone, does not do so. True, Donnelly was able to combine his industry knowledge with the information presented on the Cox HUD-1 to surmise that the form reflected bundled fees.  But putting aside Donnelly's knowledge about fee bundling in the IRRRL industry, the information on the face of the HUD-1 alone does not disclose that MIC concealed impermissible fees.  To the contrary, the form purports to show that MIC collected only permissible fees.  As such, Relators were not barred from using their industry knowledge to "mount a case by coming forward" with allegations that MIC fraudulently bundled fees on HUD-1s to conceal violations of VA regulations.  *Id.* at 655.

So, in conclusion, the Cox HUD-1 is not an allegation of fraud under the *Springfield* formula, and, accordingly, it fails the first prong of the *Cooper* test. Therefore, we affirm the district court's finding on MIC's conditional cross appeal that Relators' FCA claim is not barred by previous public disclosure.

### C.    Fraudulent Transfer

Having addressed the FCA claim, we now turn to the second issue Relators appeal: whether the district court correctly held that Relators lack Article III

standing to pursue a state law claim against Edwards under Georgia's Uniform

Voidable Transfers Act (UVTA).  After careful review, we affirm.[10]

It is well-established that a plaintiff must satisfy three requirements to

establish Article III standing.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

(1992).  First, there must be an "injury in fact" that is both "concrete and

particularized," as well as "actual or imminent, not conjectural or hypothetical."

*Id.* (internal quotation marks omitted).  "Second, there must be a causal connection

between the injury and the conduct complained of—the injury has to be fairly . . .

trace[able] to the challenged action of the defendant."  *Id.* (alteration in original)

(internal quotation mark omitted).  "Third, it must be likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision."  *Id.* at 561

(internal quotation marks omitted).

The Supreme Court has addressed the first of those requirements—injury in

fact—in the context of relators bringing qui tam actions under the FCA.  *See Vt.

Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000).  There,

the Court explained that a relator does not have standing to pursue a qui tam action

based on his *own* injury in fact.  *Id.* at 772–73.  Before obtaining a judgment, a

relator's interest is comparable to that of a person "who has placed a wager upon

---

[10] Because Relators lack standing to bring this claim against Edwards, we need not address
Edwards's conditional cross appeal contesting personal jurisdiction.

the outcome" of a case.  *Id.* at 772.  So how, then, do relators have standing to bring qui tam actions?  The answer, *Stevens* tells us, is found in the common law doctrine of assignment: an assignee has standing to vindicate the rights of an assignor.  *Id.* at 773.  As the doctrine of assignment applies in this context, the FCA's qui tam provision "effect[s] a partial assignment" of the government's claim to the relator.  *Id.*  And only as an assignee does the relator have standing to pursue the qui tam action.  *Id.*

But because the assignment to relators is "partial" rather than total, relators are not assigned *all* of the government's rights associated with a particular action.  *Id.*  The FCA assigns the narrow right to "bring a civil action for a violation of section 3729 for the person and for the United States Government."  31 U.S.C. § 3730(b)(1).  It does not assign relators the right to pursue additional claims that arise from, or are related to, the qui tam action.  Indeed, *Stevens* states that "an interest that is merely a 'byproduct' of the [FCA] suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes."  529 U.S. at 773.  As Relators conceded at oral argument, that is what we have here.  *See* Oral Argument Recording at 22:52–23:11 (Oct. 21, 2020).  Therefore, the FCA itself does not confer standing on Relators to pursue the fraudulent transfer claim.

Relators argue, however, that they can show an injury in fact, notwithstanding *Stevens*, because they base their fraudulent transfer claim on their

own injury in fact suffered as creditors under Georgia's UVTA.  *See* O.C.G.A. §

18-2-70, *et seq*.  That statute gives creditors the right to avoid fraudulent transfers

and to obtain an injunction against the debtor to prevent further disposition of

property.  *Id.* § 18-2-77(a).  And because the UVTA applies pre-judgment,

Relators argue that they have standing under that statute as pre-judgment creditors

of Edwards.  *See id.* § 18-2-71(3) ("'Claim' means a right to payment, whether or

not the right is reduced to judgment . . . .").

At oral argument in this case, Relators argued that the *Stevens* Court

envisioned this scenario when it noted that Congress could "define new legal

rights, which in turn will confer standing to vindicate an injury caused to the

claimant."  529 U.S. at 773.  Picking up on that language, Relators argue that,

through the UVTA, the Georgia legislature conferred a new legal right to assert a

pre-judgment claim that is contingent upon the underlying FCA claim.

It is true that Congress can take "concrete, *de facto* injuries that were

previously inadequate in law" and "elevat[e] [them] to the status of legally

cognizable injuries."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (citing

*Lujan*, 504 U.S. at 578) (first alteration in original).  We can assume for purposes

of our decision (without deciding) that a state legislature can do the same.  And

when courts analyze what "constitutes injury in fact," legislative judgment can

play an "important role[]" in that determination.  *Id.* at 1547–48.  But legislatures

cannot simply create an injury in fact where there is no concrete injury.  "Injury in fact is a constitutional requirement, and 'it is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.'"  *Id.* (internal citation and brackets omitted).

This means (on our assumption) that the Georgia legislature could give relators the right to pursue a fraudulent transfer claim only if relators have a concrete interest in a claim that is a byproduct of the underlying suit.  *Stevens* makes clear that they do not.[11]  529 U.S. at 773.  Consequently, it would be inconsistent with *Spokeo* to hold that the UVTA can create a concrete injury where none existed.  To do so would be to "erase Article III's standing requirements" by finding that the Georgia legislature "statutorily grant[ed] the right to sue to a plaintiff who would not otherwise have standing."  *Spokeo*, 136 S. Ct. at 1547–48.  Accordingly, Relators cannot establish standing under Georgia's UVTA. Therefore, we affirm the district court's holding that Relators lack standing to assert a fraudulent transfer claim against Edwards.

### AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

[11] This is not to say, of course, that pre-judgment creditors cannot establish Article III standing based on their *own* damages claim.  For example, in *Enterprise Financial Group, Inc. v. Podhorn*, 930 F.3d 946 (8th Cir. 2019), cited by Relators, a pre-judgment creditor had Article III standing based on its own damages claim, rather than a damages claim that the government had partially assigned to it.

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 15, 2021

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  19-12736-GG
Case Style:  Brian Donnelly, et al v. Mortgage Investors Corporation, et al
District Court Docket No:  1:12-cv-04020-AT

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, each party to bear own costs.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Joseph Caruso, GG at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs